```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
```

RAFAEL RODRIGUEZ,                    . Civil Action No. 16-1033
                                     .
      Plaintiff,                     .
                                     . U.S. District Court
           vs.                       . 101 Larry Holmes Drive
                                     . Easton, PA
PRIMECARE MEDICAL, INC. SUSAN,       .
RORBERTS, LPN, ALLISON YOUNG, RN,    . March 21, 2017
PAULA DILLMAN-MCGOWAN, CRNP,         . 10:08 a.m.
and ELIZABETH GARCIA, LPN,           .
                                     .
      Defendants.                    .
. . . . . . . . . . . . . . . . . . .
.

          TRANSCRIPT OF TESTIMONY OF DR. MICHAEL T. BROWN
               BEFORE HONORABLE EDWARD G. SMITH
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        AFSAAN SALEEM, ESQ.
                          THE RAMEAU LAW FIRM
                          16 Court Street, Suite 2504
                          Brooklyn, NY  11241
                          (718) 852-4759
                          rameaulawny@gmail.com


For the Defendant:        JOHN R. NINOSKY, ESQ.
                          JOHNSON DUFFIE STEWART & WEIDNER
                          301 Market Street
                          PO Box 109
                          Lemoyne, PA  17043-0109
                          (717) 761-4540
                          jninosky@johnsonduffie.com


Audio Operator:           Matt Sheetz
TRANSCRIBED BY:           Valori Weber
                          Weber Reporting Corporation
                          2755 Commercial Street SE, #101-216
                          Salem, OR  97302
                          (970) 405-3643
          Proceedings recorded by electronic sound
   Recording, transcript produced by transcription service.

# <u>I N D E X</u>

<u>**Page**</u>

## <u>WITNESS FOR THE PLAINTIFF</u>

DR. MICHAEL T. BROWN

Direct Examination by Mr. Saleem ........................ 3

Cross-Examination by Mr. Ninosky ...................... 172

Redirect Examination by Mr. Saleem ................... 192

Recross-Examination by Mr. Ninosky ................... 199

Further Redirect Examination by Mr. Saleem ............ 200

Further Recross-Examination by Mr. Ninosky ............ 202

Further Redirect Examination by Mr. Saleem ............ 203

1          MR. SALEEM:  We call Dr. Michael T. Brown, and he is

2     outside, Your Honor.

3          THE COURT:  Very well.

4          MR. SALEEM:  Should we go get him or --

5          THE COURT:  Yeah, if you would, please.

6          MR. SALEEM:  Sure.

7          (Witness summoned)

8          THE COURT:  Good morning, sir.

9          DR. BROWN:  Good morning.

10         THE CLERK:  Remain standing, raise your right hand.

11         Do you swear or affirm that the testimony you're about

12    to provide in the issue now before this Court shall be the

13    truth, the whole truth, and nothing but the truth so help you

14    God?

15         DR. BROWN:  I do.

16         THE COURT:  Thank you very much, sir.  And, sir, you

17    may be seated.  And, sir, would you please state your full name,

18    spelling your last name for the record.

19         DR. BROWN:  My name is Dr. Michael T. Brown, B-r-o-w-n.

20         THE COURT:  Thank you very much, sir.

21         Counsel, you may proceed.

22         MR. SALEEM:  Okay.  Thank you, Your Honor.

23

24    ///

```
1                        DR. MICHAEL T. BROWN,

2   a witness, having been first duly sworn, was examined and

3   testified as follows:

4                        DIRECT EXAMINATION

5   BY MR. SALEEM:

6   Q    Good morning, Dr. Brown.

7   A    Good morning.

8   Q    Okay.  And feel free, if you want, when I'm asking you

9   questions, you can also just look to address the jury as well,

10  okay?  First off, Doctor, what type of doctor are you?

11  A    I am a general and cancer surgeon.

12  Q    Okay.  And first off, can we just start by just describing

13  to the jury your education starting with high school and where

14  you attended?

15  A    I grew up in Philadelphia.  I graduated from West Catholic

16  High School.  I attended the University of Scranton.  I did my

17  medical school at Jefferson Medical College at Thomas Jefferson

18  University.  I graduated in 1986.  I served a five-year general

19  surgical residency at the Medical Center of Delaware.  And I --

20  Q    Doctor, I'm just going to cut you off.

21  A    Okay.

22  Q    We're going to get to that.  You're just -- you're rushing

23  ahead.

24  A    Oh, okay.

25  Q    You're skipping five questions ahead of me, which I
```

1    appreciate and I'm sure the jury would appreciate, but I think

2    it's important just to kind of go through it a little bit

3    slower, okay?  So, first off, the high school you went to, you

4    graduated in four years?

5    A    Correct.

6    Q    Okay.  And then after that you went to the University of

7    Scranton.

8    A    Correct.

9    Q    Okay.  And then did you graduate with honors?

10   A    Yes.

11   Q    Magna cum laude?

12   A    Yes.

13   Q    Okay.  And that was also four years.

14   A    Correct.

15   Q    And you got a degree in biology.

16   A    Correct.

17   Q    Okay.  And then after you graduated college, did you attend

18   medical school?

19   A    I did.

20   Q    Okay.  And that was the Thomas -- the Jefferson University

21   in Philadelphia?

22   A    Jefferson Medical College in Philadelphia.

23   Q    Sorry.  And you received that degree after four years in

24   1986.

25   A    Correct.

```
 1  Q     Okay.  And once you graduated medical school, are you a
 2  doctor?
 3  A     Yes.
 4  Q     Okay.  And what -- after you go to -- finish going to
 5  medical school, what's the next line or training that you have
 6  to undergo as a doctor?
 7  A     You have to at least do an internship to receive a license.
 8  Q     What is an internship, Doctor?
 9  A     An internship is your first year out of medical school
10  where you work in a hospital setting and are supervised.
11  Q     And who are you supervised by?
12  A     The attending physicians.
13  Q     Okay.  And do you also work alongside nurses when you're a
14  -- as a first-year intern?
15  A     Yes.  Yes.
16  Q     Okay.  And after you finished the one year internship, do
17  you go on for additional training?
18  A     Yes.  You can choose to do a residency in a certain medical
19  specialty.
20  Q     Okay.  And what is a residency?
21  A     A residency is a further defined period of training within
22  a specialty.  Certain specialties have different year
23  requirements as to how many years you have to do.
24  Q     Okay.  And you were going for residency in general surgery?
25  A     Correct.
```

```
1    Q     And how long is the residency in general surgery?

2    A     Including your internship, it's a five-year program.

3    Q     Okay.  And for that five years, what's happening during

4    those five years?  What are you doing?

5    A     You're rotating through different aspects of general

6    surgery and participating in operations and all phases of

7    patient care in a supervised environment gradually taking on

8    more and more responsibility.

9    Q     Okay.  But you're actually engaging in patient care during

10   those five years?

11   A     Correct.

12   Q     Okay.  And you're actually serving as the patient's doctor

13   during that time?

14   A     Correct.

15   Q     But you're also being supervised by more experienced

16   doctors, is that fair to say?

17   A     Correct.  Yes.

18   Q     Okay.  Now, did you stop your training after you received

19   your five-year -- finished your five years in residency in

20   general surgery?

21   A     No.

22   Q     Okay.  What additional training did you get?

23   A     Then I served what is known as a fellowship.

24   Q     What's a fellowship, Doctor?

25   A     A fellowship is additional training after your residency.
```

```
1   Q    Okay.  And why did you go for that additional training?
2   A    Because I wanted to subspecialize.
3   Q    Okay.  And when you say subspecialize, what do you mean?
4   A    Well, many specialties today then subspecialize because of
5   the complexity of medicine.  So after I performed five years of
6   general surgery, I then chose to subspecialize in the area of
7   cancer surgery.
8   Q    I see.  Okay.  And how long was that fellowship training?
9   A    One year.
10  Q    Okay.  And did that conclude your training?
11  A    Yes.
12  Q    Okay.  Did you go for any additional degrees?
13  A    Yes.
14  Q    What additional degrees did you go for?
15  A    I have an MBA in healthcare from Alvernia University.
16  Q    And how long was that, the MBA course?
17  A    That was a two-year program.  I graduated in 2007.
18  Q    Okay.  And why did you go for -- why did you decide to get
19  an MBA?
20  A    Well, I've taken on more leadership responsibilities and
21  the MBA was offered through the Pennsylvania Medical Society and
22  Alvernia University.  I serve as the medical director of McGlinn
23  Cancer Institute.
24  Q    Okay.  And, Doctor, just if we can do the math here, in
25  terms of the years of training that you have had, you went
```

1   through four years of college, right?

2   A    Correct.

3   Q    And then you had four years of medical school.

4   A    Correct.

5   Q    And then you had five years of residency in general

6   surgery.

7   A    Correct.

8   Q    And then you had an additional year in fellowship in

9   surgical oncology.

10  A    Correct.

11  Q    Okay.  So just doing the math here, 4 plus 4 is 8, plus 5

12  is 13, plus 1 is 14, 14 years of medical training?

13  A    Correct.

14  Q    Okay.  And an additional two years of training for the MBA.

15  A    Correct.

16  Q    Okay.  And once you -- now, additional to your fellowship,

17  are you licensed to practice medicine in the State of

18  Pennsylvania?

19  A    I am.

20  Q    Okay.  And in addition to your license, do you have any

21  certifications?

22  A    I do.

23  Q    And, first of all, what is a certification?  How is it

24  different than a license?

25  A    A certification is certified by certain organizations.  And

1   in medicine, we take medical boards.  So you take generalized

2   boards to get your license and then you take specific boards to

3   be board certified within your specialty.

4   Q     Okay.

5   A     So I am board certified in surgery through the American

6   College of Surgeons, so I have letters after my name, and Fellow

7   of the American College of Surgeons.

8   Q     Okay.

9   A     That's the highest accreditation you can get in your field.

10  Q     And do all doctors or all surgeons -- are all surgeons

11  board certified?

12  A     No, not necessarily.

13  Q     Okay.  What do you have to do to become board certified?

14  A     You have to be in practice for two years.  You have to take

15  a written examination.  And then a year later after your written

16  examination you have to take an oral examination.  You have to

17  take a written test every ten years and you must submit ongoing

18  CME credits, 150 hours every 2 to 3 years to maintain your board

19  certification.

20  Q     And when you say oral examination, what do you mean by oral

21  examination?

22  A     Oral examination is where you go through a set of question

23  and answers through a board of senior experienced surgeons.

24  They ask you different scenarios in general surgery.

25  Q     So it's a fairly intensive process to become board

1  certified?

2  A    Quite.

3  Q    Okay.  You mentioned the term CME.  What's CME?

4  A    Oh, CME stands for Continuing Medical Education.  One

5  credit is one credit hour.  That means you need 150 hours every

6  couple years.

7  Q    Okay.  So despite the fact that you had 14 years of medical

8  training you still are undergoing -- you're required to undergo

9  training?

10  A    All the time.

11  Q    Okay.  And you say you're board certified by the American

12  Board of Surgery.  Do you also have certification from the

13  National Board of Medical Examiners?

14  A    Yes.

15  Q    And what is that board?

16  A    That board is the general board that when you finish your

17  medical school and your first year of internship, you're able to

18  get a license to practice medicine in the State of Pennsylvania.

19  It's a general board examination covering the entire realm of

20  medicine that you're able to write prescriptions independently.

21  Q    I see.  Okay.  And do you also have any certifications from

22  the American College of Surgeons in terms of advanced trauma

23  life support?

24  A    Right.  Well, I was an instructor in advanced trauma life

25  support.  I'm no longer an instructor.  I don't participate in

```
 1   trauma surgery.  I'm also a member of the Society of Surgical
 2   Oncology and some other related societies, Society of
 3   Gastrointestinal Surgeons, American Society of Clinical
 4   Oncologists, and the American Society of Breast Surgeons.
 5   Q    I see.  Okay.  And, Doctor, have you held any teaching
 6   positions?
 7   A    I do.
 8   Q    You do.  Okay.  Do you currently hold any teaching
 9   positions?
10   A    Yes, I do.
11   Q    What teaching positions do you currently hold?
12   A    I'm on the clinical faculty of Philadelphia College of
13   Osteopathic Medicine.  I'm a preceptor for King's College in
14   Wilkes-Barre.  I'm a member of the Cancer Center at Thomas
15   Jefferson University in Philadelphia, the Kimmel Cancer Center.
16   And we have our own teaching programs at the Reading Hospital.
17   Q    Okay.  You used the term preceptor.  What's a preceptor?
18   A    Preceptor is where you're an instructor for students going
19   through the program.
20   Q    Okay.  And how long have you held those teaching positions?
21   A    More than a decade.
22   Q    Okay.  And have you served on any committees?
23   A    Yes.
24   Q    What committees have you served on?
25   A    I'm currently the chairman of the cancer committee at the
```

1    hospital.  I am the cancer liaison officer of Reading Health

2    System to the American College of Surgeons.  And I have served

3    as head of the nutrition committee and I am serving as the chief

4    of general surgery right now.

5    Q    Okay.  And yeah, you just -- you led into my next question.

6    What current clinical positions do you hold?

7    A    Section chief of general surgery.

8    Q    What does it mean to be sectional chief?

9    A    Section chief means that you provide meetings and ongoing

10   meetings for the other general surgeons within your section.  We

11   have approximately 15 surgeons in our section and we go over

12   things that are happening in the hospital and I have to sign off

13   the credentials of the surgeons.  We follow any new procedure of

14   how we would credential those procedures.  And we look at things

15   going on within our section and then we have section meetings

16   within the entire department of surgery, how the hospital

17   functions, how the section works with other sections.

18   Q    And what is credentialing?

19   A    Credentialing is how we make sure that the physician or

20   surgeon is adequately trained to do the procedure they may want

21   to do.

22   Q    Okay.  And as a section chief, you're overseeing -- is it

23   fair to say you're overseeing the work of or are responsible for

24   15 other surgeons?

25   A    Correct.

```
1   Q    Okay.  And how long have you held that position?
2   A    More than five years.  Approximately seven years.
3   Q    Okay.  Thank you.
4             MS. RAMEAU:  Your Honor, may we approach?
5             THE COURT:  Certainly.  Counsel, please approach.
6             (Sidebar)
7             MS. RAMEAU:  What I notice is that one of the jurors
8   is falling asleep.  It's the one with grey hair.  I can't recall
9   his name.  He was falling asleep, but when I said, "Can we
10  approach," he sort of woke up.  I think maybe --
11            MR. SALEEM:  (Inaudible).
12            (End of Sidebar)
13            THE COURT:  Ladies and gentlemen, we are going to
14  stand in recess for 15 minutes.  I'm going to again caution you.
15  You should keep an open mind about this case until all the
16  evidence is in on both sides, so you should refrain from
17  discussing it with each other or with anyone else, including
18  members of your family or allow anyone to talk to you about it.
19  Do not form any opinions about this case until you retire to the
20  jury room after my charge.
21            We'll stand in recess for 15 minutes.
22            THE BAILIFF:  All rise.
23            (Recess taken at 10:22 a.m.)
24            THE COURT:  Mr. Saleem, you may continue, sir.
25                     DIRECT EXAMINATION CONTINUED
```

1   BY MR. SALEEM:

2   Q    Great.  Thank you, Your Honor.  Doctor, have you published

3   any articles?

4   A    Yes.

5   Q    About how many articles or in what subject areas did you

6   publish those articles?  And now these articles are --

7   A    Four or five in cancer related fields.

8   Q    Okay.

9   A    Sarcomas, liver cancer, colon cancer.

10  Q    Okay.  Thank you.  And these are in publications that would

11  you -- in medical journals and presented or were they presented?

12  A    They're in medical journals and in some textbooks.

13  Q    Okay.  Great.  And at this time, Your Honor, I would like

14  to offer Dr. Brown as an expert in the field of general surgery.

15          THE COURT:  Okay.  So, Mr. Ninosky, do you have any

16  questions on qualifications?

17          MR. NINOSKY:  Just a few, Your Honor.

18          THE COURT:  Very well.  You may proceed, sir.

19          MR. NINOSKY:  Thank you.

20                      VOIR DIRE EXAMINATION

21  BY MR. NINOSKY:

22  Q    Doctor, I just have a few questions for you and I'll be

23  candid with you.  It's because I have to get some things out,

24  okay.

25  A    Fine.

```
1   Q    You have never worked in a prison.

2   A    No.

3   Q    You never have provided any sort of correctional

4   healthcare.

5   A    Well, I have treated prisoners throughout my career.

6   Q    Correct.  But you have never been working in a correctional

7   facility providing care.

8   A    Correct.

9   Q    You have never reviewed policies or procedures.

10  A    Correct.

11  Q    You have never formulated policies or procedures.

12  A    Correct.

13  Q    And, in fact, you never even reviewed them in this

14  particular case.

15  A    Correct.

16  Q    And, sir, you don't even think you're qualified to give an

17  opinion as to --

18           MS. RAMEAU:  Objection.

19           THE COURT:  Counsel, please approach.  And I need a

20  basis when you have an objection.

21           (Sidebar)

22           MS. RAMEAU:  (Inaudible).

23           MR. SALEEM:  We're not offering him as an expert in

24  that.  We're offering him as an expert in general surgery.  So

25  whether or not (inaudible).
```

1          MS. RAMEAU:  (Inaudible) qualifications to offer as an

2    expert in the field of general surgery.  This is beyond the

3    scope of (inaudible).

4          MR. NINOSKY:  (Inaudible).

5          THE COURT:  (Inaudible).

6          MR. NINOSKY:  Well, to get this back to, the Court

7    hasn't rule on our motion for the Monell portion of this case.

8    I'm trying to establish a record.  They don't have an expert who

9    can give any testimony as to policies or procedures.  So, to me,

10   I'm doing this so that I can come to you and say, "Your Honor,

11   based upon his lack of experience, the Monell portion of the

12   case should be over.  There's not going to be any testimony as

13   to that because they don't have a qualified expert to give any

14   such testimony."

15         THE COURT:  So your question to him (inaudible).

16         MR. NINOSKY:  I was going to ask him, "You don't even

17   feel qualified to be able to give an opinion as to policies and

18   procedures for correctional healthcare."

19         THE COURT:  I'll overrule the objection.  Ask the

20   question.

21         MR. NINOSKY:  And the only other thing I ask is I want

22   to know which lawyer is going to be involved.  You can do it by

23   witness.  I don't care.  But he's asking questions and now she's

24   making objections.  I don't appreciate being tag teamed.  You

25   know, one at a time, please, respectfully if we can give that

1    instruction.

2          MS. RAMEAU:  But, Your Honor, and I don't want to

3    confuse the jury with this.  I think if we create an

4    instruction, that might be inappropriate.

5          MR. NINOSKY:  Well, here's how we fix it.  Do you

6    withdraw the Monell claim against PrimeCare?  If you withdraw

7    that claim right now with prejudice I'm not going to ask any

8    more questions about it.

9          MS. RAMEAU:  (Inaudible).  Your Honor, we'll withdraw

10   it and we want an instruction that the jury is not to consider

11   any response from this.

12         THE COURT:  (Inaudible).

13         MS. RAMEAU:  (Inaudible).

14         MR. NINOSKY:  Well, now, respectfully, I disagree and

15   here's why.  We only got the dismissal now.  It was certainly

16   proper to ask those questions.  I don't want this jury to think

17   I was asking -- going down an improper line of questioning.

18         THE COURT:  (Inaudible).

19         MR. NINOSKY:  And there would be no more questions.

20   And then I'm not going to object to him as a general surgeon.

21         MS. RAMEAU:  Okay.

22         (End of Sidebar)

23         THE COURT:  Ladies and gentlemen, Counsel have come to

24   an agreement that the issue of the prison's policies and

25   procedures is no longer an issue in this case, so you can

 1   disregard the questions regarding the policies and procedures

 2   that were in place at the prison regarding medical care.

 3              Is that instruction satisfactory to the Plaintiffs?

 4              MR. SALEEM:  Yes, Your Honor.

 5              THE COURT:  And satisfactory to the Defense?

 6              MR. NINOSKY:  And with that, Your Honor, I have no

 7   objection to the tender and I have no further questions of the

 8   witness at this time.

 9              THE COURT:  Very well.  Without objection, Dr. Brown

10   is accepted as an expert in general surgery.

11              Mr. Saleem, you may continue, sir.

12              MR. SALEEM:  Thank you, Your Honor.

13                        DIRECT EXAMINATION CONTINUED

14   BY MR. SALEEM:

15   Q    Doctor, have you ever been qualified as an expert before to

16   testify at trial?

17   A    I have.

18   Q    On how many occasions have you been qualified as an expert?

19   A    Three or four.

20   Q    Okay.  And of those times that you were qualified, on how

21   many occasions did you serve an expert on the side of the --

22   withdrawn.  And in what types of cases did you serve as an

23   expert?

24   A    I served as an expert for other physicians in cases and for

25   the hospital in a case.

```
 1   Q     And when you say other physicians in cases and the hospital

 2   in cases, those are cases in which the hospital and physicians

 3   were being sued?

 4   A     Correct.

 5   Q     So you were a Defendant on behalf of the Defendants?

 6   A     Correct.

 7   Q     I mean an expert on behalf of the Defendants.

 8   A     Correct.

 9   Q     Okay.  Doctor, how many times have you testified as an

10   expert on behalf of an injured person or a patient?

11   A     I have never testified on behalf of --

12   Q     Okay.  So this is the first time you're testifying --

13   A     Correct.

14   Q     -- as on behalf of someone who's been injured?

15   A     Yes.

16   Q     Okay.  And what about this case, Doctor, that made you

17   decide to testify in this case as an expert?

18   A     I thought there was a breach in the standard of care.

19   Q     Okay.  Okay.  And, Doctor, in this case also you also

20   served as the treating doctor for Mr. Rodriguez, is that

21   correct?

22   A     I did.

23   Q     Okay.  So you were actually the surgeon who performed the

24   appendectomy, right?

25   A     Yes.
```

```
 1   Q    And also you have performed a subsequent surgery on behalf
 2   of Mr. Rodriguez, is that right?
 3   A    Correct.
 4   Q    Okay.  And did you also continue to treat him while he was
 5   being -- while he was staying at Reading Hospital?
 6   A    Yes.
 7   Q    Okay.  And, Doctor, and do you currently maintain a
 8   surgical practice?
 9   A    Yes.
10   Q    Okay.  In an average week, about how many surgeries would
11   you perform?
12   A    Fifteen to twenty.
13   Q    Okay.  And how often would you see patients during the
14   week?
15   A    Every day.
16   Q    Okay.  Do you have any plans to see any patients today?
17   A    I already performed an operation this morning.
18   Q    You performed an operation this morning?
19   A    Correct.
20   Q    What operation did you perform this morning?
21   A    A partial mastectomy for breast cancer.
22   Q    Okay.  And then you came here to testify.
23   A    Correct.
24   Q    Okay.  Doctor, are you being compensated for your time away
25   from your practice?
```

```
 1   A    I am.
 2   Q    Okay.  And how are you being compensated?  What is your
 3   rate of compensation?
 4   A    Three hundred and fifty dollars an hour.
 5   Q    Okay.  And have you also been -- what, if anything, did you
 6   do to prepare for your testimony here today?
 7   A    I have reviewed the records at the hospital and the records
 8   of the prison.
 9   Q    Okay.  And are you also -- have you been compensated or are
10   you expecting to be compensated for that time that you spent
11   reviewing the records?
12   A    Yes.
13   Q    Okay.  Which was it?  Have you been compensated or you're
14   expecting to be compensated?
15   A    Expecting to be compensated.
16   Q    Okay.  And have you and I met before today?
17   A    Last night.
18   Q    Okay.  And when was the first time that we met before
19   today?
20   A    Last night.
21   Q    Last night.  I'm sorry.
22   A    Correct.
23   Q    I didn't hear that.  Okay.  Okay.  And have you ever worked
24   with my firm before?
25   A    Never.
```

```
 1  Q    Okay.  All right.  Doctor, now let's -- I want to start

 2  talking a little bit into this case is about an appendix.  Let's

 3  try to like educate the jury as to what it is.  First off, can

 4  you just define what an appendix is?

 5  A    An appendix is a tube like structure that occurs off of the

 6  beginning of the colon.  We call it the cecum.  It's in the

 7  right lower aspect of the abdomen.

 8  Q    Okay.

 9  A    It's about as long as your finger.

10  Q    Okay.

11  A    It can vary in size.

12  Q    Okay.  I'm going to stop you, Doctor.  Sometimes a picture

13  is worth 1,000 words.  So let me just first off --

14            MR. NINOSKY:  No objection.

15            MR. SALEEM:  Your Honor, I'd just like to show the

16  witness and also -- that's about it, Your Honor.

17            THE COURT:  And there's no objection to this being

18  published to the jury?

19            MR. NINOSKY:  No, Your Honor.

20            THE COURT:  And do you want to mark that as a --

21            MR. SALEEM:  Yes.  Can we mark this as Plaintiff's

22  Exhibit 1?

23            THE COURT:  Very well.  And without objection,

24  Plaintiff's Exhibit 1 is admitted into evidence and may be

25  published to the jury.
```

```
 1              (Plaintiff's Exhibit 1 admitted)

 2              MR. SALEEM:  Great.  Thank you, Your Honor.

 3   BY MR. SALEEM:

 4   Q    And I'm just going to show you -- if it's not clear,

 5   Doctor, can you tell me?  Because I want to make sure it's clear

 6   to the jury as well.  Is that in focus?

 7   A    Not quite.  That's good.

 8   Q    That's better, right?  Okay.  It's not an eye exam.  I just

 9   want to make sure.  Okay.  Doctor, I think you just mentioned

10   something about quadrants.  Based on the diagram here -- and,

11   Your Honor, if it's permissible for the witness, if he could

12   step off and point to the document, if that's permissible.

13              THE COURT:  Certainly.  That would be fine.

14   BY MR. SALEEM:

15   Q    Great.  Thank you.  So, Doctor, can you just look at the --

16   there's two figures on the screen.  What is the difference

17   between the two figures?

18   A    The first figure breaks the abdomen down into a little bit

19   more specific areas.  Generally, we use this figure to break the

20   abdomen down into four quadrants.

21   Q    And when we say this figure, just for the record, we're

22   talking about the right figure.

23   A    Correct.

24   Q    Okay.  And what comprises the abdomen?

25   A    The abdominal cavity is your bowel.  It's divided by
```

1    diaphragm, which separates the lungs and chest and the heart.

2    It's called the diaphragm.  And below is the pelvis and along

3    the side walls are your muscles of the abdominal cavity.

4    Q    Okay.  And what is in -- can you just go through the

5    different quadrants and what organs or what you expect to find

6    in the different quadrants?

7    A    Yeah.  Your esophagus comes down through the chest and then

8    you have your stomach.  Then you have 20 feet of small intestine

9    which enters the colon or your large intestine in the right

10   lower quadrant.  The appendix comes off of the colon.  The colon

11   goes up, around, down, and enters the rectum.  Behind it, you

12   have the liver, the gall bladder here.  In the back, you have

13   the two kidneys.  You have your bladder up right there in the

14   front.

15   Q    And where is the appendix generally found?

16   A    Generally found in the right lower quadrant.

17   Q    Okay.  Are there times that the appendix is located in

18   different areas?

19   A    It can.  It can be sometimes wrapped behind the colon and

20   can be pointing into the right upper quadrant.  It can sometimes

21   be very deep in the pelvis.  It can, in some patients that have

22   a very floppy colon, it could actually be over into the left

23   side.

24   Q    Okay.  And, Doctor, don't sit down too quickly.  I'm just

25   going to show you what's been -- a book called *Atlas of Human*

1   *Anatomy* by Frank Netter.  Have you heard of this book?

2   A    Yes.

3   Q    Okay.  And is this -- how have you heard of this book?

4   A    It's a standard.

5   Q    Okay.  And it's standard in the field of medicine and

6   surgery?

7   A    In medicine.

8   Q    Okay.  I'm just going to show you -- so it's an

9   authoritative text, Doctor?

10  A    Yes.

11  Q    Okay.  And I'm just going to show you a page from there,

12  which is labeled plate 275.  And I'm just looking at this

13  diagram, Doctor.  This is a diagram right here of the human

14  body.  What does that diagram show?

15  A    It shows the abdominal cavity and it shows possible

16  positions of the appendix (inaudible).

17  Q    And just, I don't know if you can overlay the other picture

18  or not, but are there situations then that the appendix could be

19  located in areas other than the right lower quadrant?

20  A    Correct.  It could be mostly in the right lower quadrant,

21  but at times it could be in the right upper quadrant or even

22  across the midline into the left lower quadrant.

23  Q    Okay.  And is there any way to know for a patient where

24  their appendix is located just by looking at them?

25  A    No.

1  Q     And, Doctor, just while we have this page open, what is

2  this picture right here?

3  A     This is a picture of the small intestine and the colon and

4  the colon, the beginning of the colon called the cecum.  This is

5  a retrocecal appendix, meaning the appendix is actually behind

6  the cecum.

7  Q     Okay.  And what is then this black and white image on the

8  top?

9  A     Yeah.  This is contrast.  So the patient was given barium.

10 That shows up on film.  And so you can see a particularly long

11 appendix.

12 Q     Okay.

13 A     It's a very long appendix.

14 Q     And I'm going to show you now, Doctor, this image, but it's

15 called plates 274.  What does this image depict?

16 A     This depicts opening of the colon, the small intestine

17 entering into the colon, and you have an opening into the

18 appendix.  The appendix is a hollow tub structure and it has an

19 opening.

20 Q     And I'm just going to show you one more.  This is on plate

21 276.  What does this diagram depict, Doctor?

22 A     This is the colon that frames the abdomen.  So you have the

23 right lower quadrant with the appendix.  You have the right

24 colon, the transverse colon, the left colon, the sigmoid colon,

25 which is S-shaped entering into the rectum.

```
 1   Q    And this is a two-page diagram that spills from plate 314
 2   to 315, well, both 314, actually.  What are we looking at here
 3   in this diagram, Doctor?
 4   A    This is a diagram demonstrating the nerves of the
 5   intestine.  And it shows you the majority of the small intestine
 6   and right colon, the nerves go back and join T10 in the spine.
 7   And T10 is the general area where you would feel pain around
 8   your belly button.  So any inflammation going in this area you
 9   would most likely proceed it as being pain in and around your
10   naval and umbilicus.
11   Q    Okay.  What was the last term you used, Doctor?  Bilicus?
12   A    Umbilicus.
13   Q    Umbilicus.  What does that word mean?
14   A    Naval, belly button.
15   Q    Okay.  All right.  Great.  Thank you, Doctor.  And what
16   function does the appendix serve?
17   A    It's unknown what function the appendix serves.  It has
18   lymphoid tissue.  Lymphatic tissue can help with certain
19   infections, but the true nature of the appendix is unknown.
20   Q    Can someone survive without an appendix?
21   A    Yes.  Quite well.
22   Q    Okay.  Okay.  Now, Doctor, in your practice have you had
23   patients come to you or present to you with abdominal pain?
24   A    Yes.
25   Q    Okay.  And when they present to you with abdominal pain are
```

```
 1   there certain things or measures that you take when someone
 2   presents to you with abdominal pain?
 3   A    Yes.
 4   Q    Now what are -- and when you were talking about abdominal
 5   pain, are there a range of diagnosis or conditions that could
 6   lead to abdominal pain?
 7   A    Yes, there are several.
 8   Q    Okay.  Have you heard the term differential diagnosis?
 9   A    Yes.
10   Q    Can you just describe to the jury what it means, what a
11   differential diagnosis is, the term?
12   A    A differential diagnosis is a preliminary diagnosis and
13   it's what are the different medical conditions that you would be
14   considering in abdominal pain.  What's your number one, your
15   number two, your number three consideration of what's going on
16   with the patient.
17   Q    Okay.  And what is the purpose in or what is the reason for
18   having those differential diagnosis?
19   A    So that you can then narrow your focus on further
20   evaluation.  You know, so you can rule in number one or rule it
21   out.  Move on.  Rule in number two or rule it out.
22   Q    And we have -- we talked about differential diagnosis.  Is
23   it a range in terms of what could possibly happen to the person
24   or as a result of the abdominal pain?
25   A    Yes.
```

```
1   Q    Okay.  And when you are doing a differential diagnosis, do
2   you start it anywhere in terms of severity?
3   A    Yes.
4   Q    Where would you start?
5   A    The most severe condition.
6   Q    Okay.  And so when you say the most severe condition, is
7   that something that you would want to first -- is that the first
8   thing you want to figure out, if the person has that or not?
9   A    Yes.
10  Q    Okay.  And why is it important to start with the most
11  severe condition?
12  A    Because usually they're time sensitive.
13  Q    What do you mean by time sensitive?
14  A    Well, if they need to be -- the patient will deteriorate,
15  become worse if you don't make that diagnosis and take
16  corrective action.
17  Q    Okay.  So you want to first establish whether or not the
18  person has the most severe thing.  And then you used the term
19  rule out.  What do you mean by rule out?
20  A    Rule out is to evaluate and either, you know, consider
21  further or decide that, no, that condition is not in play in
22  this patient.
23  Q    Okay.  So you want to first -- when at first someone
24  presents to you with abdominal pain, is it fair to say that
25  everything is initially on the table?
```

```
1    A    Usually.

2    Q    Okay.  So you would start out, the cup -- I think you

3    weren't here for this, but during opening arguments this was

4    used.  So is it fair to say that you first think about all the

5    possibilities first in terms of coming up with a diagnosis?

6    A    Correct.

7    Q    Okay.  You're not going to start at the bottom, right?

8    A    Correct.

9    Q    Okay.  Because if you start from the bottom, when you start

10   from the bottom, that means you're limiting yourself, right?

11   A    Correct.

12   Q    Okay.  So you want to first figure out what the problem is

13   and then narrow it down and ultimately come up with the correct

14   diagnosis, is that right?

15   A    Correct.

16   Q    Okay.  Because I think, as you said, it's important.  Time

17   is a factor, is that fair to say?

18   A    Correct.

19   Q    Okay.  So if you -- what could possibly happen, Doctor, if

20   you start out, limit yourself to a different diagnosis and then

21   be proven wrong?

22   A    The patient's condition could deteriorate.

23   Q    Okay.  And let's just talk specifically about abdominal

24   pain.  What are the different differential diagnosis for

25   abdominal pain?
```

1  A    There could be many, many conditions.

2  Q    But what's --

3  A    I'll go over the most common ones.

4  Q    Let's just start, if you could, from the strengths, from

5  the highest to the lowest, Doctor.

6  A    Well, the highest abdominal complaint would be someone who,

7  you know, has pain all over their abdomen and who has imagining

8  studies that demonstrate free air.  That's a term we use where

9  there's air outside of the intestine where it shouldn't be

10 around the liver or around any of the organs.  And that

11 signifies that there's a perforation of an organ.

12 Q    And, okay.  And what are the other types of possible

13 differential diagnosis?

14 A    The free air could be -- it could be associated with a

15 perforated ulcer, perforated diverticulitis, which is

16 inflammation of the left colon.  And even in appendicitis you

17 can have gall bladder disease.  That's very common usually in

18 the right upper quadrant.  Diverticulitis is very common.

19 Urinary tract infection, inflammation of the stomach, gastritis,

20 and you can even present with abdominal pain with kidney stones

21 on one side or the other.

22 Q    You mentioned a lot there, Doctor.

23 A    Right.

24 Q    I just want to kind of go through a little bit of it.  What

25 are the potential complications of a perforated liver, a

1    perforated ulcer if it's not properly diagnosed?

2    A    The patient would develop peritonitis and go on to become

3    very, very sick.

4    Q    And when you say very, very sick, what do you mean?

5    A    Well, peritonitis is inflammation of the entire abdominal

6    cavity.

7    Q    So what we were looking at before -- I don't know if this

8    picture helps or not.  Does this diagram help or would a

9    different one help, Doctor?

10   A    No, that one helps.

11   Q    This one helps?

12   A    Right.

13   Q    Okay.  When you say entire abdominal cavity, just what --

14   A    In more than one quadrant.

15   Q    Okay.

16   A    You would be seeing inflammation in more than one quadrant.

17   Q    Okay.

18   A    So usually we talk about either localized inflammation or,

19   you know, non-localized inflammation.

20   Q    Okay.  And that's just one possible outcome of and one

21   potential differential diagnosis for someone presenting with

22   abdominal.

23   A    Correct.

24   Q    Now you also mentioned diverticulitis which is also -- I

25   think you said it's a perforated colon.

1   A      Correct.

2   Q      What is the significance of the perforated colon?

3   A      Again, you can get a localized abscess in diverticulitis.

4   That can be commonly in the left lower quadrant, but can also be

5   centrally located.  And when you perforate the colon it spills

6   bowel movement into -- which is teeming with bacteria, and you

7   can either get a localized abscess or you could get inflammation

8   throughout the abdomen.

9   Q      Okay.  You used a couple of terms there.  I'm trying to

10  make sure we're on the same page.  What does perforated mean?

11  A      Perforated means that you get a hole.

12  Q      Okay.  And the term abscess, what is that?

13  A      Abscess is a pocket full of puss.

14  Q      Okay.  And what about inflammation?  What does that mean?

15  A      Inflammation is swelling of the tissue.  Inflammation can

16  be associated with infection or just inflammation of the tissue

17  from other factors.

18  Q      Okay.

19  A      Appendicitis and diverticulitis is associated with

20  infection.  A perforated ulcer initially is just associated with

21  the inflammation of the stomach and then secondarily gets

22  infected.

23  Q      Okay.  And you also mentioned complications with the gall

24  bladder.  What potential outcome can happen as a result of that,

25  if that's not diagnosed properly?

1   A    You can go on to get gangrene of the gall bladder.  The

2   gall bladder can actually die.  You can become very sick from

3   it.

4   Q    And what's gangrene?

5   A    Gangrene is when the tissue gets so swollen, or edema, it

6   squashes its blood supply and then it actually starts to die and

7   the tissue dies.

8   Q    Okay.  And what's gastritis?

9   A    Gastritis is inflammation of the stomach.

10  Q    Compared to that, is that on a lower level in terms of

11  differential diagnosis, in terms of severity or if you can just

12  explain?

13  A    Yes.  Generally gastritis is not as severe as, you know, a

14  perforated stomach.

15  Q    Okay.  And what is gastritis exactly?

16  A    Gastritis is inflammation of the lining of the stomach.

17  Q    And how can someone get gastritis?

18  A    You can get it a couple of different ways.  You can get it

19  -- you can pick up an infection that can cause it.  Some people

20  are prone to gastritis through either a stomach virus.  You can

21  get it with irritation of medications.

22  Q    Okay.  And if someone is presenting with -- withdrawn.  And

23  how would you go about ruling out the different differential

24  diagnosis, the ones that you just described to us?

25  A    Generally, we use a combination of physical examination,

 1   history and physical examination, laboratory values, and imaging

 2   studies.

 3   Q    Okay.  Now in your practice do you -- are you the first

 4   person that would see the patient or have they already been seen

 5   by other medical professionals usually?

 6   A    Usually they've been seen by other medical professionals.

 7   Q    And if someone is presenting in a hospital setting and they

 8   go to the emergency room, who would then tend to first come into

 9   contact with?

10   A    The triage nurse and the emergency room physician.

11   Q    Okay.  And the nurses, would they be either what's called

12   RNs, registered nurses, or LPNs?

13   A    RNs.

14   Q    Okay.  Would there be LPNs at all or no, as far as you

15   know?  Licensed Practical Nurses?

16   A    I'm not sure that there are LPNs in the emergency room at

17   this point.

18   Q    Okay.  And when the nurses first -- and do the nurses --

19   when you say triage, what do you mean by triage?

20   A    Triage.

21   Q    Triage, sorry.

22   A    Triage is a word of just sorting out how sick the patient

23   is so that if somebody comes in with severe abdominal pain that

24   the nurse would recognize that they get moved up and be seen.

25   And if somebody comes in and the nurse feels that they're not

1    that sick, then they'll be put in a different queue or line to

2    be evaluated.

3    Q    And how would a nurse go about doing that, making that

4    assessment or making that decision?

5    A    They would talk to the patient.  They would examine the

6    patient, have the history.

7    Q    Okay.  And when you say talk to the patient, is that to

8    obtain what's called a history?

9    A    Yes.

10   Q    Okay.  That's a history of the complaint?

11   A    Correct.

12   Q    Okay.  And in addition to talking with the patient, what is

13   the nurse looking for when they are conducting that history?

14   A    They're looking for the overall patient's demeanor.  Does

15   the patient look sick?

16   Q    All right.  And what significance is it to actually look at

17   the patient as opposed --

18   A    Oh, I'm sorry.  Okay.  Turn it off.

19   Q    Let me just -- I didn't finish asking the question.

20   A    Yeah.  I'm sorry.

21   Q    And what significance is it to actually look at the

22   patient?

23   A    It's very significant.

24   Q    Why?

25   A    Well, because a picture is worth a thousand words.

1    Q      Okay.

2    A      You can look at a patient and you can get a good assessment

3    as to whether this patient is sick or this patient does not look

4    too sick from a medical standpoint.

5    Q      And of what significance is the -- withdrawn.  And the

6    history.  Is it fair to say that some patients are better able

7    to give a history as others?

8    A      Yes.

9    Q      And what are some of the limitations that could come into

10   play as to why someone may not be able to give as good a history

11   as other people?

12   A      Well, education level, the authority to express yourself,

13   you know, your vocabulary level all come into play as to be able

14   to express, age generally.  You know, an adult can express

15   themselves better than a child in exactly what's going on.

16   Q      And are these sorts of things that nurses are trained to

17   take into account when they're taking a history?

18   A      Yes.

19   Q      And I think you mentioned age.  So is it fair to say that

20   the history presented by a 6 year old may differ from the

21   history presented by, say, a 30 year old person?

22   A      Correct.

23   Q      And thank you so much.  So they conduct a history.  They --

24   and which is examining -- let me start over.  Aside from taking

25   the history, you mentioned a physical exam.

1    A    Right.

2    Q    How would a nurse go about conducting a physical exam?

3    A    The nurse --

4    Q    Would nurses conduct physical exams?

5    A    No.  They would defer that to the physician.

6    Q    Okay.  So what information is the nurse being provided with

7    to make a decision as to whether or not to go to a physician?

8    A    To take the history and they would take the initial vital

9    signs.

10   Q    Okay.  Now, you mentioned vital signs.  Let's just talk for

11   a second.  Are there -- what are the vital signs?

12   A    The vital signs are temperature, pulse, blood pressure, and

13   your rate of breathing.

14   Q    Okay.  And what significance are the vital signs as part of

15   your assessment of the patient?

16   A    They're significant.  They're more significant as they

17   become more abnormal.

18   Q    Okay.  Okay.  And just for -- withdrawn.  Okay.  Now, are

19   there certain guideposts to diagnose appendicitis?

20   A    There are.

21   Q    Okay.  And what are general guideposts to come up with a

22   diagnosis of appendicitis?

23   A    Take the history first.

24   Q    Okay.

25   A    And the general history of appendicitis is starting with

abdominal pain.

Q    Okay.  And does it -- abdominal pain in any particular

area?

A    The pain is usually described as periumbilical or centrally

located within the abdomen.

Q    Okay.  Okay.  And have you conducted physical examinations

of abdominal examinations?

A    Yes.

Q    About how many have you conducted in your career?

A    Thousands.

Q    And have you treated patients with appendicitis?

A    Yes.

Q    About how many have you treated in your career?

A    Hundreds.

Q    And have you performed surgeries regarding the appendix?

A    Yes.

Q    How many have you performed?

A    Hundreds.

Q    Okay.  And when you perform those surgeries are there

different -- are there two different types of surgeries?  Is

there something called a laparoscopy versus an open abdomen?

A    There is.

Q    What is a laparoscopy?

A    Laparoscopic surgery is when we put a small TV camera

usually through the belly button and then we put in two other

1   small little incisions and we put in two little tubes to put our

2   working instruments in.  And we're able to take the appendix out

3   through the belly button.  It's called minimally invasive

4   surgery.

5   Q    So if you could just, if you don't mind, Doctor, just

6   demonstrate where you would on your own body, if you could,

7   perform those incisions on the patient.

8   A    The TV camera goes through the belly button.  And since the

9   appendix is located in the right side, the surgeon works from

10  the left side of the abdomen.  And two --

11  Q    I'm sorry.  Why is that?

12  A    So that you have room to go across the abdomen.  If you

13  came in on the right side you would be right on the appendix.

14  You wouldn't have any working room.

15  Q    I see.  Okay.

16  A    So when the TV camera goes in the abdominal cavity is

17  expanded, so the wall of the abdominal cavity is blown up with

18  about six liters of carbon dioxide.

19  Q    And how is that done?

20  A    Through a little pump.  There's a little side port on the

21  main tube.

22  Q    So literally like some air or something is pumped and

23  literally the --

24  A    Yeah.

25  Q    -- stomach is pushed out.

```
 1  A    With a insufflator of carbon dioxide is about six liters.
 2  Q    Okay.  And then the purpose of that is to help you --
 3  A    It's to move the abdominal wall out of the way and get you
 4  working space.
 5  Q    Okay.  And then after you do that what's -- how does it go?
 6  A    And two other ports are placed in the left abdomen.  They
 7  can either be --
 8  Q    When you say ports, what do you mean by ports?
 9  A    Ports are little tubes which you can put your instruments
10  through.
11  Q    Okay.
12  A    We have little graspers.  We have little scissors.  We have
13  little tools that burn little blood vessels.  We can put little
14  clips on blood vessels through these little ports.
15  Q    Okay.
16  A    The port in your belly button is about the size of your
17  thumb.  The other ports are about the size of your little
18  finger.
19  Q    Okay.  So in terms of -- you can sit down, Doctor.  Thank
20  you.  So in terms of actual openings on the patient, you're
21  talking about just three small openings?
22  A    Correct.
23  Q    Okay.
24  A    Little ports are about a half an inch and the larger port
25  is an inch at most.
```

1   Q    Okay.  And when you do that, what do you do once they're

2   inside?  Like when you're talking TV camera, like how big is

3   that camera?

4   A    Well, the tube is only, you know, the size of your thumb,

5   but it's projected on a camera this big.

6   Q    Oh, a screen?

7   A    A screen this big.  Correct.

8   Q    I see.  And once you view -- and the purpose is, I guess,

9   to view the abdomen.

10  A    Correct.

11  Q    And to view the appendix, obviously.

12  A    Correct.

13  Q    And once you do that, what's the next step in that surgery?

14  A    The next step is to first locate the appendix and then the

15  appendix has a couple -- usually one main artery feeding the

16  blood supply of the appendix, so you need to control that artery

17  if you're going to take the appendix out.  There's a couple of

18  different ways.  You can burn through the artery.  You could --

19  Q    So when you say burn, what do you mean, burn?

20  A    Well, we have a little electrocautery device that we put in

21  and we just burn the tissues.  It just burns where you're

22  touching.  And if you cauterize the artery, it won't bleed.

23  That's one way.

24  Q    I'm sorry.  I'm not familiar with these terms, but I don't

25  think the jury is either.  When you say cauterize, what do you

1  mean by cauterize?

2  A    Just burn.

3  Q    Okay.  All right.  Continue.  Sorry.

4  A    And then once you have the appendix, you want to remove the

5  appendix.  You want to take it off at its base.

6  Q    Okay.

7  A    Where it's coming off of the colon.  There is --

8  Q    And you would cauterize it at that point?  Is that right?

9  A    No.

10  Q    Okay.

11  A    You have to either staple it.

12  Q    Okay.

13  A    Or you could suture it.

14  Q    And how -- you say staple or suture, how is that done?  Is

15  it done just while your instruments are inside the body?

16  A    Correct.  We have a little stapler that goes through one of

17  the ports.  It has jaws about a little bit more than an inch and

18  it opens up sort of like an alligator.  It goes in.  You put the

19  appendix in the jaws, close it, and then you pull the trigger

20  and it staples a line of staples that will hold the appendix

21  closed and cuts it.  It staples and cuts at the same time.

22  Q    Okay.  And then once it's cut what happens to the appendix?

23  A    Then we stick in a little bag and we put the appendix in a

24  little bag and then we bring the appendix out through the belly

25  button.

```
1   Q    And this is all done inside the person's body?

2   A    Yes.

3   Q    Okay.  And then you're saying that the appendix is then

4   pulled out of the -- which hole does it pull it out of?

5   A    It's pulled out of the belly button because it's a little

6   bit bigger hole.

7   Q    Okay.

8   A    It's too big to pull out through the other holes.

9   Q    Okay.  And then what happens after that, after the appendix

10  is removed?

11  A    Well, we wash out that area and then we close the

12  incisions.

13  Q    Okay.  And then how would you close the incisions?

14  A    We close them with -- in the umbilicus, we close what's

15  called the fascia.  That's the layer that the muscle is attached

16  to.  We close that with sutures and then we close the skin with

17  sutures that dissolve.

18  Q    Okay.  And sutures are what, just like thread?

19  A    Yeah.  Sutures are the thread we use.

20  Q    Okay.  And that's -- laparoscopic surgery is also called

21  keyhole surgery?

22  A    Correct.

23  Q    Okay.  Now, is there another type of surgery that you can

24  do to remove the appendix?

25  A    There's open surgery.
```

```
 1  Q    Okay.  What is -- well, what are the benefits of conducting
 2  laparoscopic surgery over an open appendectomy?
 3  A    Quicker recovery.
 4  Q    What do you mean by quicker recovery?
 5  A    Well, with less of an incision size, the patient recovers
 6  quicker.
 7  Q    What is the likely course of recovery for someone who
 8  undergoes a laparoscopic surgery?
 9  A    Usually we send them home within one day.
10  Q    Within one day after the surgery?
11  A    Correct.
12  Q    And what kinds of -- would they have any ramifications or
13  negative outcomes?  Do you expect any ramifications or negative
14  outcomes as a result of laparoscopic surgery?
15  A    Depends on the condition of the appendix.  If it's an early
16  appendicitis where the appendix hasn't perforated and there is
17  no puss within the abdomen, we expect the chance of a post-
18  operative abscess within the abdomen to be less.  If the
19  appendix is in a more inflamed condition, we would expect a
20  higher rate of post-operative abscess.
21  Q    And do patients who undergo laparoscopic surgery, do you
22  then continue to treat with them after their surgery?
23  A    Yes.  We see them in follow up.
24  Q    Okay.  And for how long do you follow up with them after
25  that surgery?
```

```
 1   A     Usually, I see them once, two weeks after the operation.
 2   If they're fine, I discharge them from my care.
 3   Q     Meaning?  What do you mean, discharge them from your care?
 4   A     That I no longer see them on a scheduled basis.  I'm always
 5   available if they need me, but I no longer schedule any further
 6   appointments.
 7   Q     So there's no medical need to see them anymore.
 8   A     Correct.
 9   Q     Okay.  And what types of -- and in terms of the outcome of
10   the patient who have undergone a laparoscopy, what can they
11   expect to feel in terms of either pain or discomfort as a result
12   of the laparoscopic surgery?
13   A     There's some discomfort from the putting the three holes.
14   It's usually less than an open incision and they can usually
15   return to work within one to two weeks, depending upon the type
16   of job they have.
17   Q     Okay.  Now let's talk a little bit about the open
18   appendectomy.  When would you -- is it a preference to do one
19   surgery over another, Doctor?
20   A     The preference today is to do minimally invasive surgery
21   for an appendectomy.
22   Q     And a minimally invasive surgery would be the laparoscopic.
23   A     Correct.
24   Q     Okay.  And why is that?  Why is that the preference,
25   Doctor?
```

1    A     The patients do better.

2    Q     Okay.  So let's talk a little bit about the open

3    appendectomy.  Under what -- withdrawn for a second.  How many

4    laparoscopies have you performed?

5    A     Hundreds.

6    Q     And how many open appendectomies have you performed?

7    A     Probably more than 100.

8    Q     Okay.  And is it your preference to conduct a laparoscopy?

9    A     Yes.

10   Q     Okay.  So when someone presents to you is that your plan,

11   to initially conduct a laparoscopy?

12   A     That would be my procedure of choice.

13   Q     Okay.  And when would you perform an open appendectomy?

14   A     The reasons to perform an open appendectomy would be a very

15   small child where you thought that the risk benefit ratio --

16   because you can perform an appendectomy in a four year old

17   through an incision that's only this big, and so it may be

18   safer.  So if I have a four year old, I may say it's safer to do

19   an open than laparoscopic.

20   Q     And that's because of size of the body?

21   A     Size of the body.  Or if somebody had extensive surgery

22   such that you get a patient that had an open gall bladder from

23   the old days, already had a hysterectomy, already had some other

24   procedure in the abdomen and has significant scarring that you

25   don't feel you could safely put in your laparoscopic

```
1    instruments, then you would perform an open operation.  And when
2    you perform a laparoscopic operation you always have the option
3    to convert to an open procedure if you think it's indicated.
4    Q    I see.  Okay.  And when would it be indicated, to go from a
5    laparoscopic surgery to an open appendectomy?
6    A    It's indicated when you feel you cannot perform the
7    laparoscopic surgery safely.
8    Q    And you described how a laparoscopic surgery is performed.
9    Can you describe how an open appendectomy is performed?
10   A    First, there's two choices of your incision.  In a standard
11   open appendectomy, we make a small straight incision in the --
12   over the appendix, which is in the right lower quadrant.
13   Q    And when you say incision, how big or large an incision are
14   you making?
15   A    Depends upon the size of the patient.
16   Q    Okay.
17   A    Generally, it would be under two inches.
18   Q    Okay.
19   A    And we go down --
20   Q    I'm sorry.  You said two inches.  How does that compare to
21   the size of the openings or holes that you would make in a
22   laparoscopic surgery?
23   A    Well, the laparoscopic surgery is maybe an inch incision
24   deep in the belly button and then two other half inch incisions,
25   but the patient seems to do better than when you do open.  They
```

```
 1   have more pain.  When you do it open, once you go through the
 2   skin you then have to separate the muscles.  We try not to cut
 3   the muscles going down through the belly.  We try to separate
 4   the muscles.  And then we get into the abdomen.
 5   Q    And would you have to -- would you have that issue if you
 6   were doing laparoscopic surgery?
 7   A    No.
 8   Q    So you wouldn't have to move the muscles?
 9   A    No.
10   Q    Okay.  Is that because you're going already underneath it?
11   A    Right.  You could just go right through it.
12   Q    Through it.
13   A    And so it's much better, less chance of hernia.  A hernia
14   is where they separate and it bulges out.
15   Q    Sorry.  And just to flesh on that a bit more.  What are the
16   ramifications of getting a hernia?
17   A    A hernia is where when you make an incision anywhere
18   through the muscle you sew it closed.  It never obtains the
19   strength that it had originally before it was cut.  And as the
20   time after the surgery, the longer you go after the surgery, you
21   know, months to years, the tissue thins and it can herniate,
22   which means it can create a hole in the abdominal wall and then
23   the intestines can come out of that hole.  They don't usually
24   come through the skin, but you get a lump there.  When you
25   cough, you can feel the intestines and so often you have to go
```

1    back and repair that hole or defect in the abdominal wall.

2    Q    And when you say they come out through the hole, that's --

3    what do you mean, they come out through the hole?

4    A    Well, you have a hole.  That's the hernia.  And the hernia

5    itself doesn't give you any problems or a little discomfort.

6    Where you get into trouble with a hernia is that opening in the

7    abdominal wall, that hole, the small intestine wants to work up

8    into that hole and the small intestine gets up into the hole and

9    then it can get caught.  It can get trapped.  It can get

10   twisted.

11   Q    And if it gets caught, trapped, or twisted, what are the

12   possible ramifications of that?

13   A    Well, you need another surgery.

14   Q    So you started to say and I cut you off, regarding the size

15   of the incision.  So you make the incision and then what's the

16   next thing that happens in an open appendectomy?

17   A    In an open appendectomy you find the appendix and then --

18   Q    And when you say find it, that's after moving the muscles

19   around?

20   A    Correct.

21   Q    Okay.

22   A    Once you reach the inside of the abdomen, you locate the

23   appendix, and at that time we're able to locate the blood

24   supply.  And we do it the old-fashioned way since we can.  We

25   put clamps on it, cut the vessels, and then we just tie them off

1   with --

2   Q     As opposed to what you were talking about earlier --

3   A     Right.

4   Q     -- with inside?

5   A     Right.  And we don't usually use the stapler when we're

6   open because we don't need to.  We can tie off the base of the

7   appendix, remove the appendix, and just put some sutures in that

8   area.

9   Q     And when you say tie off, what do you mean?

10  A     The appendix is about a tube, your finger, and so before

11  you cut the base and since there's a hole, there's a lumen in

12  the appendix.  If you just cut the appendix, you know, bowel

13  movement could pour out of it, so we just put a suture around it

14  and tie it down so you close it shut, one near the base and one

15  above it, and then cut between the sutures.

16  Q     Okay.  And what -- if bowel movement does come out, what

17  are the possible ramifications of that?

18  A     Infection.  Bowel movement contains about 80 percent

19  bacteria, all different kinds of bacteria.

20  Q     Okay.  So you would clamp it, tie it, and then do you just

21  literally physically remove the appendix?

22  A     Correct.

23  Q     Okay.  And then once you do that what's the next thing that

24  happens?

25  A     We wash out the area and then we close the incision in

1    layers.

2    Q    And when you say wash out, how are we actually washing it

3    out?

4    A    We pour in sterile saline and we have a suction device.  So

5    we just pour it in literally until it's really nice and clean

6    because sometimes there could be -- if the appendix is advanced

7    appendix there could be puss, and so we wash it out until the

8    water is crystal clear and then we aspirate the water and then

9    we close it in layers.

10   Q    Okay.  And aspirate just means --

11   A    Aspirate just means we suck it out.

12   Q    Okay.  And the purpose in washing that all out thoroughly

13   so it's clear is what again, Doctor?

14   A    To decrease the chance of a post-operative infection.  With

15   appendicitis, since it's an infective process you always run the

16   risk of developing an abscess after the operation, so we wash it

17   out to decrease the risk of developing an abscess.

18   Q    And how would you compare the likelihood of getting an

19   abscess from an open appendectomy as opposed to a laparoscopic?

20   A    Laparoscopic appendectomies have a less incidence of

21   abscesses after the operation.

22   Q    Now, Doctor, have you heard of the Alvarado scale?

23   A    I have.

24   Q    And how have you heard the Alvarado scale?

25   A    Through literature and --

```
 1   Q     Have you ever used the Alvarado scale in your practice?

 2   A     No.

 3   Q     Do you know what the Alvarado scale is?  Can you describe

 4   it?

 5   A     Yes.  The Alvarado scale is a scale to take decision points

 6   and assign them a number and try to decide whether the patient

 7   has appendicitis or not.  It was popularized in the late 1980s.

 8   The original Alvarado scale was for pregnant women because there

 9   was a -- you didn't want to image.  You didn't want to do a CT

10   scan in a pregnant woman and you're trying to make a best guess

11   if she would have appendicitis because in pregnancy that can

12   lift the appendix way out of the abdomen.  So a pregnant woman

13   could present with appendicitis way up under her ribcage,

14   unlikely that most people would present that way.  And it takes

15   into account some variables.

16   Q     And so you mentioned pregnant women.  Why would you not

17   want to conduct imagining on pregnant women?

18   A     You could do harm to the fetus.

19   Q     Okay.  So this scale is used -- so how does this scale, the

20   Alvarado scale, compare to using imaging?

21   A     It's not nearly as accurate.

22   Q     Which is more exact?

23   A     Imaging.

24   Q     Okay.  And when you say imagining, what types of imaging

25   would you expect someone who is experiencing abdominal pain to
```

1   undergo?

2   A     The best type of the CT scan.

3   Q     What is a CT scan?

4   A     A CT scan is a scan that takes slices through the body like

5   a loaf of bread and then it recreates them.  So we give the

6   patient a contrast material, so they drink something that is

7   similar to a chalky milkshake that then allows us to see the

8   intestines.  And then they go through a CT scan.  The CT scans

9   now are very fast.  It doesn't take that long at all to scan the

10  entire abdomen.

11  Q     When you say very fast, roughly how long are we talking

12  about?

13  A     Probably two minutes now.  They used to be longer.  And

14  then we recreate the scans and it allows us to see inside the

15  body and actually -- so when we're evaluating the appendix, we

16  look for the size of the appendix, the size of the wall of the

17  appendix, is there any fluid around the appendix.  They're the

18  types of information we would get from a CT scan.

19  Q     Okay.  And how prevalent are CT scans?

20  A     Extremely prevalent.

21  Q     And I think you said -- and what is involved in sending

22  someone to get a CT scan?

23  A     Well, in the emergency room you just place an order and

24  then they go over to CT scan.

25  Q     Okay.  And if you were seeing someone in private practice

1   that didn't come through the emergency room what would be

2   entailed to send them for a CT scan?

3   A    You would call the CT scan, the radiology department, and

4   say, "I need a CT scan."  And they would tell you what available

5   opening they had for the next available CT scan and then you'd

6   send the patient for the CT scan.

7   Q    And I think you also -- you mentioned that you have treated

8   inmates.

9   A    Yes.

10  Q    Okay.  If an inmate is in a jail would he be able to get a

11  CT scan?

12  A    He could.

13  Q    Okay.  And that would be just involving him being

14  transported to a facility that can conduct a CT scan?

15  A    Correct.

16  Q    Okay.  Can your CT scan also be conducted on site?

17  A    No, they're not portable.

18  Q    Okay.  So somebody would have to -- you'd have to

19  physically leave a facility to go get a CT scan.

20  A    Correct.

21  Q    But as you said, the actual time it takes to get a CT scan

22  is about two minutes for the actual -- for the scan.

23  A    Right.  It doesn't take that long to actually do the scan.

24  Q    Okay.  So in terms of timewise from the time I guess

25  someone goes to get the CT scan until they're finished how much

1  actual time are they in that facility in the process of getting

2  the CT scan?

3  A    Not that long.  You know, if you have an appointment and

4  you come in and they're running on time.  It takes a little bit

5  of time to prep the patient.  I mean, the patient needs to have

6  an IV because they shoot IV contrast in.  The patient needs to

7  have oral contrast.  Usually they like to wait an hour after

8  giving you the oral contrast so that the contrast has enough

9  time to work its way through the intestines.

10 Q    When you say contrast, will you just -- what is the purpose

11 of the contrast?

12 A    The contrast is to show up the intestine because you can

13 see it on a CT scan, but when you take in a contrast you see --

14 the intestine lights up and you see it much better.

15 Q    I see.  Okay.  And so from the time of their prep work to

16 the time they get the CT scan to the time they go back, all

17 total would that be -- if everybody is on schedule and

18 everything else, would that be a half an hour or?

19 A    It would be more like one to two hours.

20 Q    One to two hours.  Okay.  And, okay.  Okay.  And is the

21 Alvarado scale used much today in light of the fact that we have

22 CT scans?

23 A    No.

24 Q    And you, in this case, reviewed the medical records from

25 PrimeCare, which is when Mr. Rodriguez was in the Berks County

1    facility, is that right?

2    A     Correct.

3    Q     Okay.  And did you see any indication that any of the

4    medical staff or nursing staff used the Alvarado scale?

5    A     No.

6    Q     Let's go in and talk a little bit about the treatment Mr.

7    Rodriguez received at the facility.

8                MS. RAMEAU:  Your Honor, can we approach briefly?

9                THE COURT:  Certainly.  Counsel, please approach.

10               (Sidebar)

11               MS. RAMEAU:  (Inaudible).

12               MR. NINOSKY:  (Inaudible).

13               MR. SALEEM:  We could take a longer lunch.  I have no

14   problem with that.

15               THE COURT:  (Inaudible).

16               MR. SALEEM:  That's fine.  Whatever.

17               MR. NINOSKY:  (Inaudible) and screw up the case.

18               MR. SALEEM:  No, no, no.  We have lot, Your Honor,

19   today pretty much for the doctor.  And we've also -- we'll work

20   with Counsel in terms of the witness (inaudible), so that's

21   fine.

22               THE COURT:  (Inaudible).

23               MS. RAMEAU:  Quarter until 1:00?  We'll come back at a

24   quarter until 1:00.

25               THE COURT:  (Inaudible).

```
1              MR. SALEEM:  Okay.

2              MS. RAMEAU:  Okay.

3              THE COURT:  Thank you.

4              (End of Sidebar)

5              THE COURT:  Ladies and gentlemen, we are going to

6   recess for lunch just a little bit early today and we're going

7   to stand in recess for one hour.

8              Please remember that you are not to discuss the case

9   among yourselves or with anyone else during the lunch and

10  recess.  Furthermore, you are to wear your juror badges in

11  obvious place on your clothing while you are in the courthouse.

12  And you are to avoid reading any newspaper articles or listening

13  to any media communications regarding this case.

14             You should keep an open mind about this case until all

15  the evidence is in on both sides, until you've heard the closing

16  arguments and the charge of the Court, and until you get to the

17  jury deliberation room because it is only at that time that you

18  will know enough about this case and about the law to

19  intelligently and fairly discuss it.  So you should refrain from

20  discussing it with each other or with anyone else, including

21  members of your family, or allow anyone to talk to you about it.

22  Do not form any opinions about this case until you retire to the

23  jury room after my charge.

24             We'll stand in recess for one hour.

25             THE BAILIFF:  All rise.
```

```
 1                    (Recess taken at 11:41 a.m.)

 2              THE COURT:  Continue your direct examination, sir.

 3              MR. SALEEM:  Great.  Thank you.

 4                    DIRECT EXAMINATION CONTINUED

 5   BY MR. SALEEM:

 6   Q    Doctor, you have the unenviable task of discussing

 7   abdominal pains after we've all had lunch, but we have to

 8   unfortunately get into it.  Before we get to the -- just a

 9   matter of housekeeping, Your Honor, I'd like to at this point

10   move into evidence Plaintiff's Exhibit 1, or sorry, we've

11   already -- we identified as Plaintiff's Exhibit 1.  For the

12   purpose of this Court, we'll call it Plaintiff's Exhibit 2, Your

13   Honor, which are the PrimeCare medical records which are Bate

14   stamped numbered 1 through 516.

15              THE COURT:  Mr. Ninosky, any objection to the

16   admission of Plaintiff's Exhibit 2, which are the medical

17   records?

18              MR. NINOSKY:  No, Your Honor.

19              MR. SALEEM:  And --

20              THE COURT:  Without objection, Plaintiff's Exhibit 2

21   is admitted into evidence.

22              (Plaintiff's Exhibit 2 admitted)

23              MR. SALEEM:  Thank you, Your Honor.

24              And also while we're doing that, I'd like to move into

25   evidence identified as Plaintiff's Exhibit 2, but for the
```

1    purpose of this Court, move into evidence as Plaintiff's Exhibit

2    3, which are the Reading Hospital medical records which are Bate

3    stamped Berks' 1489 through 1625.

4              THE COURT:  Mr. Ninosky, any objection to Plaintiff's

5    Exhibit 3?

6              MR. NINOSKY:  No objection, Your Honor.

7              THE COURT:  Without objection, Plaintiff's Exhibit 3

8    is admitted into evidence.

9              (Plaintiff's Exhibit 3 admitted)

10             MR. SALEEM:  Great.  Thank you, Your Honor.

11             And finally, at this point I'd like to introduce into

12   evidence Berks' 645 through 649.  That is the --

13             MR. NINOSKY:  No objection, Your Honor.

14             THE COURT:  And what is Plaintiff's Exhibit 4?

15             MR. SALEEM:  And that is the surgical pathology

16   report, Your Honor, that was taken on April 20th.

17             THE COURT:  Very well.  Without objection, Plaintiff's

18   Exhibit 4 is also admitted to evidence.

19             (Plaintiff's Exhibit 4 admitted)

20             MR. SALEEM:  Great.  Thank you, Your Honor.

21             THE COURT:  You're welcome, sir.

22   BY MR. SALEEM:

23   Q    Okay.  Doctor, before we get into the records, you had

24   mentioned before we broke for lunch that you have treated

25   inmates as part of your practice, is that right?

1    A    That's correct.

2    Q    Okay.  Does your treatment of a patient differ in any way

3    if you knew they were an inmate?

4    A    No.

5    Q    Okay.  So there's no modified standard of care for inmates

6    as opposed to people who have not been -- not an inmate?

7    A    Correct.

8    Q    Okay.  And the human body that's situated in a jail is the

9    same as a human body that's outside a jail?

10   A    Yes.

11   Q    Okay.  So would you expect there to be any kind of modified

12   standard of care just because someone is an inmate?

13   A    There should be none.

14   Q    Okay.  All right.  And in your practice, Doctor, what type

15   of -- do you supervise other types of medical staff or other

16   doctors?

17   A    Yes.

18   Q    And what titles or roles do they have?

19   A    Residents.

20   Q    Okay.  Do you also supervise interns?

21   A    Yes.

22   Q    Okay.  So interns would be the first year out of medical

23   school?

24   A    Correct.

25   Q    And then residents could be second, third, fourth year out

1   of medical school?

2   A    Correct.

3   Q    Okay.  Do you also have fellows underneath you at all?

4   A    Not at this time.

5   Q    Okay.  And do you also have part of your team, any nurses?

6   A    I've had physician assistants.

7   Q    Physician assistants, okay.  And do the interns who are

8   underneath you conduct history and physical of patients?

9   A    Yes.

10  Q    Okay.  And does the supervisor of them review their work?

11  A    Yes.

12  Q    Okay.  And so just the process of conducting history and

13  physical would be the doctor, in this case, an internist would

14  be the first year out of medical school --

15  A    Correct.

16  Q    -- would go and actually see the patient and examine them,

17  right?

18  A    Correct.

19  Q    And then they would document that in the chart?

20  A    Yes.

21  Q    Okay.  And would you rely upon that examination or would

22  you conduct your own examination?

23  A    No, I would conduct my own exam.

24  Q    Okay.  And what is the purpose of also conducting your

25  examination if they've already seen the patient?

```
 1   A    To verify that they've correctly performed the assessment.
 2   Q    Okay.  And it's fair to say that you have more experience
 3   in terms of conducting an exam than a first year medical
 4   student?
 5   A    Yes.
 6   Q    First year resident, at least?
 7   A    Right.
 8   Q    Okay.  Okay.  And I just touched upon the term, the chart.
 9   What is the medical chart?
10   A    The medical chart is the record of everything that goes on
11   during the medical experience of the patient.
12   Q    Okay.  And what is its purpose?  What is its purpose for
13   you as a doctor?
14   A    Its purpose to communicate to everybody that is taking care
15   of the patient.  It's a home for all the information we're
16   gathering.  And it serves as a record in the future of what went
17   on in the past.
18   Q    Okay.  And do you rely upon the medical record?
19   A    Yes.
20   Q    Okay.  And do you rely -- and do you make entries in the
21   medical record?
22   A    Yes.
23   Q    Okay.  And do other people also look at the medical record?
24   A    Yes.
25   Q    Okay.  And the medical chart.
```

```
 1   A    Yes.
 2   Q    So is it fair to say that it's important when you're making
 3   entries to be accurate?
 4   A    Correct.
 5   Q    Okay.  It's important to be precise.
 6   A    Correct.
 7   Q    Okay.  And the purpose is because other people are making
 8   medical decisions based upon what's come before.
 9   A    Correct.
10   Q    Okay.  Doctor, I'm not going to go through all 516 pages of
11   the medical records from at least the PrimeCare.  I just want to
12   highlight certain pages and I'll just refer to them by Bates
13   number when I go through.  Let me -- and I'm going to put them
14   on the -- since they're in evidence, I'm just going to put them
15   on the ELMO machine so you don't have to get up or anything.
16   A    Thank you.
17   Q    Now, I'm just going to first direct your attention.  I
18   believe they're the first -- and you've reviewed these before,
19   right, Doctor?
20   A    Yes.
21   Q    Okay.  So I think the first instance of, at least that's
22   documented, of Mr. Rodriguez complaining of medical pain that's
23   in the chart at least occurred on April 16th.  Would you agree?
24   Do you have any reason to disagree with that?
25   A    No.
```

1   Q    Okay.  Okay.  Put this on the -- the writing is very small,

2   but I'm going to try to make it bigger.  I'm looking right now

3   for the record at PCM60.  Too fast.  Let me know, Doctor, when

4   you think it's --

5   A    Okay.  That's fine.

6   Q    -- clear enough to you and, Your Honor, is it clear enough

7   to Your Honor or -- I just want to make sure that the jury can

8   also be able to see it.  Okay.  So just based upon this chart,

9   it appears that this was documented on April 16, 2015, is that

10  fair?

11  A    Correct.

12  Q    Okay.  And this section of the chart is called what, an

13  abdominal complaints chart, is that right?

14  A    Yes.

15  Q    Okay.  And in this case it appears -- when it says

16  interviewer, does that appear as if the person who conducted

17  this assessment?

18  A    Yes, I would assume.

19  Q    Okay.  And in this case that would be Susan Roberts.

20  A    Yes.

21  Q    Okay.  An LPN, what is an LPN?

22  A    A licensed practical nurse.

23  Q    Okay.  Do you know how much schooling they have?

24  A    Usually less than 18 months.

25  Q    Okay.  And in this case, okay.  And what is the chief

1    complaint that is listed right here, the first line?

2    A    Stomach pains times two days.

3    Q    If you can't read it -- there we go.  Okay.  And by times

4    two days, what does that indicate to you?

5    A    That it's been going on for 48 hours.

6    Q    Okay.  So if this note was made on April 16, 2015, when

7    would your review of the chart, when would you believe that the

8    pain is -- the person who wrote this chart is indicating that

9    the pain started?

10   A    April 14th.

11   Q    Okay.

12   A    Or the 15th.

13   Q    Fourteenth or the fifteenth, okay.  And then this is --

14   okay.  So, and what is this -- when it says, "Not relieved by

15   Maalox," to you what does the significance of that mean?

16   A    That means that the patient took Maalox and still had the

17   pain after he took Maalox.

18   Q    Okay.  So you would expect to see, if there's a section of

19   the chart that has the medical administration record, you would

20   expect to see some indication that he was being given Maalox.

21   A    Correct.  That the Maalox was given, what time it was

22   given, and how much Maalox was given.

23   Q    Okay.  And what is Maalox?  Like what's Maalox?

24   A    Maalox is an antacid.

25   Q    Okay.

```
 1   A    It basically absorbs the acid in your stomach and coats the
 2   lining of your esophagus and stomach.
 3   Q    Okay.  And what's the purpose of it?
 4   A    To decrease heartburn.
 5   Q    Okay.  And the next line says, "Recently started Naproxen
 6   375 mg BID."  First off, what does BID stand for?
 7   A    BID is twice a day.
 8   Q    Okay.  And 375 mg, that's just the dosage that was given?
 9   A    Correct.
10   Q    That's 375 mg twice a day?
11   A    Correct.
12   Q    Okay.  And what is Naproxen?
13   A    Naproxen is a non-steroidal anti-inflammatory medication,
14   very much similar to Motrin or Advil.
15   Q    Okay.  And what significance, if any, is there, the fact
16   that the patient had recently started Naproxen and now is
17   experiencing stomach pain?
18   A    One of the side effects of medicines such as Naproxen is
19   irritation of the stomach.
20   Q    Okay.  And now underneath that section, the section that
21   says, "If pain is present, describe it," and there's three
22   categories.  You see that dull, sharp cramping?
23   A    Correct.
24   Q    What is the significance of the fact that it's checked off
25   "sharp and cramping"?
```

1   A    They're very non-specific.

2   Q    Okay.  Does that mean anything to you in terms of an exam,

3   that the patient's just on its face just sharp and cramping as

4   opposed to dull?

5   A    Cramping is usually more severe than dull and sharp is

6   usually localized because it's sharp like somebody is stabbing

7   you with a knife.  It's a sharp more localized pain.  Cramping

8   is not so localized.  That would be over most of the abdomen.

9   You usually can't localize cramping.

10  Q    Okay.

11  A    And dull is a mile discomfort.

12  Q    Okay.  And when you examine a patient, are you looking to

13  see if the pain is dull, sharp cramping or are you looking at

14  different metrics?

15  A    No.  I use the same metrics pretty much.

16  Q    Okay.  And the next section talks about intensity of pain.

17  What is the intensity of pain?  How is that asked?

18  A    Well, in the hospital we use a scale of one to ten, with

19  ten being the worst pain of your life, one being very minimal

20  notice of any pain, and we ask the patient to give us a number.

21  We also have a chart that is a non-verbal chart.  It shows a

22  smiley face and you can see where the patient is smiling, which

23  is no pain, happy, and then where they go with a blunted

24  expression to where they look like they're in a lot of pain to a

25  ten where the patient looks severely in pain.

1    Q    And what is the purpose of using the smiley faces when

2    you're trying to ascertain a patient's pain level?

3           MR. NINOSKY:  Objection.  Outside the scope.  There's

4    nothing in his report concerning this.

5           THE COURT:  Counsel, please approach.

6           (Sidebar)

7           MR. NINOSKY:  There's no discussion about any sort of

8    smiley faces or anything else in the report that was authored.

9    There's also no such document in the Reading records that either

10   he authored or anybody else's record.

11          MR. SALEEM:  And just (inaudible).

12          MR. NINOSKY:  Well, that I agree with, but the flip

13   side of it is how he conducts his examination, it isn't relevant

14   if he's using smiley faces or not.  What's relevant is whether

15   there was an evaluation that was done with this particular

16   patient.

17          MR. SALEEM:  (Inaudible).

18          THE COURT:  (Inaudible).

19          (End of Sidebar)

20          MR. SALEEM:  And --

21          THE COURT:  And, Mr. Saleem, you may proceed, sir.

22          MR. SALEEM:  Thank you, Your Honor.

23   BY MR. SALEEM:

24   Q    And what is the purpose of using the smiley face as opposed

25   to actually asking the patient to describe the pain, the

1    severity of pain?

2    A    It's another means of helping the patient pinpoint exactly

3    what their pain is.

4    Q    And this is done for all patients?  You are given the

5    smiley level chart for all patients?

6    A    No.  Some patients are patients that can give you a number.

7    Some patients of areas give you a number.  Some patients

8    struggle with the number concept.

9    Q    Okay.

10   A    And the smiley faces help them.

11   Q    Okay.  And in this case the fact that it was noted that the

12   intensity of pain was moderate, what, if anything, significance

13   does that have to you?

14   A    That it was more than just uncomfortable, that it was

15   getting to be, you know, very uncomfortable.

16   Q    Okay.  Are terms moderate and severe something that you

17   would use in your assessment of a patient?

18   A    I might.

19   Q    Okay.  And what is this next line, the significance of the

20   fact that it says pain -- what makes pain worse?  That it

21   increases with medication.  What is that, if anything, of

22   significance to you?

23   A    Really not much.

24   Q    Okay.  Now when it says increases of the medication, we

25   just discussed the patient was getting two different types of

1   medication.  From that entry, can you tell if it's pain

2   increases with the medication of the Naproxen or pain increases

3   with Maalox?

4   A    You can't tell.

5   Q    Okay.  So this is an entry that's not clear to you.  It's

6   not clear in the chart.

7   A    Correct.

8   Q    Okay.  And would it make a difference to you as in terms of

9   your diagnosis or your treatment of the patient which medication

10  is causing him pain?

11  A    It may.

12  Q    Okay.  And the next entries indicate that the patient was

13  nauseous.  And just for purposes, just so we're all clear, what

14  does nausea mean?

15  A    Nausea is unsettled stomach.

16  Q    Okay.  And in this case, vomiting, it was checked off that

17  he was not vomiting, is that right?

18  A    Correct.

19  Q    Okay.  And what about BM?  What does BM stand for?

20  A    Having a bowel movement.

21  Q    Okay.  All right.  And in this case, it was noted as normal

22  and his urination is also noted as normal.

23  A    Correct.

24  Q    Okay.  Next says vital signs were taken.  Of what

25  significance do you note anything regarding his vital signs?

1    A    They appear to be normal.

2    Q    Okay.  And, okay.  And it says in general appearance --

3    what do you make of the fact that it says, "Looks to be in

4    pain?"  What significance does that present to you with someone

5    who is already experiencing the same symptoms that we just

6    finished talking to you about?

7    A    It correlates that he's having, you know, being

8    uncomfortable, that he's in pain.

9    Q    Okay.  And what significance, if any, is the fact that

10   there are bowel sounds active.  What does that mean?

11   A    Bowel sounds are normally active within the abdomen and

12   some conditions can cause the intestines to shut down.

13   Q    Okay.

14   A    Severe inflammation within the abdomen.

15   Q    And how are you determining that bowel sounds are active?

16   How are you noting that?

17   A    We use a stethoscope to make that assessment.

18   Q    Okay.  And if bowel sounds -- so a normal finding, would we

19   expect to hear the sounds when you're listening to the abdomen,

20   is that right?

21   A    Correct.  And there can be a character, the sounds.  They

22   can be diminished.  They can be high pitched.

23   Q    Okay.  And is that something that you have been trained to

24   listen to?

25   A    Correct.  Yes.

1    Q    Okay.  And if they are absent, what, if anything, for

2    significance could that mean?

3    A    That could mean that there's some process going on within

4    the abdomen.

5    Q    Okay.  And just the last line on there, it says soft.

6    What, if anything, is significant of the fact that it's noted --

7    I think it's continued, sorry -- from the next page just so

8    you're clear.  Looking at 60 and 61 right now, PCM.

9    A    Okay.

10   Q    So would palpation mean touching?

11   A    Yes.

12   Q    Okay.  So touching the abdomen reveals that it's I think

13   soft and tender.  What, if any, significance does that have to

14   you?

15   A    Well, soft as opposed to rigid.  As the patient develops a

16   rigid abdomen it's harder like a board.  Soft is more like a

17   pillow, which is normal.  Softness would be a normal quality of

18   the abdomen.  And tenderness is an abnormal quality of the

19   abdomen.  Generally, when you examine the abdomen it shouldn't

20   be tender.

21   Q    Okay.  And what, if any, effect does it have depending on

22   the size of the patient or the size of their abdomen in terms of

23   assessing whether it's soft or not?

24   A    Well, in larger patients it can be difficult to pick up

25   rigidity in the abdomen.  So the abdomen can generally be softer

1    in patients that have a higher body mass index, but tenderness

2    would be the same.

3    Q    Okay.  And in terms of this case, if Mr. Rodriguez was

4    5'11" and his weight ranged in the range of around 280 pounds,

5    medically speaking how would you characterize him?

6    A    He has an increased body mass index.

7    Q    Okay.  And would he be, medically speaking, be considered

8    obese?

9    A    Yes.

10   Q    Would he be considered morbidly obese?  Is that a higher

11   level of obesity or no?

12   A    No.  Just moderate obesity.

13   Q    Just obese.  Okay.  And there are other terms here in terms

14   of under palpation.  What is rebound tenderness?

15   A    Rebound tenderness is when you push on one side of the

16   abdomen and then you release it and you get -- the pain rebounds

17   to the other side.

18   Q    Can you just demonstrate to the --

19   A    Yeah.  So when you examine the patient with appendicitis,

20   the appendix is usually located on the right lower quadrant.

21   You push in the left side and then when you release it is when

22   the patient gets the pain.

23   Q    On the other side?

24   A    On the other side.

25   Q    I see.  Okay.  And what about the term guarding, which is

1  also noted there?

2  A    Guarding is when the patient's abdomen is rigid and so when

3  you feel the abdomen it's tense more like a board and the

4  patient will tense up their abdomen because they don't want you

5  to push on their abdomen because it hurts.

6  Q    I see.  Okay.

7  A    So they essentially guard their abdomen.  That's where the

8  term comes from.

9  Q    I see.  Okay.  And now the next section talks about the

10  location and description of findings.  LUQ, does that stand for

11  lower -- I mean, left upper quadrant?

12  A    Left upper quadrant.

13  Q    LLQ is left lower quadrant?

14  A    Correct.

15  Q    And RUQ is right upper quadrant --

16  A    Correct.

17  Q    -- and right lower quadrant.

18  A    Correct.

19  Q    So just a reminder is these are the quadrants we were

20  talking about earlier.

21  A    Correct.

22  Q    So what, if any, significance is it to you that the patient

23  is presenting with pain that is in the left upper quadrant and

24  right upper quadrant?

25  A    They're non-specific findings.

1   Q    Okay.  And what about the fact that -- now, once you

2   conduct the -- now, in terms of your examination when someone

3   presented to you with abdominal pain, I think we talked about

4   the history, right?  You would conduct that.

5   A    Correct.

6   Q    And then the next thing would be the physical, right?

7   A    Correct.  The physical.

8   Q    Is there something that you use in terms of when you're

9   conducting an examination called SOAP, an acronym?

10  A    SOAP is a way we record an assessment.

11  Q    Okay.

12  A    So when you have a patient who presents for the first time

13  you do what's called a history and physical examination where

14  you take the history of the illness, you perform a physical

15  examination, and then you formulate a differential diagnosis,

16  which is an assessment, and then you formulate a plan based on

17  that differential diagnosis.  When we do follow up or daily

18  assessments of the patient, we use the acronym SOAP, S-O-A-P.

19       S is subjective.  How are you feeling?  How are things

20  going?  How are you eating?  You know, is anything going on?

21  Object, for object of signs such as vital signs, such as your

22  physical examination, you know, heart, lungs, abdomen, skin.

23  And then A is your assessment.  Is the patient getting better?

24  Is the patient getting worse?  And P is your plan.  You know,

25  are we going to stay the course?  Are we going to change the

1   course?

2   Q    Okay.  And based upon what has been presented to you right

3   now based on what we just reviewed, what would your assessment

4   be at this point?

5   A    My assessment would be that the patient's getting worse

6   since he's stating he's had pain for 48 hours or 2 days and that

7   it was not relieved by Maalox he was recently on and he's now

8   exhibiting abdominal tenderness.

9   Q    All right.  And in your mind, what would you be suspecting

10  is the cause of that abdominal tenderness?

11  A    Well, I would have a differential diagnosis of acute

12  appendicitis, gastritis, a viral gastroenteritis would be three

13  of the most common abdominal complaints.

14  Q    Okay.  And why are you suspecting acute appendicitis at

15  this point?

16  A    Acute appendicitis is one of the most common complaints

17  within the abdomen of abdominal pains within the abdomen of

18  abdominal pain, especially in age group from 15 to 25 or

19  certainly from 10 to 30, common in males because in women you

20  have more differential diagnosis.  Ovarian cists, twisted ovary,

21  tubal pregnancy, a lot more common.  Urinary tract infections in

22  women.  So that in men the differential diagnosis is slightly

23  narrow than women.

24  Q    And at the time this was conducted how old was Mr.

25  Rodriguez?

```
1   A     Twenty-two.
2   Q     Okay.  So because -- and because you had several different
3   differential diagnosis, would that effect the -- that was your
4   assessment?  Is that the (inaudible)?
5   A     Yes.
6   Q     Okay.  And would that then lead you to determine what your
7   plan is?
8   A     Correct.
9   Q     Okay.  Now, so acute appendicitis, is that fair to say that
10  that's the most severe of your potential differential diagnosis
11  of the ones that you're factoring into?
12  A     Yes.  Yes.
13  Q     Okay.  So, and I think of the ones you mentioned would
14  gastritis be on the lower end?
15  A     Yes.
16  Q     Okay.  And is gastritis also referred to as stomach upset
17  or GI upset?
18  A     Yes.
19  Q     Okay.  So would your treatment -- and is there any danger
20  to the patient if you only consider one of those differential
21  diagnosis?  Say the lowest one, as opposed to the higher one?
22  A     Yes.
23  Q     What could --
24  A     Because you could miss the diagnosis.
25  Q     Okay.  So if you're talking about that funnel earlier, you
```

```
 1   want to keep that funnel wide open to think of multiple possible

 2   avenues.

 3   A    Correct.

 4   Q    Since you don't want to turn the funnel on its head and

 5   just focus on one, correct?

 6   A    Correct.

 7   Q    Okay.  So in this case, what was the assessment that was

 8   noted in the chart here?

 9   A    GI upset.

10   Q    Okay.  And were there any other differential diagnosis or

11   upsets noted in the chart?

12   A    No.

13   Q    Okay.  And of what significance to you is the fact that

14   only GI upset was noted as a possible type of pain, cause for

15   the type of pain?

16   A    That other diagnosis may not have been considered.

17   Q    Okay.  And is the danger in not considering the other

18   diagnosis is that -- what is the danger in just focusing on one

19   diagnosis to the exclusion of the others?

20   A    You can't make a diagnosis if you don't think about it.

21   Q    All right.  And in this case, so because the assessment was

22   considered GI upset is it fair to say then that the plan

23   followed that assessment?

24   A    Correct.

25   Q    Okay.  And because the assessment was not looking at your
```

1   other differential diagnosis like appendicitis the plan was not

2   focusing on treating appendicitis, is that fair to say?

3   A    Correct.

4   Q    Okay.  And in this case does it indicate -- is that

5   consistent with what is documented in the plan as to what the

6   course of treatment was for the Plaintiff, Mr. Rodriguez?

7   A    Yes.  He would report worsening symptoms, increase oral

8   fluids.

9   Q    And what in terms of medication was provided to him?

10  A    Pepto Bismol and Maalox.

11  Q    Okay.  And Pepto Bismol and Maalox, are those medications

12  that are meant to treat GI upset?

13  A    Yes.

14  Q    Would you, if you're suspecting a patient who has

15  appendicitis, would you expect to give them Maalox and Pepto

16  Bismol?

17  A    No.

18  Q    Okay.  And why not?

19  A    Well, they're not effective and if I thought the patient

20  had appendicitis I wouldn't feed the patient.

21  Q    What do you mean, you won't feed the patient?

22  A    Well, because patients that have appendicitis, you know,

23  often need surgery.  If I didn't think that they or it was very

24  early in on the course, you could give Maalox or Pepto Bismol.

25  There's not much of a down side to that.  Although he already

```
 1    had Maalox and it hadn't been effective.  You know, I don't know
 2    that I would add Maalox and Pepto Bismol together.  You know, I
 3    would do one or the other, but there's not much downside to
 4    either of them.
 5    Q    And when you say -- so is the failure to consider other
 6    differential diagnosis with someone presenting with the symptoms
 7    that Mr. Rodriguez presented a deviation from the standard of
 8    care?
 9    A    Well, you have an LPN making an assessment and a diagnosis
10    which is beyond the scope of practice for an LPN.  So an LPN can
11    collect information and then needs to provide that information
12    to a higher level practitioner to actually even formulate the
13    diagnosis and to make a plan.
14    Q    Okay.
15    A    So --
16    Q    Sorry.  I didn't mean to cut you off.
17    A    So I don't see that the LPN, you know, they can collect
18    information, but they have to then give the information to
19    somebody else to make a diagnosis or a plan.
20    Q    And can an LPN prescribe medication or would it have to go
21    through either a nurse practitioner or a doctor to get it
22    through that?
23    A    It would have to go through a higher level practitioner.
24    Q    So the fact that the -- and there's indication in the plan
25    that there was medication prescribed, does that indicate to you
```

1  that this nurse, Ms. Roberts, had already spoken to some sort of

2  provider level?

3  A    I would assume so.

4  Q    Okay.  And what is the -- in terms of the referral, what

5  does it indicate in the referral there, the second to last box?

6  A    That the patient would initiate a follow up visit if the

7  patient thought he wasn't improving.

8  Q    Okay.  And what's PRN mean?

9  A    As needed.

10  Q    Okay.  So that's based upon as needed, the patient making

11  that own determination?

12  A    Correct.

13  Q    Okay.  And what, if anything, is significant about the last

14  line, education?

15  A    Report worsening symptoms and increase fluids.  Worsening

16  symptom is something that the patient feels, nausea, fever,

17  vomiting, or pain.

18  Q    Okay.  And what is the significance about increasing the

19  fluids?

20  A    That would be to increase your oral fluid intake.

21  Q    And how would that -- someone who's presenting with

22  symptoms of appendicitis, what, if any, effect would that have?

23  A    Well, usually with appendicitis once you start the

24  abdominal pain the nausea and the vomiting come after the

25  abdominal pain.  And so patients that are developing

1    appendicitis often go on to then develop what we call anorexia

2    or they lose their appetite.  And then they don't want to eat

3    and they don't want to drink because it hurts their abdomen and

4    they tend not to eat or drink.

5    Q    So just to be clear, the term anorexia, I mean, it's not

6    the way we use it in popular culture.

7    A    Right.

8    Q    But medically speaking, it just means loss of appetite?

9    A    Loss of appetite.

10   Q    Okay.  And when you are -- so under this circumstance if

11   you were presented by an LPN who conducted this sort of

12   assessment what would your plan be at this point?

13   A    My plan would to then see the patient and perform my own

14   assessment.

15   Q    And why would you want to see the patient at this point?

16   A    Well, the patient is becoming ill and the patient has

17   sufficient complaints to warrant an evaluation.  He's having

18   abdominal tenderness.  It didn't respond to Maalox.  I would

19   want to perform my assessment to see if I thought that he had a

20   mild abdominal complaint or if it was something more serious.

21   Q    And you being you, being a doctor, want to physically lay

22   hands and lay eyes on a person, is that correct?

23   A    Correct.

24   Q    Okay.  And would that be a deviation of someone who was

25   presenting with these symptoms, these complaints, to not be seen

```
1    by either a medical care provider on the level of either a nurse
2    practitioner, physician's assistant, or a doctor?
3    A    It would be if he eventually was not seen at some point.
4    Q    Okay.  So you would expect as a result of this at some
5    point to see the patient?
6    A    Especially if symptoms persisted.
7    Q    Okay.  And when you say at some point, how soon after, if
8    the patient is presenting with these symptoms and there's
9    documentation that his symptoms did not go away, how soon after
10   this assessment would you expect to lay hands and lay eyes on
11   the patient?
12             MR. NINOSKY:  Objection.  Outside the scope.
13             THE COURT:  Response?
14             MR. SALEEM:  I think it's directly in line with what
15   he was talking about.
16             THE COURT:  Counsel, please approach.
17             (Sidebar)
18             MR. NINOSKY:  There's nothing in his report talking
19   about the timeliness other than obviously there's no diagnosis.
20   There's no anything in his report saying that all the
21   (inaudible) in this report had to have been this particular
22   person.  Would have had to have seen this patient sooner, which
23   he wasn't in the facility.  There's nothing in there about that.
24             MS. RAMEAU:  But he did talk in his report about a
25   timely diagnosis and this is a late diagnosis, so it's
```

1    (inaudible).

2            THE COURT:  (Inaudible).

3            MR. SALEEM:  (Inaudible).  Obviously it comes into

4    play because (inaudible).

5            MR. NINOSKY:  Well, there's nothing in his report

6    about Paula Dillman having either come into the facility or

7    timeliness of her doing an exam.  That's different.  There are

8    several days in there and that's their theory of the case.  He's

9    going to be able to say that it should have been diagnosed

10   quicker.  I get that, but this is a specific question trying to

11   establish a standard of care for time as to when Paula Dillman

12   should have done an exam.  That's not in the report.

13           THE COURT:  I'll sustain the objection.  (Inaudible).

14           (End of Sidebar)

15           Mr. Saleem, you may proceed, sir.

16           MR. SALEEM:  Thank you, Your Honor.

17   BY MR. SALEEM:

18   Q    Doctor, I'm now going to show you -- what we just looked at

19   was the assessment that was done by Ms. Roberts.  I'm going to

20   show you now Plaintiff's 2, Bates stamped PCM202.  And, Doctor,

21   this document was written by Ms. Roberts again, is that right?

22   A    Yes.

23   Q    Okay.  And it was also on April 16, 2015, is that right?

24   A    Correct.

25   Q    Okay.  And this document is a telephone order form to --

1   meaning that who did she speak to in this document where it says

2   provider giving the orders?

3   A    I don't know.

4   Q    Do you see that?

5   A    Where?

6   Q    It's about right over here.

7   A    Oh, P. Dillman-McGowan.

8   Q    Okay.  And what does CRNP stand for?

9   A    Certified Nurse Practitioner.

10  Q    Okay.  So in this case Ms. McGowan was the -- and case

11  nurse practitioners give orders?

12  A    Yes, they can.

13  Q    Okay.  And this leads you to believe this is a follow up

14  documentation after Ms. Roberts' assessment that we just talked

15  about a second ago?

16  A    Yes.

17  Q    Okay.  And this is documentation of her conversation with

18  Ms. McGowan.

19  A    Correct.

20  Q    Ms. Dillon-McGowan, okay.  And in addition, reason provider

21  called.  And in that indication, is that an indication of what

22  Ms. Roberts is conveying to Ms. Dillon-McGowan?

23  A    Correct.

24  Q    Okay.  And does it indicate that this is something that's

25  done -- this is a telephone or verbal order form, right?

1   A     Correct.

2   Q     Okay.  And see where it says patient described as tearing

3   in quotes, tearing or T-E-A-R-I-N-G, which --

4   A     Yes.

5   Q     Okay.  That could be pronounced tearing like with eyes or

6   tearing with ripping, right?

7   A     I would think crying, tearing up.

8   Q     Okay.  Okay.  But it's not -- again, it's not clear, right?

9   A     Correct.

10  Q     You were making that assumption.

11  A     Correct.

12  Q     Okay.  If a patient makes a statement that's -- what is the

13  purpose of putting a statement in quotes?

14  A     In quotes, it usually -- usually we put it in quotes if

15  it's coming from -- if the patient said something.

16  Q     Okay.

17  A     You know, then we put it in quotes.  That's a description.

18  You know, the patient wouldn't say, "I'm tearing."

19  Q     Okay.

20  A     You know, so I'm not sure why it's in quotes.

21  Q     Okay.  But could it also be tearing in the sense that the

22  pain feels like it's tearing?

23          MR. NINOSKY:  Objection.  It's speculation at this

24  point.

25          MR. SALEEM:  Well, he just mentioned this.  I'm just

 1  trying to clarify what's --

 2          THE COURT:  I assume Mr. Rodriguez will be able to

 3  testify as to what -- well, maybe I shouldn't assume that.  But

 4  whatever was said and whatever it meant, I don't think it's

 5  appropriate to try to speculate on that.

 6          MR. SALEEM:  Well --

 7          MR. NINOSKY:  And we know that Nurse Roberts is going

 8  to say what it meant because she is the one who made the

 9  documentation.

10          MR. SALEEM:  What I am just trying to get at, Your

11  Honor, is just my whole point is that it's not clear based upon

12  the document.  There's two possible meanings.

13          THE COURT:  Very well.

14  BY MR. SALEEM:

15  Q    Is that fair to say, Doctor?

16  A    Yes.

17  Q    Okay.  And I think we discussed earlier the importance of

18  making documents in the medical chart is to be clear, right?

19  A    Correct.

20  Q    And you want to be precise because other people are looking

21  at it.

22  A    Correct.

23  Q    Right.  And in this case you don't know if it's tearing

24  with eyes or tearing as in a stripping, a shredding sort of.

25          MR. NINOSKY:  Objection, as to leading.

```
1              MR. SALEEM:  Okay.  That's fine.  I'll withdraw that.
2              THE COURT:  The objection is sustained.
3   BY MR. SALEEM:
4   Q    That's fine.  And it also notes complains of acid reflux.
5   Do you see that?
6   A    Yes.
7   Q    C slash O, does that mean complains of?
8   A    Yes.
9   Q    Okay.  Do you know -- we previously looked at other
10  documents.  Did it make any mention of acid reflux in that and
11  under the chief complaints?
12  A    I think it's on the other page.  No.
13  Q    Can I approach, Your Honor?
14             THE COURT:  Certainly.  That's fine.
15  BY MR. SALEEM:
16  Q    Okay.  I just want to know if you see a mention of acid
17  reflux.
18  A    Yeah, the heartburn is not checked.
19  Q    Heartburn is not checked?
20  A    Not checked.
21  Q    Okay.  And would expect heartburn to be checked if someone
22  is complaining of acid reflux?
23  A    Right.  I would assume they're essentially synonymous
24  terms.
25  Q    Okay.  And would someone, a patient in this case,
```

1    necessarily use the term acid reflux?

2    A    No.

3    Q    Okay.  That's something that more the medical personnel

4    use?

5    A    Correct.

6    Q    Okay.  So the fact that it's indicated that the patient is

7    describing as tearing and also complains of acid reflux, does

8    that mean that in this case Ms. Roberts is making an assessment

9    that she thinks Plaintiff has acid reflux as opposed to him

10   actually saying, "I have acid reflux?"

11             MR. NINOSKY:  Objection.  Speculation.

12             THE COURT:  Counsel, please approach.

13             (Sidebar from 1:37 p.m. to 1:46 p.m.)

14             THE COURT:  And, ladies and gentlemen, whenever we do

15   have a bench conference, we try to keep them to a minimum, but

16   feel free to stand up and stretch if you wish to.  You don't

17   have to remain seated during those conference.

18             Mr. Saleem, you may continue, sir.

19   BY MR. SALEEM:

20   Q    Great.  Thank you, Your Honor.  And as a result of this

21   phone conversation with Ms. McGowan, what orders did she give in

22   respect to medication?

23   A    To discontinue the Naproxen.

24   Q    That's -- DC means discontinue?

25   A    Yes.

1    Q    Okay.

2    A    Stop taking.

3    Q    Okay.  And what was the purpose of discontinue -- what

4    would be the purpose of discontinuing the Naproxen?

5    A    It may be contributing to abdominal discomfort.

6    Q    Okay.  And it appears that three different types of

7    medication were prescribed?

8    A    Yes.

9    Q    Okay.  Including the Maalox that had previously been given

10   to him?

11   A    Yes.

12   Q    Okay.  Okay.  So that was -- that entry was made around

13   September -- April 16th around 9:32, 21:32 is 9:32.

14   A    Correct.

15   Q    Okay.  And the next entry I'm looking at is PCM73.  Under

16   this indication, I just want to focus your attention on the

17   middle note with 41715.  And in this case, the note is that his

18   -- this is authored by Allison Young.  She's an RN.  Is that

19   fair?

20   A    Correct.

21   Q    But it indicates that she would assess by -- appears to be

22   assessed by another individual, is that fair?

23   A    Patient assessed on K unit by Tracy Reeves.

24   Q    Okay.  So you would expect there to be some indication of

25   Ms. Reeves assessing the patient in the chart, right?

```
 1              MR. NINOSKY:  Object again, Your Honor.
 2              MR. SALEEM:  I'll withdraw that.
 3              THE COURT:  Okay.
 4    BY MR. SALEEM:
 5    Q    There were vital signs taken, both blood pressure and heart
 6    rate?
 7    A    Correct.
 8    Q    Okay.  And it says that patient states he's still vomiting.
 9    What, if any, significance do you place on that?
10    A    That he was already vomiting.
11    Q    Okay.  And when we looked at the chart earlier the
12    indication from Ms. Roberts, what did she note as to whether or
13    not Mr. Rodriguez was vomiting?
14    A    That he wasn't vomiting.
15    Q    So but now a chart note has mentioned that he is vomiting
16    later, so --
17    A    Correct.
18    Q    Okay.  And at this time as a result of him vomiting it
19    appears that -- it says a provider was called.
20    A    Correct.
21    Q    And in this case the provider would be Ms. Dillon-McGowan.
22    And she instructed him to bring to medical for assessment.  What
23    is further assessment?  What do you understand that to be?
24    A    That he would be assessed at the medical unit.
25    Q    Okay.  And the next entry, does that seem to indicate that
```

1   Ms. Young brought the patient over to the medical unit for

2   assessment?

3   A     Yes.

4   Q     Okay.

5   A     Patient brought over to medical for assessment.

6   Q     Okay.  And again it appears his vital signs were taken.

7   A     Correct.

8   Q     Blood pressure, heart rate.  Is that -- and then is there

9   any significance of his blood pressure and heart rate to you?

10  A     His heart rate is low.

11  Q     Okay.  And what, if anything, could that be an indication

12  of or what significance?

13  A     From vomiting you can get what's called vagal.  You can

14  actually lower your heart rate when you're vomiting.

15  Q     Okay.  And what does the term afebrile mean?

16  A     Afebrile means without fever.

17  Q     Okay.  And what, if any, significance is that?

18  A     Just that he doesn't have a fever.

19  Q     Okay.  And previously you mentioned that you're suspecting

20  acute appendicitis.  What were the criteria that you were using

21  to determine or what were the factors that led you to come up

22  with that being a differential diagnosis?

23  A     Abdominal tenderness.

24  Q     Okay.  Anything else?

25  A     Nausea.

1    Q     Okay.

2    A     And now vomiting.

3    Q     Okay.  What are -- have you heard or is pain in the right

4    lower quadrant an indication of appendicitis?

5    A     It can be.

6    Q     But does it always have to be present to be diagnosed with

7    appendicitis?

8    A     No.

9    Q     Okay.  And what about rebound tenderness?  Is that a

10   potential symptom of appendicitis?

11   A     It can be.

12   Q     Okay.  Can you have appendicitis without having rebound

13   tenderness?

14   A     Yes.

15   Q     Okay.  And what about the fact of a high fever?  Is that a

16   symptom of appendicitis?

17   A     No.  It's a very general symptom.

18   Q     Okay.  I mean, if a patient -- so the fact that the patient

19   does not present with a high fever, can you exclude appendicitis

20   from a differential diagnosis?

21   A     No.  No.

22   Q     Why not?

23   A     Because it's not always associated with a fever.

24   Q     Okay.  And what is the significance of -- withdrawn.  Now

25   looking at this chart on, again, this note that's dated 4/17 at

1    3:39.  It says, "Patient vomited once in medical."  Do you see

2    that?

3    A    Correct.

4    Q    Okay.  So now based upon the note we just read earlier when

5    the Plaintiff says he's still vomiting, now is an indication

6    that he vomited again, is that right?

7            MR. NINOSKY:  Objection as to leading, Your Honor.

8            THE COURT:  I'll sustain the objection.

9    BY MR. SALEEM:

10   Q    Okay.  What, if anything, is significant to you that the

11   patient vomited in the medical unit having previously mentioned

12   that he was still vomiting?

13   A    That whatever condition is going on is certainly not

14   resolved and appears to be getting worse.

15   Q    And in this case it mentions that Ms. Young then spoke to

16   Ms. Dillman-McGowan.  It says, "Provider called."  What

17   instructions did she give to Nurse Young?

18   A    Try to drink and eat something and ordered CMP and CBC

19   stat.

20   Q    What, if anything, is significant of the fact that she was

21   ordering to try to drink and eat something?  Let me ask you this

22   way, Doctor.  If you were -- I think previously you said that if

23   you were suspecting someone of acute appendicitis you would not

24   want to give them anything by mouth, is that fair?

25   A    Right.  And we generally would not feed somebody vomiting.

```
 1   Q    Okay.  So does the fact that Ms. McGowan ordered Mr.
 2   Rodriguez to try to drink and eat something, does that indicate
 3   to you that she was not considering appendicitis as a
 4   differential diagnosis?
 5   A    Yes.
 6   Q    Okay.  And that is fair to say because we previously
 7   discussed that they were anticipated to be GI onset based upon
 8   what we read before?
 9   A    Yes.
10   Q    Okay.  And what are CMP and CBCs?  Are those blood tests,
11   Doctor?
12   A    CBC is a complete blood count looking at the white count.
13   CMP, I'm not sure if they are ordering electrolytes or what is
14   ordered in that test at that facility.
15   Q    Okay.
16   A    It goes electrolytes like potassium or goes by many
17   different names.
18   Q    Okay.
19   A    I'm not exactly sure what's included in that test.
20   Q    Okay.  And CBC is -- and what would be the purpose in
21   ordering those tests?
22   A    To see if the white cell count is elevated.
23   Q    Okay.  And the term stat, what does that mean?
24   A    That means rapidly.
25   Q    Okay.  In a hospital setting, have you given orders that
```

1    you would want to be filled out stat?

2    A    Yes.

3    Q    Okay.  And what is your expectation as to how soon those

4    orders would be filled out?

5    A    In a hospital setting stat means right away.

6    Q    Okay.  And what would you anticipate it to be in a jail

7    setting?

8              MR. NINOSKY:  Objection.

9              THE COURT:  Sustained.

10   BY MR. SALEEM:

11   Q    And right away means within how many minutes or hours or

12   how would you calculate that?

13   A    Depending upon what you're ordering.

14   Q    Well, in this case if you're ordering blood tests stat.

15   A    If I'm ordering blood tests, the blood test would be done

16   stat, reasonably within 15 to 20 minutes in the hospital,

17   availability within an hour to 2 hours.

18   Q    Okay.  And meaning you would get the results within two

19   hours.

20   A    Correct.

21   Q    Okay.  And I just want to look at -- I'll show you PCM94.

22   What is PCM94?  What type of document is it?

23   A    It's a lab results slip.

24   Q    Okay.  And I'm just going to show you.  Does it appear as

25   if it was ordered by Ms. McGowan?

A     Yes.

Q     Okay.  And what is the date that it was collected on?

A     April 17th, 04:00, 4:00 in the morning.

Q     Okay.  And date collected means the date that the blood was actually collected from the patient?

A     Correct.

Q     Okay.  And what does the date received mean?

A     Date received means at what time was it received in the lab.

Q     In the lab, okay.  So it was collected at 4:00 a.m., but the lab only collected it at 11:32 p.m.

A     Correct.

Q     Okay.  And what, if any, significance is there, the fact that there was a almost 16 hour delay in collecting it?

A     Well, you can have degradation of the blood in the test if you wait that long.

Q     And what do you mean?  When you say degradation, what do you mean?

        MR. NINOSKY:  Objection.  Outside the scope.

        THE COURT:  I'll overrule the objection.

        THE WITNESS:  If the blood is sitting around for a long period of time, it does have a preservative in it, but certain of the numbers can be less accurate after a long period of time.

BY MR. SALEEM:

1  Q    And what is the date of the report?

2  A    4/18, 6:55.

3  Q    And what does that mean?  What does that date mean?

4  A    That means it was the next day at 6:55 in the morning.

5  Q    That's when this report was generated?

6  A    Yes.

7  Q    Okay.  And in the treating of appendicitis, would part of

8  your assessment be conducting a blood test to look for white

9  blood cell counts?

10  A    Yes.

11  Q    Okay.  And of what significance or what role would you

12  place on those tests?

13  A    White blood cells are -- it's a generalized test.  It's not

14  specific for appendicitis.  The white blood cell count can go up

15  in appendicitis.  It doesn't always go up.

16  Q    Okay.  So the fact that if the white blood cell count was

17  normal, it did not show any elevation, could you rule out

18  appendicitis?

19  A    No.

20  Q    Okay.  And I'm just going to show you what's been marked as

21  -- so after Mr. Rodriguez was seen in the early morning hours of

22  the 17th does it appear that he was next -- the next time he was

23  looked at was on April 17th at -- there's an entry that's at

24  least indicated it's 13:35.  Do you see that, Doctor?

25  A    Yes.

1    Q     Okay.  And of what significance is it that the patient
2    stated that he was feeling weak and having no appetite?
3    A     That he's not improving.
4    Q     Okay.  And what about the fact that he -- what is no
5    emesis?  I'm probably not pronouncing that --
6    A     That's no vomiting.
7    Q     Okay.  And it says, "No vomiting since early a.m."  Does
8    that indicate that he vomited?  What does that indicate to you?
9    A     That he vomited earlier previous to that.
10   Q     Okay.  And what significance is there, the fact that he's
11   reported eating nothing for breakfast and a small amount for
12   lunch?
13   A     That he doesn't feel well.
14   Q     Okay.  And if a patient presented with these symptoms, how
15   would you describe the patient's conditions from when we first
16   started talking about him when he was first seen on the 16th?
17   A     Well, that he's no better and appears to be worse.
18   Q     Okay.  What would the appropriate course of action to be
19   taken at this point?
20   A     To have somebody evaluate him.
21   Q     And when you say somebody --
22   A     So somebody of a higher level.
23   Q     Okay.  Higher level than a licensed practical nurse or a
24   registered nurse.
25   A     Correct.

1  Q    Okay.  Okay.  And I'll just show you now what's been marked

2  -- and just the term, just to be clear, it says, "0600 and 1200

3  med pass."  That's 6:00 a.m. and 12:00 p.m.

4  A    Correct.

5  Q    Okay.  And the next entry that appears to be was at April

6  17th at 19:11 appears to be the note.  Do you see that?

7  A    Yes.

8  Q    And it's 1900 med pass.  Is that 7:00 p.m.

9  A    Yes.

10  Q    Okay.  And this is a note again by Susan Roberts, right?

11  A    Yes.

12  Q    And Susan Roberts we mentioned saw him the day earlier,

13  right?

14  A    Yes.

15  Q    She made the initial assessment, right?

16  A    Yes.

17  Q    Okay.  And again, her note notes that patient was

18  complaining of abdominal pain.

19  A    Yes.

20  Q    And this is now abdominal pain that he's been complaining

21  of when she talked about him yesterday on the 16th she said it

22  had been going on for two days.

23  A    Correct.

24  Q    Okay.  So now this would be if she's seeing him on the 17th

25  it would potentially be three days.

1    A    Correct.

2    Q    Okay.  And thus far, is there any indication in the records

3    that he had been seen by any provider, either a doctor, a

4    physician's assistant, or a certified registered nurse

5    practitioner?

6    A    No.

7    Q    Okay.  And would that be something that you would have

8    expected him to see at this point, to be seen at least by one of

9    those three types of individuals?

10          MR. NINOSKY:  Objection.

11          THE COURT:  Counsel, please approach.

12          (Sidebar from 2:03 p.m. to 2:12 p.m.)

13          THE COURT:  Ladies and gentlemen, rather than having

14   you sit there while we're discussing this matter, I'm going to

15   take a 15-minute recess.  I'm going to again remind you that you

16   should keep an open mind about this case until all the evidence

17   is in on both sides.  So you should remain from discussing with

18   each other or with anyone else including members of your family

19   or allow anyone to talk to you about it.  Do not form any

20   opinions about this case until you retire to the jury room after

21   my charge.

22          We'll stand in recess for 15 minutes.

23          THE BAILIFF:  All rise.

24          (Jury excused)

25          THE COURT:  And I think, Doctor, for this discussion,

1   it might be best if you step outside.

2           THE WITNESS:  Yes.

3           THE COURT:  Thank you.

4           You may be seated.  The record will reflect that the

5   jury is no longer present and also that the witness, Dr. Brown,

6   has stepped out of the Courtroom.

7           I just want to make sure that the theory of the

8   Plaintiff is not moving away from the report and away from the

9   original claim.  And so I want to give everyone a chance to

10  reread the expert witness disclosure.  If there is no question

11  that he opines within a reasonable degree of medical certainty

12  that the staff departed from the standard of medical care when

13  they failed to recognize obvious signs of appendicitis.  Now

14  here it says, "Failed to order proper diagnostic testing," but

15  I'm not sure what that proper diagnostic testing he believes

16  should have been ordered other than what would have been

17  available at a hospital.  Because he does say later on in the

18  report, he talks about diagnostic tests that would have been

19  performed if they had gotten him to a hospital.

20          It was, "During the prevalence of this condition, I

21  have seen a number of cases involving."  Yeah, he talks about in

22  paragraph 16, "There are other symptoms associated with

23  appendicitis such as vomiting and diarrhea and high temperate,

24  but an appropriate abdominal examination is often key in

25  diagnosing this condition."

1          Then it goes to 17.  "While some scans such as a CT

2     scan can help confirm or rule out a suspicion of appendicitis,

3     it is common knowledge among healthcare professionals that a

4     diagnosis of appendicitis is made by way of a proper clinical

5     assessment.  This involves taking a full history of the

6     patient's symptoms, how the symptoms have worsened, and by

7     performing a physical examination of Plaintiff.  If following

8     such an assessment a strong index suspicion of appendicitis

9     remains, a patient will often be listed for surgery, which can

10    be carried out by keyhole surgery."  Then he goes on to talk

11    about that, but that's far less invasive.

12         And he also talks about at paragraph 22 where there's

13    a broader discussion of 21 about delays in obtaining an

14    appropriate diagnosis.  "The delay in diagnosis of appendicitis

15    is unreasonable because Mr. Rodriguez presented with complaints

16    of right lower quadrant pain days before his hospitalization.

17    Diagnostic aids can dramatically reduce negative appendectomies,

18    perforations, and hospital stay.  These aids are laparoscopy,

19    scoring systems, ultrasonography, and computed tomography.

20    Unfortunately, Mr. Rodriguez was not properly assessed until he

21    got to the hospital."

22         So I think that is when you're trying to suggest that

23    the hospital personnel failed to assess him, those are the areas

24    where there is a failure to assess, correct?  And, Mr. Ninosky,

25    would you agree with that?

```
1              MR. NINOSKY:  Yeah.  I'm taking it as when they -- as

2    we discussed at sidebar.  That there was an assessment done,

3    information obtained, and there was a failure to recognize after

4    that assessment that it was appendicitis.  That, to me, is what

5    is discussed.  And that, to me, is what the theory of the case

6    is about.

7              THE COURT:  Attorney Saleem, what are your thoughts?

8              MS. RAMEAU:  I'm sorry.

9              MR. SALEEM:  I'm just going to defer to Ms. Rameau,

10   Your Honor.

11             THE COURT:  Oh, certainly.

12             MS. RAMEAU:  It's paragraph number 22, correct, Your

13   Honor?

14             THE COURT:  Right.  The issue that was before us, and

15   that's what the objection was, was whether Dr. Brown in his

16   report -- and he was not deposed, is that correct?

17             MR. NINOSKY:  No, no depositions have been taken.

18             THE COURT:  So in his report did he opine that one of

19   the areas where -- and I'm going to get the exact name -- where

20   Ms. Dillman-McGowan, Nurse Dillman-McGowan, did he opine that

21   one of the things that she did that fell below the applicable

22   standard of care was she did not come to the prison earlier to

23   do a onsite physical assessment of Mr. Rodriguez?

24             MS. RAMEAU:  Well, that's not specifically in the

25   report, but I think it's inherent in the doctor's report and his
```

1    opinions that there was a delay.  And to the extent that there
2    was a delay in making the diagnosis, the only Defendant in this
3    case who was in a position to make any kind of a diagnosis is
4    Ms. Paula Dillman-McGowan.  No one else in this Courtroom can do
5    that.
6          So, inherent in this document is that her delay in
7    actually making herself present at the facility in order to make
8    a proper abdominal assessment contributed to -- caused, rather -
9    - caused the delay in the diagnosis.  And it's one thing to get
10   information second-hand or third-hand from an LPN or an RN.
11   It's another for a medical provider, a physician or a nurse
12   practitioner, to actually be present at the facility and to
13   conduct the examination themselves, and I think that the doctor
14   was clear in that.
15         THE COURT:  Well, he does say at paragraph 5 that the
16   staff -- one of the problems with this report is he never breaks
17   down the negligence of each individual Defendant.  And we have
18   individual Defendants that are all on trial here, that are all
19   personally liable for their part in what's alleged to have
20   happened here.  So that does make it a problem.  It would be a
21   whole lot easier if he said, "This is what certified registered
22   nurse practitioner Paula Dillon-McGowan did wrong.  This is what
23   Susan Roberts, LPN, did wrong."  He doesn't do that.
24         So when he says, "The staff departed from the
25   applicable standard of care when they failed to recognize

1    obvious signs of appendicitis, failed to order proper diagnostic

2    testing, and failed to transfer Mr. Rodriguez to a facility

3    capable of performing such testing."

4              I'm not sure that means that in order to do it

5    properly and to meet the standard of care Paula Dillon-McGowan

6    had to come to the facility at an earlier time.  I don't know

7    how you read that into that.  But I understand your argument

8    that he's just broadly saying they should do more and now at

9    trial he's going to get into specifics.

10             The problem is that's really putting the Defense in an

11   untenable position that suddenly things that he didn't say were

12   -- like the blood test.  That the blood test -- I think there

13   was a suggestion that the blood test was not tested in a timely

14   fashion once the blood had been drawn.  There is nothing in this

15   report to suggest that that's what led to a misdiagnosis or that

16   that fell below the standard of care, yet that's what the jury

17   heard was -- or at least was an insinuation that maybe this

18   blood test wasn't accurate because the blood wasn't tested in a

19   timely fashion.

20             That's brand new to the Defense because they would

21   never have known that they should have someone who could opine

22   on a blood test because there's nothing in here to suggest the

23   blood test wasn't tested in a timely fashion.  And that's the

24   whole purpose of the report is so they can be put on notice so

25   they can address those issues with the jury.  And I would be

1    fairly certain that the responsive expert opinion from the

2    Defense is not even going to mention a blood test, other than

3    the fact that one was done and it showed that there was no

4    problem with the white blood count.

5            MR. NINOSKY:  That's correct, Your Honor.

6            THE COURT:  So I guess the issue is the law is clear

7    that the witness cannot testify outside the scope of his report.

8    Sometimes it is difficult to define where those lines are drawn,

9    when it actually goes outside the scope and when it is

10   legitimate that the Defense should have been put on notice that

11   this was part of what he was going to claim was the negligence

12   in this matter or the delivered indifference.  There is no

13   question the blood test is not in this report and that should

14   not have gone to the jury.

15           This issue of whether Ms. McGowan should have come in

16   earlier, is that reasonably contained within the idea that

17   that's why they failed to diagnose in a more expeditious

18   fashion?  I know you believe it is.

19           MS. RAMEAU:  I believe it is, Your Honor.  I believe

20   it is.

21           THE COURT:  And what else?  Like what diagnostic tests

22   should they have performed?  Like is he going to testify as we

23   go to that paragraph that listed all the diagnostic testing that

24   could be performed?

25           MS. RAMEAU:  Well, certainly the CT scan he mentions

1  in the report.

2         THE COURT:  But he's not going to suggest they could

3  have done a CT scan, correct?

4         MS. RAMEAU:  No, of course not, Your Honor.

5         THE COURT:  Because I don't think -- they should have

6  sent him to the hospital earlier.

7         MS. RAMEAU:  Right.

8         THE COURT:  And they should have sent him to the

9  hospital earlier because they should have recognized that he had

10 appendicitis.  That's what the doctor is really saying is that -

11 -

12        MS. RAMEAU:  Yes.

13        THE COURT:  -- not that they should have performed

14 these tests, but that they should have gotten to the hospital

15 quicker.

16        MS. RAMEAU:  So that he could be subjected to these

17 tests because obviously they don't have the facilities at the

18 prison for him to be put into a CT scan machine.

19        THE COURT:  Right.  So I believe this report is saying

20 based on the information they had they should have diagnosed him

21 with an appendicitis earlier, that any doctor would have

22 recognized this was appendicitis earlier.  Maybe a nurse would

23 have recognized this was appendicitis and gotten him to the

24 hospital right away, not that they should have done more to tell

25 whether it wasn't appendicitis, that they should have known it

1    from the information they had.  I think that's what he's saying.

2             MS. RAMEAU:  And in addition to that, if I may, Your

3    Honor.

4             THE COURT:  Certainly.

5             MS. RAMEAU:  The report also said that they should

6    have transferred him to a facility capable of conducting --

7             THE COURT:  Yes.

8             MS. RAMEAU:  -- proper diagnostic testing.

9             THE COURT:  In other words, they should have

10   recognized that this was a problem that needed him to get to the

11   hospital right away, not Nurse McGowan should have come in, not

12   they should have seen him more times during the day, not that

13   they should have done more testing on him, but they didn't need

14   to do any more.  They should have known that he had this problem

15   and gotten him to a hospital where he could have gotten these

16   tests that the doctor lists.  I think that's what the report

17   says.

18            MS. RAMEAU:  Yes, Your Honor.

19            THE COURT:  Take a look at the report.

20            Mr. Ninosky, do you wish to be heard?

21            MR. NINOSKY:  No.  I was just going to say that's

22   exactly -- I will represent to the Court that what you just said

23   is how this case has been defended based upon the report that's

24   been prepared which was they should have diagnosed it based upon

25   that symptomology, not about any specifics about Ms. Dillon-

1    McGowan should have come in sooner.  She should have done this

2    or that.  It's that these are the symptoms, such as the lower

3    right quadrant pain, which he describes in there.  It should

4    have been a red flag to send the guy out.

5              THE COURT:  Right.

6              MR. NINOSKY:  That's been their theory.  Now we're

7    bringing in the other things as the Court's recognized.

8              THE COURT:  In fact, what supports that theory is the

9    fact that he didn't break down the individual Defendants.  He

10   saw this as a failure to diagnose, not a failure to test, not a

11   failure to -- but a failure of the entire staff, given

12   everything they did -- and not suggesting that they did anything

13   wrong except that they failed to diagnose it as an appendicitis

14   when they did what they did.  That all of -- I think that's what

15   he's saying, that they should have gotten him to the hospital

16   right away and not that any individual Defendant did anything

17   wrong other than they failed to diagnose this as appendicitis.

18             But take a look at the report.  It's relatively short.

19   Read it again.  See if there's something different and where

20   maybe some actions of individual Defendants might appropriately

21   be addressed by the doctor, but I think that his report focuses

22   on failure to diagnose, get him to the hospital where they could

23   do better testing and testing that could only be done in the

24   hospital such as the CT scan, and get him operated on right away

25   because if he'd been operated on right away it would have --

1    hopefully it would not have perforated and caused a greater

2    problem.

3            But take a look at it.  I'll come in before we bring

4    the jury in just to address it to make sure that we stay within

5    the bounds of the report, but I don't want to unduly hamper your

6    ability to get the whole information about what happened to the

7    jury, but at the same time, it's incumbent on me not to allow a

8    new theory to be introduced that the Defense had no idea was

9    going to be introduced to this jury and accordingly would have

10   no way to address it other than asking their expert to testify

11   outside the scope of his or her report, but that's not what the

12   reports are for.

13           MR. NINOSKY:  And even -- and again, respectfully, at

14   this stage of the game it's impossible to even prepare my

15   witnesses to give adequate testimony even if it would be outside

16   the scope.

17           THE COURT:  All right.  Take a look at the reports.

18   We'll discuss this for a few minutes before we bring the jury

19   back in and we'll --

20           MS. RAMEAU:  How long do we -- I'm sorry, Your Honor.

21   How long do we have?

22           THE COURT:  How long would you like?  Fifteen minutes?

23           MS. RAMEAU:  That's fine.

24           THE COURT:  Sure.  Let's stand in recess for 15

25   minutes

1          THE BAILIFF:  All rise.

2          (Recess taken at 2:27 p.m.)

3          THE COURT:  -- it was properly.

4          MS. RAMEAU:  Well, I think it's clear from the report,

5   Your Honor --

6          THE COURT:  Okay.

7          MS. RAMEAU:  -- that Dr. Brown intended that part of

8   his opinion be that had Rafael Rodriguez been sent to a hospital

9   soon he would have been subjected to proper diagnostic tools and

10  tests that would have yielded the proper diagnosis.

11         THE COURT:  I agree.

12         MS. RAMEAU:  I think that that's clear.

13         In addition to that, I think that what's inherent in

14  this report is that the individual responsible for making the

15  diagnosis, Defendant Paula Dillman-McGowan, that her conduct

16  fell below the standard of care when she failed to adequately --

17  properly, rather -- diagnose Mr. Rodriguez with appendicitis.

18  But I think that what is also inherent in the opinion is that

19  she also failed to conduct a proper assessment to the extent

20  that she deferred on a number of days to assessments conducted

21  by LPNs, right.  And she's the one in charge of these LPNs.

22         But I understand it doesn't specifically say this in

23  the report, but I think that it is inherent in the report that

24  Defendant Paula Dillman-McGowan, that her conduct specifically

25  fell below the standard of care when she failed to conduct her

1    own assessment and relied on assessment conducted by the LPNs in

2    this case, LPN and RN.

3          THE COURT:  Mr. Ninosky, what is your thought?

4          MR. NINOSKY:  I respectfully disagree.  That's not

5    anywhere inferred in that report.  The report is pretty clear

6    that based upon the symptomology that was presented, and

7    frankly, what was reported to Paula Dillman-McGowan, should have

8    been in this expert opinion sufficient for a diagnosis of an

9    appendicitis.  Then he should have been sent out for whatever

10   diagnostic testing or treatment was necessary.  Not that she

11   needed to do an independent assessment, not that she should have

12   come in any sooner to do so.  That isn't anywhere addressed in

13   the report.

14         THE COURT:  I wonder if we should bring Dr. Brown in

15   and ask him.  I'm not suggesting that he can suddenly amend his

16   report, but I wouldn't be at all surprised if he said, "No, I

17   didn't mean she should have come in earlier.  I meant," because

18   if I just look at his report, what he seems to me is this was so

19   obvious.  And I think he even said this about the OB/GYN.  This

20   is so obvious that anybody would have seen it and they would

21   have sent him to a hospital, not that we had to do more to see

22   what the problem was or come in and do more, that this was so

23   obvious from the information available to them that Mr.

24   Rodriguez should have been sent to a hospital right away.

25         I believe that's what Dr. Brown is saying in this

1  report and I believe that's what he would say if he was asked.

2  I don't believe he would say that Ms. Dillman-McGowan should

3  have come in earlier.  I don't think he would say, "That's what

4  I mean here is she should have come to the prison quicker.  It's

5  that she should have realized this was an appendectomy based

6  upon the information she had available to her."

7          And then when we start giving different reasons why

8  the Defendant should have done things differently, he's not

9  saying they should have done anything differently except he does

10  say, "Get diagnostic testing."  But then when you go like in

11  paragraph 20, 21, and especially 22 where he says, "Diagnostic

12  aids can dramatically reduce negative appendectomies,

13  perforations, and hospital stay."  But then he talks about these

14  aids and he says Mr. Rodriguez was not properly assessed until

15  he got to the hospital.  So he talks about laparoscopy, scoring

16  systems, ultrasonography, and computed tomography.

17          So I don't mind him saying that they didn't do those

18  things and they should have done them if that's what he means by

19  that, they should have done them and they didn't.  I don't mind

20  him saying, "How was he not -- how was Mr. Rodriguez not

21  properly assessed?"  Because he clearly says he was not properly

22  assessed.  I mean, it would have been nice if there was a little

23  more detail on it, but he clearly says he was not properly

24  assessed, clearly says the diagnosis was untimely, and clearly

25  says he should have been sent to the hospital earlier and it

1    would have avoided all the problems that he suffered.  So

2    clearly the doctor can testify about all of that.

3            And then I don't know because the report isn't

4    specific enough how far he can go beyond that to say what should

5    have been done differently to diagnose, but I'll certainly let

6    you get into that because he says there was not a proper

7    assessment and a proper diagnosis.  I'll let you get into that

8    to an extent, but as soon as it starts getting into conduct that

9    he doesn't talk about at all such as nowhere does he say or even

10   allude to the fact that Ms. Dillman-McGowan fell beneath the

11   standard of care because she tried to do this diagnosis based on

12   information that was being done by the RNs or the LPNs.  He just

13   doesn't say it.  He doesn't even allude to it unless you just

14   completely read it because we know the facts, but he knew the

15   facts too.  He knew the facts too and if he thought that that

16   was negligent behavior, he, I presume, would have put in his

17   report that that was negligent behavior.

18           Do you want to hear from the doctor outside the

19   presence of the jury to see what he meant in his report or would

20   that just be superfluous?

21           MR. NINOSKY:  To me, at this point it is because

22   irrespective of what he says, we're still with what the document

23   says and what clearly what was conveyed to the Defense and how

24   we had to defend against what his opinion was.

25           MS. RAMEAU:  Your Honor, I think that we should hear

1   from the doctor so you get a sense of, you know, what perimeter

2   beyond the four corners of the document is acceptable.

3          THE COURT:  Let's do it.  Would you have the doctor

4   come on in?

5          Doctor, sorry you've been held out there for so long

6   and please have a seat, sir.

7          THE WITNESS:  Thank you.

8          THE COURT:  The issue that's before the Court right

9   now, of course, is in your report you said that it's your

10  opinion within a reasonable degree of medical certainty that

11  PrimeCare staff departed from the applicable standard of medical

12  care when they failed to recognize obvious signs of

13  appendicitis, failed to order proper diagnostic testing, and

14  failed to transfer Mr. Rodriguez to a facility capable of

15  performing such testing.  And that's your opinion, correct?

16         THE WITNESS:  Yes.

17         THE COURT:  You were asked right before we broke.

18         THE WITNESS:  Right.

19         THE COURT:  First of all, you were asked about a blood

20  test.  Nowhere in here did you suggest that the blood test was a

21  problem.  Do you believe the blood test was a problem?

22         THE WITNESS:  No.

23         THE COURT:  And then you were asked about whether

24  Paula Dillman-McGowan, the CRNP, should have come to the prison

25  earlier, but nowhere in here do you say anything about that she

 1  couldn't make the diagnosis based on information that was

 2  provided by the other onsite care professionals.  Did you mean

 3  to say that or --

 4         THE WITNESS:  Well, and you can correct me if I'm

 5  wrong.

 6         THE COURT:  Oh, certainly, sir.

 7         THE WITNESS:  My understanding that a licensed

 8  professional cannot practice differently in a prison as they

 9  would practice in any other facility.

10         THE COURT:  Right.

11         THE WITNESS:  If they're licensed in Pennsylvania.

12  And the second thing, it's my understanding that in the

13  treatment of prisoners that the prisoner has the right to prompt

14  medical assessment that would be your general understanding of

15  what the medical assessment would be.  In my reading of the

16  records, the system in evaluating this gentleman is that a

17  higher level of practitioner should have seen the patient.  You

18  know, that he was on Wednesday and Thursday he had the

19  complaints, but he was not seen by somebody higher than an LPN

20  or an RN at any time, especially on Friday, Saturday, or Sunday,

21  and then presents to the hospital on Monday.

22         And I think that as my understanding of the law is

23  that there was a breach in the standard of care because he was

24  not properly assessed by the level of practitioner and that they

25  did not -- if a level of practitioner had assessed him in a

1    proper manner, which is in person, they would have made a

2    diagnosis sooner.  And it is that, and I feel that that's a

3    breach of the standard of care for a gentleman to go five days

4    and have not been seen by someone higher than an RN.

5                THE COURT:  Okay.  So --

6                THE WITNESS:  And I think that's inconsistent with the

7    practice of treating criminals.

8                THE COURT:  And so you believe if the higher level

9    person had seen him earlier --

10               THE WITNESS:  Correct.

11               THE COURT: -- the would have realized this was an

12   appendectomy.

13               THE WITNESS:  Well, you don't have to --

14               THE COURT:  Or an appendicitis.  I'm sorry.

15               THE WITNESS:  You don't have to make the diagnosis of

16   appendicitis.  You should assess the patient and realize is the

17   patient well enough to be kept at the facility or does the

18   patient need to be moved to another level of care.  I can make

19   the diagnosis of appendicitis at the hospital, but we never had

20   that opportunity because he was not properly assessed and sent

21   to the hospital.  They didn't recognize that he was getting

22   sicker and sicker and sicker and they should have recognized

23   that.

24               THE COURT:  Now, so it's not that they should have

25   realized it was appendicitis, but they should have realized he

1  was getting sicker and sicker so that he could be sent to the

2  hospital where proper testing could have been done to identify

3  that he was ill.

4          THE WITNESS:  Right.  And one of the ways you realize

5  that he's getting sick is having, you know, a differential

6  diagnosis of what could be wrong with this gentleman.  And

7  appendicitis is what he had.  He showed signs and symptoms of

8  appendicitis.  But I'm not saying that they're at absolute fault

9  because they didn't say, "Oh, he has appendicitis."  They didn't

10 assess him properly to say, "He needs to go to the hospital to

11 be assessed by a physician or a higher level of care or to get a

12 CT scan or to do something."

13         THE COURT:  Because he's getting sicker.  He's not

14 getting better.

15         THE WITNESS:  He's getting worse.  Yes.  And you can

16 see, okay, the first 24 hours, okay.  The second 24 hours, okay.

17 72 hours, okay.  But now 5 days and to show up at the hospital,

18 you know, midday on Monday, you know, in extraneous (phonetic).

19         THE COURT:  Okay.  Attorney Saleem, do you wish to

20 question the doctor at all?

21         MR. SALEEM:  No, Your Honor.

22         THE COURT:  Mr. Ninosky, do you have any questions?

23         MR. NINOSKY:  I'd like to know what the Court's ruling

24 is going to be before I do because, Doctor, you would agree with

25 me what you just said to the Judge isn't in this report?

1              THE WITNESS:  It is that I thought that, but that the

2      company that runs the healthcare for the prison is in breach of

3      the standards.

4              MR. NINOSKY:  Doctor, I don't see that anywhere where

5      you say that the company -- with how --

6              THE WITNESS:  Isn't that the PrimeCare?

7              THE COURT:  PrimeCare is the company.

8              THE WITNESS:  PrimeCare.

9              MR. NINOSKY:  Let me finish.

10              THE WITNESS:  Okay.

11              MR. NINOSKY:  Okay.  I don't see anywhere in here

12      where you have any criticisms about how healthcare itself is

13      rendered.  And, in fact, upon direct before you started on

14      qualifications, I specifically asked you questions.  You don't

15      know how healthcare is run in a prisoner setting, correct?

16              THE WITNESS:  No, that's not correct.  I don't know

17      the policies of that specific prison.  I know I've reviewed the

18      record of this specific case.

19              MR. NINOSKY:  Right.

20              THE WITNESS:  And, you know, when you said by an

21      expert in prison policy, no, but it's my understanding that I

22      know what the scope of practice is for an LPN.

23              MR. NINOSKY:  Right.

24              THE WITNESS:  I know what the scope of practice is for

25      an RN.

```
 1              MR. NINOSKY:  Right.

 2              THE WITNESS:  And a reasonable standard is that a

 3   prisoner must be given reasonable healthcare.

 4              MR. NINOSKY:  Right.  Uh-huh.

 5              THE WITNESS:  Right.

 6              MR. NINOSKY:  And he was assessed by nursing staff,

 7   right?

 8              THE WITNESS:  Correct.

 9              MR. NINOSKY:  The provider was called with

10   symptomology, correct?

11              THE WITNESS:  Correct.

12              MR. NINOSKY:  That provider issued orders, correct?

13              THE WITNESS:  Correct.

14              MR. NINOSKY:  He was monitored for multiple days for

15   vital signs and any other symptoms or complaints, correct?

16              THE WITNESS:  No, not correct.

17              MR. NINOSKY:  Doctor, you're disagreeing with me that

18   on Saturday and Sunday his vital signs were taken both times?

19              THE WITNESS:  Vital signs is not a proper assessment.

20              MR. NINOSKY:  Well --

21              THE COURT:  Well, let me interrupt you for a minute,

22   Counselor.  And I apologize.

23              MR. NINOSKY:  Okay.

24              THE COURT:  Nowhere do you suggest that -- and I'm

25   getting back to this issue because that's what was right before
```

1   the Court -- that certified registered nurse practitioner Paula

2   Dillman-McGowan should have actually come to the facility to

3   make a diagnosis at an earlier time.  I think -- right?  Is that

4   correct?

5           THE WITNESS:  Okay.  No.  I think -- what did I state

6   about that?  I thought that she breached the standard.

7           THE COURT:  You never even mentioned her name, but you

8   did say that the PrimeCare staff.

9           THE WITNESS:  Correct.

10          THE COURT:  So let's say she's PrimeCare staff.

11  Failed to recognize obvious signs of appendicitis, failed to

12  order proper diagnostic testing.

13          THE WITNESS:  Yes.

14          THE COURT:  And failed to transfer Mr. Rodriguez to a

15  facility capable of performing such testing.  What I interpret

16  from that is not that they should have done more, but that --

17  well, from what you just said -- but they should have realized

18  his condition was worsening.

19          THE WITNESS:  Correct.  And --

20          THE COURT:  They shouldn't have even known it was

21  appendicitis from what you just said.

22          THE WITNESS:  Well, had that nurse practitioner seen

23  the patient and examined the patient, because examining the

24  patient is, you know, an abdominal assessment is actually beyond

25  the scope of an LPN and an RN.  And so she didn't come on Friday

1   to see him and to examine him and then he didn't have a proper

2   assessment on Saturday or Sunday.  All he had was vital signs of

3   my reading of the record.  The only thing in the record is vital

4   signs for Saturday and Sunday.

5            MR. NINOSKY:  And no complaints, correct?

6            THE WITNESS:  No.  No other assessment.  I mean,

7   assessment is, you know, was he getting better, was he getting -

8   - when he comes to the hospital, the first statement he makes

9   is, "They told me I couldn't come to the hospital until Monday

10  to the triage nurse."  And then when the ER doc comes in he

11  tells the ER doc he's been vomiting ten times.  And so --

12           MR. NINOSKY:  Actually, he said ten times.  Then

13  another time he said 25 times, right?  So you would agree with

14  me there's a lot of inconsistencies as to what he was saying and

15  you would also agree with me with the lab work that was done you

16  would expect to see electrolyte issues that weren't present for

17  somebody who claims to be having those types of symptoms, fair?

18           THE WITNESS:  No.  They can be non-specific.  So you

19  can see them or not see them.

20           MR. NINOSKY:  Okay.

21           THE WITNESS:  So, yes, they may be present in 60 to 70

22  percent of the time, but they're not present in 30 percent of

23  the time.

24           MR. NINOSKY:  Well, Your Honor --

25           THE COURT:  All right, Doctor.  Thank you.

1          You have no questions, Counsel?

2          MR. SALEEM:  No, Your Honor.

3          THE COURT:  You may step back out.  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  We're making your afternoon more exciting.

6          And the record will reflect the doctor has left the

7     courtroom.

8          That makes the situation even a little more difficult.

9     Now he's not even saying that he meant they should have

10    diagnosed it as an appendicitis, but rather than I think what he

11    said was basically they should have seen his condition

12    deteriorating, got him to a hospital where a hospital could have

13    done the testing and determined it was an appendicitis.

14         MR. NINOSKY:  And the problem with that, Your Honor,

15    none of those people that were doing those assessments over the

16    weekend were sued.  None of them are parties in this case.  So

17    he doesn't identify them.  They are not sued.  And now he's

18    going to say that they had deficient assessments on people that

19    aren't even parties in this case.

20         MS. RAMEAU:  That's not what he's saying.  He's saying

21    that --

22         MR. NINOSKY:  That's what I just heard.

23         MS. RAMEAU:  -- he was getting progressively worse

24    from the time he first presented with the symptoms, right?

25    We've got documentation that says that the very first time they

1    put the symptoms down on paper was on the 16th, but that the

2    symptoms started 48 hours before, which takes us back to the

3    14th.  That from the 14th to the 15th to the 16th he was

4    deteriorating and he further deteriorated on the 17th.  So

5    whatever happened on the 18th, Your Honor, there's no indication

6    -- no one's going to be able to argue in this Courtroom that he

7    was doing well on the 18th given the state of his abdomen.  To

8    make that argument would be completely disingenuous and no jury

9    would buy it.

10          So whether the individuals who took his vital signs,

11   not because they were RNs or LPNs or in this lawsuit, is of no

12   moment, okay.  The individual was supervising them.  The person

13   who has the authority to go out and open up a medical practice

14   is Defendant Paula Dillman-McGowan.  She's the one who was in

15   charge of everyone here.  So --

16          THE COURT:  But that sounds like you want to release

17   the other nurses from the case because if you're saying that the

18   failure was her not coming in earlier, that kind of eliminates

19   any issues with respect to the other nurses, I think.  And I'm

20   not --

21          MR. NINOSKY:  Well, and especially when they've

22   already conceded, and I haven't said anything because I'm

23   waiting to make my motion.  They've already conceded that these

24   nurses can't diagnose.  And then he's not done testifying yet,

25   but I mean that was a specific statement that was made.  So if

1    they cannot diagnose within their scope of practice, well, then

2    the failure to diagnose can't be on these nurses.  So I agree.

3    The nurses shouldn't be here.

4            MS. RAMEAU:  But there's more --

5            MR. NINOSKY:  Now we're still going to argue about

6    respectfully what the doctor should be able to say relative to

7    Paula Dillman, but from a nursing perspective, they're not able

8    to diagnose.  And as such, how can you have a failure to

9    diagnose when they, as a matter of their nursing licenses, can't

10   diagnose.  Only thing they can do is assess, report, get a

11   history, and give information to somebody else to make a

12   decision, which is what happened here.

13           MS. RAMEAU:  Assuming that that's true, okay, assuming

14   that that's true, there's still the issue of the deliberate

15   indifference of the other two Defendants, Your Honor.  And I

16   think that that issue is still -- you know, we can still

17   establish that certainly, given the record and given the

18   interactions that the other two Defendants had with Mr.

19   Rodriguez, interactions that are in fact documented in the

20   medical record.

21           MR. NINOSKY:  Well --

22           THE COURT:  If you read the --

23           MS. RAMEAU:  And we haven't gotten to that yet.

24           THE COURT:  I don't know if you've had an opportunity

25   to read that Pearson case as it addresses the issue of nurses

1   and deliberate indifference, but this is a far cry from making

2   someone crawl across the floor to get into a wheelchair, which

3   held that one nurse in in the Third Circuit and said all the

4   other nurses should probably have been dismissed on deliberate

5   difference, but that's for another time.  I'm sure we'll get

6   into that at the appropriate time.

7         I think at this point I want you to be able to present

8   the case you came into this Courtroom intending to present and I

9   assume that case has to reflect the expert witness report of Dr.

10  Brown and of the other doctor.  Both of them said this was

11  obvious.  They should have known it was appendicitis and sent

12  him to a hospital.

13        MS. RAMEAU:  And I think if I can -- and I understand

14  what Dr. Brown is saying because I had opportunities to speak

15  with Dr. Brown myself.  So what he's saying, Your Honor, is

16  that, yes, the symptoms of appendicitis were obvious, right, and

17  yes, that there was a failure to diagnose, right?  But assuming

18  that, you know, the Defendants didn't have a clue, right?

19  Assuming that they didn't.  Still, his symptoms were

20  deteriorating, right?  He wasn't getting any better.  He's still

21  in a substantial amount of pain, right?

22        And he should have been sent to the hospital given the

23  fact that, you know, obviously like common sense tells you to

24  the extent that you give someone Maalox, right.  You give them

25  Pepcid.  They gave him a gastric cocktail, Your Honor, that was

1    ineffective.  That should have told them that they had to change

2    their plans and they failed to do that.

3            THE COURT:  Right.

4            MS. RAMEAU:  So his opinion is really two-fold, right?

5    They failed to recognize, but even if they were clueless, right,

6    even if they weren't medical professionals, let's say.  Even if

7    they had no clue, they should have sent him to the hospital

8    given the fact that his symptoms were deteriorating.

9            THE COURT:  And I don't have a problem allowing him to

10   testify along those lines.  What I do have a problem with is him

11   suddenly saying that Ms. Dillman-McGowan should have come to the

12   prison at an earlier time when he never says that was the

13   problem, that she didn't come to the hospital at an earlier

14   time.  That's not fair to her because then she would have an

15   opportunity to say, "No, I shouldn't have come to the hospital.

16   I could diagnose this basing on information from the RNs and the

17   LPNs and that's how it's typically done."

18           So same with the blood test.  I can't allow suddenly

19   the theory to be that they couldn't rely on the white blood

20   count because the test wasn't done right because the blood was

21   held out for too long.  And he didn't even mean that to be the

22   case.  I don't know how that got before the jury except that I

23   failed to sustain an objection that was timely made by Mr.

24   Ninosky.

25           So I will allow you to pursue your theory with this

1    expert, and as I'll explain later, with the other expert.  I

2    just can't let you come into new theories and it's a new theory

3    that Attorney -- that Nurse Dillman-McGowan should have come to

4    the prison earlier.  That's a new theory not contained here.

5    And I don't think you even argued it in your opening.  The

6    theory wasn't the failure to come in.  The theory was she failed

7    to diagnose it with the information she had.  She didn't need to

8    come in because it was so obvious she should have known from the

9    information that was provided by the people onsite.

10              Is that ruling clear?

11              MR. NINOSKY:  It is from my perspective.  And I would

12   ask two things.  One, that we do have a curative instruction to

13   the jury that they should disregard any testimony about blood

14   testing potentially being tainted or otherwise because that's

15   not at -- no one is going to present any evidence in the case.

16              THE COURT:  I'm going to stop there.  Attorney Saleem,

17   do you have any objection to that?  I'm asking you since you're

18   doing the questioning.

19              MR. SALEEM:  That's fine, Your Honor.

20              THE COURT:  Thank you, sir.

21              MR. NINOSKY:  The second thing, and we raised this in

22   limine, but since we're outside the presence of the jury and I

23   don't want to have any more slippages that may happen, there's

24   been nothing that was contained in this report about post-

25   surgical wound care.  And I never heard anything in the opening.

1    I never heard anything -- there's nothing in the reports.  And I

2    just want to make it crystal clear that there's nothing that

3    this expert can say as to wound care when he came back to the

4    facility after the original surgery.

5           THE COURT:  And I believe we had addressed this in the

6    motion in limine.  I think Attorney Rameau had indicated that

7    you were not trying to introduce how the wound was cared for in

8    the prison.  Rather, you were trying to introduce that in fact

9    he had that second surgery as the damages he had as a result of

10   the first surgery, not that there was further wrongdoing by

11   prison medical staff subsequent to the surgery, is that correct?

12          MS. RAMEAU:  Yes.  My recollection of the discussion

13   we had, Your Honor, is that I'm sure I indicated to the Court

14   that our position is that the subsequent surgery resulted from

15   the peritonitis caused by the rupture of the appendix.

16          THE COURT:  Right.  But it was a consequence of the

17   initial --

18          MS. RAMEAU:  It was a consequence of the first --

19   right.  The second surgery was a consequence of the failure to

20   diagnose in the first place, the failure to treat timely, right?

21          THE COURT:  Right.

22          MS. RAMEAU:  I mean, that's our position.  We're not -

23   -

24          THE COURT:  So you have no objection to the motion in

25   limine being granted, and I think I did already grant it.

1           MS. RAMEAU:  I thought that was already handled,

2     Judge.

3           THE COURT:  I think it was, but I think Mr. Ninosky

4     just wants to be clear.

5           MR. NINOSKY:  Well, and here's my confusion.  They

6     have asked that I produce Sarah Hardy tomorrow to testify.  The

7     only thing that Sarah Hardy did in this case was get -- when he

8     came back from the hospital after the original surgery, got

9     orders, and then later on that evening shipped him out because

10    he had an infection.  And the only reason that Liz Garcia is

11    sitting here is because she did one dressing change.  And, yet,

12    Plaintiffs will not voluntarily dismiss the case as to her.  So

13    I'm confused as to why we're bringing in a nurse to talk about

14    the only thing she did was get orders when he came back into the

15    jail and then send him out when it had obvious signs of

16    infection.  And I have another nurse sitting here who did

17    nothing other than one dressing change at the explicit direction

18    of a doctor.

19          THE COURT:  And I have no problem with the evidence of

20    what suffering he underwent after the surgery if that comes in,

21    but that is not part of the argument that there was any

22    negligence with respect to the wound care or certainly that

23    there was any deliberate indifference with respect to the wound

24    care.

25          MR. SALEEM:  Well, I would disagree, Your Honor, with

1   the last point.  I do think there was deliberate indifference as

2   to the wound care because in the medical records it's clearly

3   stated that there was a period of time that when Plaintiff's

4   dressing was changed Ms. Garcia was changing the dressing and

5   she was starting to see what the wound looked like and the wound

6   was open.

7           It wasn't even -- the dressing was not even there.

8   And she took no further steps except to put some note in the

9   documentation.  Didn't inform anybody else, her other providers,

10  took no additional steps.  Just changed the dressing.  Nine

11  hours later was when Plaintiff started to desaturate and then

12  ultimately led him to have to go back to the hospital.  And so I

13  think under indifference component, that's why she's in this

14  case, Your Honor.

15          MR. NINOSKY:  First of all, that's wrong.  She changed

16  a dressing and put a new one on.  So just factually that's just

17  not correct, but --

18          MR. SALEEM:  No, that's not what I said, Your Honor.

19  Just I want to be clear about this.  She said that when she

20  changed the dressing there was no prior dressing on it and that

21  she put on her own dressing.  I never said that she didn't put

22  on a dressing, but there's a period of time where there is no

23  dressing on, which needs to be addressed, because there's

24  deliberate indifference here as to why a person is coming into a

25  prison, coming after a surgery, an open appendectomy, and being

1    allowed to have his wound just be open without any covering on

2    it, dressing on it.

3          MR. NINOSKY:  And again, and that's not accurate.  The

4    dressing was changed.  The documentation in the chart is clear.

5    It was changed, okay.  And irrespective, then they need a doctor

6    to say, yes, the wound should have been covered or the dressing

7    change was inadequate for some reason.  You just don't speculate

8    as to those types of issues.  No one is tying in anything.

9    Nobody says one word about dressing changes.  Nobody says one

10   word about dressing changes causing infection.

11         So that's one.  And two, what she did was at the

12   direct order of a physician, so she can't be deliberately

13   indifferent as I think we're going to find under the Pearson

14   case and nobody says she violated the standard of care because

15   everything that we've heard about the violation of the standard

16   of care is in this report.  It ends when he goes to the

17   hospital.  It doesn't say anything about when he comes back.  So

18   she couldn't possibly have been under the PrimeCare staff that

19   were negligent because she's not doing any of the pre-hospital

20   care.

21         THE COURT:  And the --

22         MR. NINOSKY:  So that's why I don't even understand

23   why she's here.

24         THE COURT:  Attorney Saleem, I believe when the

25   Plaintiffs agreed that post-surgery wound care was not in this

1    case, and part of it was because no expert suggested that there

2    was a deviation from the standard of care or that anything was

3    done improperly, much less deliberate indifference to the care

4    of the prisoner.  So there was no medical testimony to support

5    that there was anything done improperly.

6           And I believe, Attorney Rameau, you indicated you

7    wanted that to come in, the suffering he underwent during that

8    period of time post-surgery because it was related to the

9    negligence and/or deliberate indifference that occurred prior to

10   his appendix bursting and being sent to the hospital in the

11   first place.

12          So what you just said, Attorney Saleem, is

13   inconsistent with that because now you're suggesting there's

14   another theory of liability that has to do with care post-

15   surgery.  And I believe it's already been conceded by the

16   Plaintiff that, no, post-surgery care is not an issue in this

17   case for purposes of negligence or deliberate indifference.  So

18   I kind of need to know what it is.  And I can tell you right

19   now, if you have no expert to say that the care deviated from

20   the accepted standard of care, there's no possible way you would

21   be able to introduce any evidence to suggest that a failure on

22   the part of the Defendants led to the infection that led to the

23   second operation.

24          MS. RAMEAU:  Your Honor, we'll dismiss the case

25   against Ms. Garcia.

1          THE COURT:  Okay.  Well, that's -- that wasn't exactly

2     what I was asking, but does that -- are you also conceding that

3     you have no expert to say that the nurses did anything wrong

4     after the surgery?  That this case is about failure to diagnose

5     this appendectomy and get him to the hospital in a timely

6     fashion, but that that suffering he underwent after the surgery

7     including having another surgery, an infection, et cetera, that

8     all goes towards his damages in trying to determine the pain and

9     suffering if the liability is found?

10         MS. RAMEAU:  Yes, Your Honor.

11         THE COURT:  Okay.  Then that motion in limine, I think

12    it's being reaffirmed because I believe you had previously

13    conceded that point.  And you still wish to dismiss with

14    prejudice the claims against Elizabeth Garcia?

15         MS. RAMEAU:  Yes, Your Honor.

16         THE COURT:  All right.  And there's no objection from

17    the Defense?

18         MR. NINOSKY:  Certainly not, Your Honor.  Is there

19    going to be a need for any testimony from Sarah Hardy now?

20         MR. SALEEM:  One second.

21         MR. NINOSKY:  I apologize for taking the jury's time,

22    but I think it's good we're clearing this up now, Your Honor.

23         THE COURT:  I agree.  And I also don't like the jury

24    being left to sit in the jury deliberation room, but I'm sure --

25    which one is Nurse Garcia?  At least you just got out of the

1   case.

2           MR. SALEEM:  I just think that for Ms. Hardy, she can

3   just describe just the process.  She's a nurse.  We can just

4   call her as a witness just in terms of describing the process in

5   terms of changing the wounds.  Not necessarily -- just the

6   experience of what's involved.

7           THE COURT:  And that may go towards his pain and

8   suffering?

9           MR. SALEEM:  Yes.

10          THE COURT:  Okay.  Then I think the answer, Mr.

11  Ninosky, is that -- does she have to come a far distance or is

12  she --

13          MR. NINOSKY:  Yes.  She's going to be coming from

14  Reading.

15          THE COURT:  Okay.  But if --

16          MR. NINOSKY:  Well, it isn't exactly the end of the

17  world, but I mean she'll be here, but I just wanted an offer of

18  proof and if it's going to be limited to describe how the wound

19  dressing changes were, that's fine.

20          MS. RAMEAU:  And to her observations, of course --

21          THE COURT:  Of the pains --

22          MS. RAMEAU:  -- of what his wound looked like.

23          THE COURT:  Right.

24          MS. RAMEAU:  I mean, this is your offer of proof,

25  right, Your Honor?  This is sufficient.

```
 1                THE COURT:  Right.

 2                MS. RAMEAU:  Thank you.

 3                THE COURT:  No, certainly.  I believe you are entitled

 4    to introduce all the suffering that was directly related to

 5    what's the alleged negligence and alleged reckless indifference.

 6    I say reckless indifference -- deliberate indifference.

 7                All right.  Before I bring the jury back and bring the

 8    witness back onto the witness stand, Mr. Saleem, do you have a

 9    pretty good idea of some direction for me as to what I interpret

10    they report as saying and where you can go with this doctor as

11    it pertains to the report?

12                MR. SALEEM:  Yes, I do, Your Honor.

13                THE COURT:  All right.  Let's bring the doctor in

14    first.

15                MR. NINOSKY:  Curative instruction, please.

16                THE COURT:  And I'll give the curative instruction on

17    the blood.

18                MR. NINOSKY:  Oh, and one other thing.  There's a

19    reference in the report to competent.  "A competent medical

20    professional would have."  I don't think that that language is -

21    -

22                THE COURT:  Well, there are a couple of things at the

23    end that are objectionable that he would never be allowed to

24    testify to.

25                MR. NINOSKY:  I just wanted to make sure that there is
```

1    not going to be any reference to somebody being incompetent.  He

2    can certainly there was a violation of standard care, but

3    incompetent is a totally different connotation and isn't really

4    covered under --

5            THE COURT:  And recognizing that he's not a lawyer,

6    but the word incompetence is not appropriate and I don't think

7    you're going to bring this out anyway, that he was a victim of

8    medical malpractice.  Obviously, that's why he's testifying.

9    The jury will ultimately determine.  He just needs to determine

10   whether it fell below the standard of care.  That's how he says

11   it was malpractice.

12           All right.  Let's first bring the witness back in if

13   we could have --

14           MR. SALEEM:  Yes.  Before we do that, yeah, I was

15   concerned obviously in terms of the time, Your Honor.  I mean, I

16   don't have -- just if we could find out the witness'

17   availability in the event that we don't finish him today.

18   That's what (inaudible).  We hadn't anticipated him going

19   beyond.

20           THE COURT:  Yeah.  Let's bring him in and see what he

21   says about that.

22           (Witness present)

23           THE COURT:  Thank you very much, Doctor.

24           And, Doctor, there is an issue that has been raised

25   about your availability, both through today and into tomorrow.

1    Do you have any availability?

2            THE WITNESS:  No.

3            THE COURT:  So you would need to be completed today?

4            THE WITNESS:  Yes.

5            THE COURT:  Your testimony?

6            THE WITNESS:  Yes.

7            THE COURT:  Well, let's see what we can do along those

8    lines.

9            MR. NINOSKY:  And maybe -- can we have Ms. Garcia --

10   can she leave?  I mean, can we indicate that she's dismissed

11   from -- let the jury know why she's not here and that that's why

12   she's not here?

13           THE COURT:  We'll be issuing a formal order on the

14   docket, but I will say right now the claims against Elizabeth

15   Garcia, LPN, are dismissed with prejudice without objection.

16   And certainly, ma'am, if you're not needed as a witness, you're

17   free to leave if you'd like to.

18           MR. NINOSKY:  Yeah.  And she is not.

19           MR. SALEEM:  And just also, Your Honor, just in

20   addition to that instruction that they're not supposed to take

21   any speculation as to the cause of that or, you know, the basis

22   of that --

23           THE COURT:  Certainly.

24           MR. SALEEM:  -- in terms of Plaintiff's case.

25           THE COURT:  Certainly.

```
 1              MR. NINOSKY:  Thank you, Your Honor.
 2              THE COURT:  And, of course, if you would like to
 3    remain in the gallery, you are free to remain in the gallery,
 4    but if you would like to return back home, you can do that as
 5    well.
 6              All right.  You can have the jury brought in.
 7              MR. SALEEM:  How long are we planning on staying, Your
 8    Honor?
 9              THE COURT:  Well, we've got to get the doctor
10    finished.
11              MR. SALEEM:  Okay.
12              THE COURT:  But the more you can focus on his real
13    testimony about where he believes there was negligence, the
14    better.
15              MR. SALEEM:  Okay.
16              THE BAILIFF:  All rise.
17              (Jury present)
18              THE COURT:  You may be seated.
19              The Court is called to order.  All parties previously
20    present are once again present.  The jury is present.  The
21    witness is on the witness stand.
22              Ladies and gentlemen, I apologize for that delay and
23    we will try to ensure that another similar type of delay does
24    not occur.
25              A few things I need to advise you of.  First, you will
```

 1    notice that Elizabeth Garcia, LPN, is no longer present at the

 2    Defense table.  All claims against her have been dismissed and

 3    so she will not be participating in this trial any further.

 4            Also, you earlier heard some information about a blood

 5    test.  There was no suggestion that there was anything wrong

 6    when the blood test was taken in this case, so you should

 7    disregard all of that testimony regarding that blood test.

 8            Are both Counsel satisfied with the instructions from

 9    the Court?

10            MR. NINOSKY:  I am, Your Honor.  Thank you.

11            THE COURT:  And Mr. Saleem, that was satisfactory?

12            MR. SALEEM:  Yes, Your Honor.

13            THE COURT:  Very well.  Counselor, you may proceed.

14                    DIRECT EXAMINATION CONTINUED

15    BY MR. SALEEM:

16    Q    Doctor, I think we were last talking just around the

17    assessment or note that occurred on April 17th at around 13:35,

18    which is 1:35, okay.  And I think the next time the Plaintiff

19    was assessed there is the note that's on 4/17 at 19:11.  And in

20    this assessment, what are the Plaintiff's complaints in this

21    assessment?

22    A    The patient was complaining of abdominal pain.

23    Q    Okay.  And there's an indication that the PRN meds, which

24    are the meds that he was supposed to be given as needed, that he

25    -- what does he indicate that with respect to those meds?

1   A     Patient was asked which PRN meds he wanted and replied,

2   "None.  They don't work anyway."

3   Q     And the fact that it says he was agitated, what in

4   conjunction with the fact that he didn't want the meds, is the

5   significance of that?

6   A     The fact that he feels he's not getting better.

7   Q     Okay.

8   A     And that the meds are not helping him get better.

9   Q     Okay.  And he's at this point still in the jail at this

10  point.

11  A     Correct.

12  Q     Okay.  And does the continuation of that note which

13  continues on the next page and it says -- what does it state

14  with respect to where the pain is going with the patient?

15  A     "Patient is now stating the pain is going lower."

16  Q     And what significance is the fact that the pain is going

17  lower mean?

18  A     It's starting to localize.

19  Q     And when you say -- and just remind us again what that

20  means, the fact that it was localizing.

21  A     Well, the natural history of appendicitis is that the

22  patient presents with pain in the center portion of the abdomen

23  and then as the inflammation progresses it starts to localize to

24  one of the quadrants.  And by going lower, it's starting to

25  localize to at least the lower part of the abdomen.

1  Q    And is that where the appendix is usually located?

2  A    Yes, in the right lower abdomen.

3  Q    Okay.  So based upon this, would you say that there is an

4  indication that the Plaintiff was, at least based upon his

5  progressing symptoms, was showing signs of appendicitis?

6  A    Correct.

7  Q    Okay.  And his indication he would like to go to the

8  hospital, what, if anything, does that signify to you?

9  A    That means that he's getting worse.

10 Q    Okay.

11 A    And he's not getting better.

12 Q    Okay.  Okay.  And based upon your assessment, would you

13 have -- would it be a deviation to not send Plaintiff to the

14 hospital at this point?

15 A    Since an LPN is writing that note, my understanding of

16 current medical practice would be to then notify the next level,

17 a nurse practitioner or PA or a physician, to do a further

18 assessment to either confirm or come up with a differential

19 diagnosis or a plan to, you know, move the patient to the

20 hospital.  I, in my medical opinion, had I assessed the patient

21 at that time, I would have thought that he needs a CT scan to

22 rule out appendicitis.

23 Q    Okay.  And in this case Nurse Roberts conducted an

24 assessment of him after making that entry where she notes

25 essentially what we stated before, right, that the pain was in

```
 1   the lower abdomen and that the patient was extremely agitated.
 2   Do you see that?
 3   A    Yes.
 4   Q    Okay.  And as a result of that assessment, there is a note
 5   in the record that she did speak to a provider in this case, Ms.
 6   Dillman-McGowan, and that's at PCM205.  And as a result of this,
 7   it also notes in addition to what we just discussed, this also
 8   states that Plaintiff contains of testicular pain.  What, if
 9   anything, do you make of that complaint?
10   A    Well, patients with appendicitis can occasionally complain
11   of testicular pain or pain down in the lower quadrants.
12   Q    Okay.  And can female nurses conduct testicular exams on
13   male patients?
14   A    They can, but an actual physical examination, nurses can't
15   diagnose.
16   Q    But it doesn't matter the sex of the person?  I mean, can
17   female doctors examine, do testicular exams of male patients?
18   A    Yes.  Yes.
19              MR. NINOSKY:  Objection as to relevance.
20              THE COURT:  I'll overrule it.
21              MR. NINOSKY:  Okay.
22   BY MR. SALEEM:
23   Q    Okay.  So just the mere fact that the Plaintiff was a male
24   and the nurse is a female is not really an issue in terms of
25   being able to conduct an examination?
```

```
1    A    No.
2    Q    Okay.  And what was -- as a result of getting this order,
3    what was -- did Ms. McGowan send the Plaintiff to a hospital?
4    A    No.
5    Q    Did she order the Plaintiff to be going to a CT scan?
6    A    No.
7    Q    Okay.  What did she do?  Did she move him to another unit
8    in the hospital?  I mean, in the jail?
9    A    The orders received say, "Moved to N unit."
10   Q    Okay.  And then also does it indicate -- and it indicated
11   that she is going to be seeing him on Monday for the last entry?
12   She's a provider.
13   A    Right.  Provider line 1, day 4/20.
14   Q    Okay.  So on April 17th someone who -- now, at this point
15   Mr. Rodriguez had been complaining of abdominal pain at least
16   four days, at least from the 14th.  And now we're dealing with -
17   - we're talking about the 17th.  And she's going to decide that
18   she's going to make an assessment on Monday, three days later.
19   A    Correct.
20   Q    Would you say that the failure to assess him --
21              THE COURT:  The objection is going to be leading.
22              MR. NINOSKY:  Objection.
23              THE COURT:  Leading?
24              MR. NINOSKY:  Leading and also --
25              THE COURT:  I'll sustain the leading objection.
```

1          MR. NINOSKY:  Okay.

2          MR. SALEEM:  Okay.

3          THE COURT:  So you may proceed.

4   BY MR. SALEEM:

5   Q    Would it deviate from the standard of care to not to have

6   until Monday to assess Mr. Rodriguez?

7          MR. NINOSKY:  Objection.  Violation of Court order.

8          THE COURT:  That's overruled and I'll allow him to

9   answer the question.

10          THE WITNESS:  Yes.  Reasonable medical treatment of a

11   patient suffering from abdominal pain for three to four days

12   that is not improving and is getting worse should be physically

13   assessed by a health practitioner, either a PA, a nurse

14   practitioner, or a physician.  And three days after the initial

15   three to four days of the complaint is too long of a period and

16   deviates from the standard medical practice.

17   BY MR. SALEEM:

18   Q    Thank you, Doctor.  And chart notes are notes when any

19   medical personnel -- what are chart notes?  Sorry.

20   A    Chart notes are a variety of different types of notes

21   depending upon the practitioner charting the note.

22   Q    Okay.  And we were just discussing the April 17th at 19:11

23   where the Plaintiff was extremely agitated.  What is the date of

24   the next entry of a note?

25   A    April 20th at 8:00 a.m. in the morning.

1    Q    Okay.  So there are no chart notes for April 18th, is that

2    correct?

3    A    Correct.

4    Q    Are there any chart notes for April 19th?

5    A    No.

6    Q    Okay.  In your review of the chart, did you see any

7    abdominal assessments conducted on the Plaintiff on April 18th?

8    A    No.

9    Q    Did you see any abdominal assessments conducted on the

10   Plaintiff on April 19th?

11   A    No.

12   Q    Okay.  What, if any, significance is there of the fact that

13   Plaintiff's vital signs were taken on those two days?

14   A    It's a minimal significance.

15   Q    Why?

16   A    Because it's not an adequate assessment.  They can be

17   altered, but they can also be normal.

18   Q    Okay.  Okay.  One second, Your Honor.

19            THE COURT:  Certainly, sir.

20   BY MR. SALEEM:

21   Q    We have so many pages.  One second.  Sorry.  Okay.  Doctor,

22   let's see.

23            MS. RAMEAU:  Your Honor, may I?

24            THE COURT:  Mr. Saleem, I believe Attorney Rameau may

25   have what you're looking for.

1          MR. SALEEM:  No, I'm not trying to, not yet.

2          MR. NINOSKY:  I want to see.

3     BY MR. SALEEM:

4     Q    Oh, sorry.  Okay.  And, Doctor, I want to show you now

5     what's been marked as PCM215 which is -- indicates -- I just

6     want to direct your attention.  This is on PCM215, part of

7     Plaintiff's 2.  The entry on 4/20/2015 at 10:50 a.m.  And

8     there's a -- or is there anything significant about the vital

9     signs?

10    A    No.

11    Q    Okay.  But there are some notes here.  What do the notes

12    indicate?

13    A    When approached patient had abdominal pain.

14    Q    Well, before that what does it say regarding the patient?

15    A    "Patient screaming on N unit."

16    Q    Okay.

17    A    "When approached, patient had abdominal pain."

18    Q    Okay.  And then after that it indicates that Ms. Dillman-

19    McGowan was made aware of this.

20    A    Aware of vital signs taken.

21    Q    Okay.  And what, if anything, do you make of the fact that

22    Plaintiff was found to be screaming when approached?

23    A    That he was in abdominal pain.

24    Q    Okay.

25    A    Significant abdominal pain.

1   Q     Significant enough to be screaming.

2   A     Yes.

3   Q     Okay.  And this is, again, on the 20th.

4   A     Yes.

5   Q     Okay.  Great.  Is there any indication in the chart or

6   anywhere that he was not experiencing any type of pain on the

7   18th or 19th?

8   A     Not that I saw.

9   Q     Okay.  And that's because there are no assessments one way

10  or the other, is that right?

11  A     Correct.

12  Q     Okay.  Let me show you what's been marked as Plaintiff's

13  143.  This is a documentation -- this is the way it was printed

14  out.  It seems to be that some of the wording bleeds into the

15  other, but it's an assessment conducted by Ms. McGowan on the

16  20th.  We initially mentioned the last record was about 10:50

17  a.m.  What time does this indicate that this record is?

18  A     11:16.

19  Q     Okay.  And this is -- according to the record, this is the

20  first time Ms. McGowan has ever conducted an examination of the

21  -- assessment of the patient.

22  A     Correct.

23  Q     There's no indication anywhere else that she conducted any

24  kind of prior examination of the Plaintiff, correct?

25  A     Not that I could find.

```
1    Q    Okay.  And what did she note as a result of her assessment?

2    A    Abdominal pain, follow up labs, seen for above.  Complains

3    of abdominal pain over past two to three days.

4    Q    Two to -- when you say two to three days, that would -- if

5    we're looking at this, this is written on 4/20.

6    A    Correct.

7    Q    Two to three days would be how long ago?  This would be the

8    17th or the 18th, at least just two to three days.

9    A    Right.  The 17th or 18th.

10   Q    Right.  Okay.  And we previously discussed that Mr.

11   Rodriguez was complaining of pain on the 15th, right?

12   A    Correct.

13   Q    Because he spoke to the nurse on the 16th and said or the

14   14th because she said past three days, right?

15   A    Correct.

16             MR. NINOSKY:  Objection.  It's leading.

17             MR. SALEEM:  Okay.

18             THE COURT:  The objection is overruled, but I will

19   caution, Mr. Saleem, with respect to the leading questions.

20             MR. SALEEM:  That's fine, Your Honor.

21   BY MR. SALEEM:

22   Q    And what is the significance of the fact that the pain is

23   rated 10 out of the 0-10 scale?

24   A    That it's significant pain.

25   Q    It's high, okay.
```

1    A    Very high.

2    Q    And what does it indicate with respect to whether or not he

3    is vomiting?

4    A    It says, "Positive vomiting."

5    Q    Okay.  And what about respect to what makes the pain better

6    or worse?

7    A    Eating fruit improves pain.  Drinking the milk makes pain

8    worse.

9    Q    And what, if anything, what significance do you place upon

10   that?

11   A    Not much.

12   Q    Okay.  And when does it indicate that the Plaintiff, Mr.

13   Rodriguez, last vomited?

14   A    Ten minutes ago.

15   Q    Okay.  And what about diarrhea?

16   A    Diarrhea, last episode the day before.

17   Q    Okay.  And there's no indication of any assessment of

18   anybody recognizing that he was having diarrhea the day before,

19   is that right?

20   A    No.

21   Q    Okay.  And okay.  And what about looking at the objective

22   test, what is indicated in the objective test?

23   A    The skin is warm and dry, intact, good turgor, capillary

24   refill, which is that you have a vascular supply.  CV is

25   cardiovascular.  RRR means regular rate and rhythm, that the

1    heart is beating at a regular rate and rhythm.  Respiratory,

2    RESP, is your respiratory exam.  And CTA stands for clear to

3    auscultation.  That means that when you listen to the lungs you

4    don't hear any junk or other sounds in the lung.  They appear

5    clear.

6    Q    And what, if anything, the significance of all those

7    findings would be or good positive findings?

8    A    Yes.  They're normal.  They're considered normal.

9    Q    Okay.

10   A    The abdominal time is soft, positive distention.  So it's

11   hard to be soft and distended at the same time.  Absent bowel

12   sounds.

13   Q    So what does it mean that the fact that her exam noted him

14   to be soft and distended?

15   A    Well, they're sort of somewhat contradictory, but he was --

16   you know, distended means that the abdomen is now sort of blown

17   up, more distended.

18   Q    Okay.

19   A    And absent bowel sounds in all four quadrants means that

20   the intestines have now stopped working.

21   Q    Okay.

22   A    And diffuse lower abdominal tenderness, no rebound.

23   Q    And what significance is the fact that there's no rebound

24   with all these other symptoms presenting?

25   A    Well, not much.

1    Q     Okay.

2    A     It's not a very accurate sign, you know.

3    Q     Okay.  And the fact that there's no rebound tenderness,

4    does that mean that you can discount that the Plaintiff was

5    undergoing appendicitis?

6    A     No.

7    Q     Okay.  And what is the assessment provided by Ms. Dillman-

8    McGowan here?

9    A     Abdominal pain, rule out obstruction.

10   Q     And what is the significance of that note right there?

11   A     Well, that means that he might -- that the assessment was

12   that he had significant abdominal pain and that now the

13   practitioner is thinking because he's distended, he has no bowel

14   sounds, that he may have a bowel obstruction.

15   Q     Okay.  And based upon this assessment and what he was

16   presenting with, would there be other potential diagnosis that

17   he could be undergoing besides obstruction?

18   A     Well, yes.  I mean, he could have intraabdominal process.

19   That's inflammation causing the intestines to shut down.

20   Q     Okay.  And does it indicate that she was suspecting

21   appendicitis?

22   A     No.

23   Q     Okay.  Based upon what was presented and based upon what

24   was presented up until this point, would the diagnosis of

25   appendicitis, the failure to diagnose appendicitis deviate from

1    the standard of care?

2    A     No.

3    Q     Okay.  Why not?

4    A     Because she made an assessment that the abdominal pain was

5    severe and that he had an obstruction.  And then she made the

6    plan that he should be sent to the hospital.

7    Q     Okay.  And this is after seeing him only on the 20th.

8    A     Correct.

9    Q     Okay.  Okay.  Which was the first time she saw him.

10   A     Correct.

11   Q     Okay.  And as a result of that, then she decided to send

12   him to the emergency room.

13   A     Correct.

14   Q     Okay.  Okay.  And once Mr. Rodriguez was ultimately sent to

15   the emergency room, that's at some point when he came into your

16   care, is that correct?

17   A     Correct.

18   Q     Okay.  And part of your assessment of him -- what was your

19   plan once you saw Mr. Rodriguez for the first time?

20   A     Well, the sequence of events is he was seen by the triage

21   nurse and he was seen by the emergency room physician who felt

22   he had an intraabdominal process going on.

23   Q     And what do you mean by -- what does the term

24   intraabdominal process mean?

25   A     It's that he's sick.  Something's going wrong in the

1  abdomen and he has sufficient abdominal pain to warrant a CT

2  scan, whether he has appendicitis, which would be the most

3  common diagnosis, whether he had some type of internal hernia.

4  Diverticulitis would be not as common.  Perforated ulcer could

5  be common.  You can get that even in your twenties.  The ER

6  doctor assessed him and said the next step is to get a CT scan.

7  Q    Okay.

8  A    Once they got the CT scan, it was clear that he had

9  advanced perforated appendicitis with the findings of fluid

10  around the appendix and the appendix being inflamed.  And so the

11  emergency room staff then notified the surgical team of which I

12  was the doctor on call that Monday.  My resident saw the

13  patient, evaluated the patient, called me.  I came and evaluated

14  the patient and agreed with the diagnosis of perforated

15  appendicitis.  And my plan was to take the patient to the

16  operating room for an appendectomy.

17  Q    Okay.  And were you planning on -- what type of

18  appendectomy were you planning?  Was it planning on being

19  laparoscopic or were you planning on doing open appendectomy?

20  A    My plan was to do a laparoscopic appendectomy.

21  Q    And why was that your plan?

22  A    Well, that's the best approach.

23  Q    Okay.  Doctor, I'm going to just show you what's been

24  marked previously, referring to Plaintiff's Exhibit 3 in

25  evidence, Reading Hospital records.  I'm showing you Plaintiff's

1    -- Berks' -- sorry -- 1496.  What is this document that I'm

2    showing you?

3    A    This is an operative note.

4    Q    And an operation that you conducted?

5    A    Yes.

6    Q    On what day?

7    A    4/20/2015.

8    Q    Okay.  And what was the preoperative diagnosis?

9    A    Acute perforated appendicitis.

10   Q    Okay.  And you maintained that -- what was the post-

11   operative diagnosis?

12   A    Acute perforated appendicitis with abscess and peritonitis.

13   Q    And again, just remind the jury again what --

14   A    So abscess is a pocket of puss and peritonitis means that

15   the puss has spread throughout the abdomen.

16   Q    And just again, referring to this document, again, the book

17   that you referred to earlier, this *Atlas of Human Anatomy*, when

18   you conducted your exam -- I'm just going to show you.  So you

19   went from a laparoscopic, which is using the camera, to open

20   where you were actually able to see what was going on inside

21   with your own eyes, is that right?

22   A    Right.  Well, I can see quite well with the laparoscope.

23   Q    Right.  Okay.  I didn't mean to say that.  So just looking

24   at plate 261 of this document, when you said -- when you

25   conducted the open appendectomy what -- can I approach, Your

1    Honor, for a second?

2          THE COURT:   Certainly, Counselor.

3    BY MR. SALEEM:

4    Q    Doctor, I'm just going to show you three different pages.

5    And just tell me which the best would you describe in terms of

6    what you saw or would you help the jury in terms of what you saw

7    in terms of when you did the open appendectomy.

8    A    This is fine.

9    Q    Okay.

10   A    Okay.

11   Q    So just -- I'm referring again to what was previously show

12   to jurors, plate 275.  When you conducted the open appendectomy,

13   what did you see?

14   A    Okay.  I put in the cannula at the belly button.  And as

15   soon as I made an incision in the belly button down through the

16   skin, through the fat, and into the fascia, which gets into the

17   abdomen, green fluid was coming up, very much similar to fluid

18   you would vomit.  It just poured out.

19   Q    Would that be a finding that you would expect to find when

20   you're conducting that kind of surgery?

21   A    Only on an advanced appendicitis, late stages of

22   appendicitis.

23   Q    And when you say late stage of appendicitis, how long would

24   it take for that to manifest itself to be able to see that kind

25   of substance you're seeing?

1          MR. NINOSKY:  Objection.  Outside the scope and

2    speculation.

3          THE COURT:  I'm going to have to sustain that

4    objection.

5    BY MR. SALEEM:

6    Q    So what was it again?  So when you saw it, where was this

7    liquid or this green substance?

8    A    The fluid was coming out of the umbilicus and the incision

9    is small.  It's only about the size of your thumb.  And then I

10   put the cannula in in order to put the TV camera in.  When I put

11   the TV camera in, I could see the green fluid and puss

12   throughout the abdomen.

13   Q    All right.  And what did you do as a result of seeing that?

14   A    Okay.  It was my decision at that point that it would be

15   more appropriate to open the patient to not only remove the

16   appendix, but to significantly wash out the abdomen.

17   Q    And why did you deem it more appropriate to do that as

18   opposed to doing the procedure laparoscopically?

19   A    Well, you can -- it was so contaminated that you needed

20   liters and liters of fluid to try to get it clean and to get the

21   puss off of the small intestines.  And you need to get up all

22   the quadrants, up near the spleen, up above the liver, under the

23   liver, or else he will get abscesses and he won't get better.

24   Q    And, doctor, when you said that you have conducted about

25   hundreds of these appendectomies, is that fair to say?

1  A    Yes.

2  Q    And how would this, what you saw with respect to Mr.

3  Rodriguez, compare to the ones that you've performed?

4  A    This is one of the worst.  You know, within the top ten out

5  of a couple of hundred appendectomies as to how bad this

6  appendicitis was.

7  Q    Okay.  And after the -- and at some point would you

8  ultimately remove the appendix?

9  A    Correct.

10  Q    Okay.  And is the appendix then sent for a pathology

11  report?

12  A    It is.

13  Q    Okay.  And I'm just going to show what's been previously

14  marked as, I think it's Plaintiff's Exhibit 4, which is a

15  surgical pathology report.  Bates numbers 645 through 649.  I'm

16  showing the witness and the jury 648.  And what is the purpose

17  of sending the specimen for a pathology report?

18  A    So that the pathologist -- when I look at the specimen and

19  make what's called a clinical diagnosis.  We send it to the

20  pathology which then evaluates it and makes a diagnosis under

21  the microscope for appendicitis.  Most often it's acute

22  appendicitis or inflammatory appendicitis, but in rare cases

23  there could be tumors of the appendix.

24  Q    So someone else, another doctor, is reviewing this?

25  A    Yes.  Right.

```
 1   Q     Is another doctor reviewing this to make an assessment?

 2   A     Yes.  Another doctor.  Uh-huh.

 3   Q     Sorry.

 4   A     Yes.

 5   Q     Not you, okay.

 6   A     No.

 7   Q     And what was the final diagnosis?  What did the gross

 8   description of the appendix reveal based upon this pathology

 9   report?

10   A     Specimen was retrieved, labeled appendix.  Consists of an

11   apparent ruptured ramiform -- just means wormlike.  That's the

12   appendix.  Appendix arriving in two pieces because the appendix

13   was actually necrotic or rotten that broke into pieces.

14   Q     Did you break it or --

15   A     No.  It was already broken in pieces.  The cirrhosa was

16   shaggy, inflamed, with grey-green fibrinopurulent exudate.

17   That's puss on the appendix.  They talked about the lumen,

18   partially filled lumen on the appendix.  No definite fecalith.

19   Fecalith is a little stool ball that can get stuck at the base

20   of the appendix.  And the final diagnosis was perforated acute

21   appendicitis with periappendiceal phlegmon.  Phlegmon means the

22   same thing as an abscess, puss surrounding the appendix.

23   Q     Okay.  And how long did -- do you recall how long it took

24   you to perform this surgery?

25   A     No.  An hour, hour and a half.
```

```
1   Q    Okay.  And as a result of having undergone this type of

2   surgery, this open appendectomy, what are the likelihood or

3   chances of a person developing an infection?

4   A    Well, he had an infection.

5   Q    Okay.

6   A    And so when we went in and I decided I need to open, I

7   opened.  I took the appendix out.  I washed out all four

8   quadrants.  Whenever we have contamination, especially in more

9   than one quadrant, I use at least 10 liters of fluid.  So you

10  know what a 2 liter bottle of soda is.  I'm using at least 10

11  liters to wash it out until I get the fluid in the abdomen as

12  clean as possible, as clear fluid.  I aspirate out the fluid.  I

13  put a drain in.  You can close the muscle layer, but you leave

14  the skin wide open because otherwise he'd get an infection in

15  the abdominal wall.  And I packed that with betadine soaked

16  gauze.

17  Q    Okay.  And how long does the patient have to have that

18  wound be dressed or contained like that?

19  A    I would think it would take four to six weeks to heal.

20  Q    So, and how is it covered?  You said four to six weeks.

21  How is it covered during that time?

22  A    Well, usually we use wet-to-dry dressings and we leave it

23  wide open, so it's a packed wound.  And every day it will slowly

24  close and then it eventually just closes.

25  Q    And there's something also called a wound vac.  Do you know
```

1   what a wound vac is?

2   A    A wound vac is a sponge we put in the wound and then we put

3   a plastic tape over the wound so it creates a suction.  And then

4   we hook it to a little machine and it sucks on the wound, sucks

5   the fluid out of the wound.  By but sucking on the wound

6   continuously, we get healing a little bit faster.

7   Q    Okay.  And as a result of this, Mr. Rodriguez having to

8   undergo this open appendectomy, did his wound become infected

9   again requiring him another hospitalization?

10              MR. NINOSKY:  Objection.

11              THE COURT:  Basis.

12              MR. NINOSKY:  I mean, form of the question, how it was

13   phrased.

14              THE COURT:  Well, I guess the issue is it's not in the

15   report that this occurred, but is this just to set forth what

16   happened afterwards?

17              MR. SALEEM:  Yes, Your Honor.  Just --

18              THE COURT:  All right.  The form you're concerned with

19   is what caused the infection.

20              MR. NINOSKY:  Correct.

21              THE COURT:  To the extent the question is just did he

22   have an infection afterwards, I will prevent that question.

23              MR. NINOSKY:  And, frankly, we can stipulate to that.

24              THE COURT:  Very well.  Stipulated that he did get an

25   infection.

1          And Mr. Saleem, in all fairness to Mr. Ninosky, my

2    understanding is your witness is not available tomorrow.

3          MR. SALEEM:  Correct.

4          THE COURT:  And we're running out of time for cross-

5    examination.

6          MR. SALEEM:  Correct.

7          THE COURT:  And I certainly can't leave him no time

8    for cross-examination.

9          MR. SALEEM:  I understand that, Your Honor.

10          THE COURT:  So the quicker you can wrap up, the

11    better.

12          MR. SALEEM:  I am trying to do that, yes.

13    BY MR. SALEEM:

14    Q    And just to show you, earlier when you saw the whole green

15    puss and everything else on the abdomen, can you point out where

16    in what regions you saw it?

17    A    Well, the majority of the puss is going to be in the lower

18    abdomen just based on gravity, but there was puss up over the

19    spleen, which is all the way up in the left upper quadrant and

20    up over the liver.

21    Q    And the fact that you saw that, what, if anything, what is

22    the significance of the finding of the puss all the way up

23    there?

24    A    Well, the fact that it's been going on for a while.  You

25    know, in my estimation, greater than 24 hours.

```
1              MR. NINOSKY:  Objection.

2              THE COURT:  Outside the scope of the report?

3              MR. NINOSKY:  Correct.

4              THE COURT:  I'll overrule the objection.

5              MR. NINOSKY:  Understood.

6   BY MR. SALEEM:

7   Q    Continue.

8   A    Can you ask the question again?

9   Q    Sure.  And just what is the significance of the fact that

10  you saw the puss and other liquid and fluid up in those upper

11  regions?

12  A    That it's, one, that it takes a while to get that way.  And

13  the second thing is that it puts you at a very, very high risk

14  for postoperative infection in that even washing out the abdomen

15  doing the best we can we still get 20 percent infection abscess

16  formation after we do that.

17  Q    Okay.  And did Mr. Rodriguez undergo another operation by

18  you?

19  A    Yes.  He had to undergo a second washout procedure.

20  Q    Okay.  And as a result of that second washout, how long was

21  his hospital stay after that washout?

22  A    It's two months or so.

23  Q    Okay.  And so this incident -- and if I just show you that

24  the record shows -- if I say June 3rd, would you disagree with

25  that?
```

1   A    No.

2   Q    Okay.  But is it fair to say you continued to treat with

3   him up until and including August 7th?

4   A    Yes.  I saw him out of the hospital in my office at patient

5   visits.

6   Q    Okay.  And as of -- and during the course of his hospital

7   stay, what type of treatment was he getting?

8   A    Well, he was getting antibiotic therapy and we had taken

9   cultures.  Cultures are where we grow out the bacteria to see

10  what type of bacteria he has so that we can narrow our

11  antibiotics to specifically treat the bacteria that was causing

12  the problem.  He also needed to be anticoagulated.  Because of

13  the degree of inflammation within the abdomen, he had developed

14  a clot in the main vein of the intestines going up towards the

15  liver.  And so when you have a lot of inflammation in the

16  abdomen the veins can clot off.  And he had a clot in one of

17  those veins.  And so he needed to be anticoagulated, which means

18  his blood needed to be thinned so that that clot didn't grow.

19  The body will eventually absorb the clot.  But while he was in

20  the hospital we had him on Heparin, which is a medicine that

21  thins the blood.

22  Q    And if untreated, what could be the likely outcome of that

23  blood clot?

24          MR. NINOSKY:  Objection.  Relevance.

25          THE COURT:  Sustained.

1   BY MR. SALEEM:

2   Q    Doctor, I'm just going to show you a note on July 6th.  And

3   there's an indication here that he had a tube in place in lower

4   right quadrant.

5   A    Correct.

6   Q    What does that mean?

7   A    After we had washed him out and then he was in the hospital

8   and he came back because his wound wasn't looking good.  He was

9   sick.  We opened him up, washed him out again, and he did well.

10  And then he got worse again, but this time when we did CT scans

11  the puss pocket was localized to the right lower quadrant.  And

12  so instead of re-operating on him, which every time you re-

13  operate the risks go up for having some other problem,

14  interventional radiologists stuck a tube in his right abdomen in

15  the vicinity of where the appendix used to be and was draining

16  the puss.  So he had a tube that had to stay in until the puss

17  was completely drained.

18  Q    And your surgery, the second surgery was on April 27, 2015?

19  A    Correct.

20  Q    And he was still having that tube as of July 6, 2015?

21  A    He had to keep it in for a long time.

22  Q    Okay.  And how does that -- is that just something that's

23  literally like a bag that's -- what is that?

24  A    It's a little tube about the size of a straw and it goes to

25  a little -- we call it a grenade.  It's about the size of a

```
1   potato.  It's just a little collection device that puts a
2   suction on it and it collects there and you change it twice a
3   day, empty it twice a day.
4   Q    Okay.  Just give me one second, Your Honor, okay?
5            THE COURT:  Certainly, Counselor.
6            MR. SALEEM:  Thank you.
7   BY MR. SALEEM:
8   Q    And, Doctor, while Mr. Rodriguez was in the hospital was he
9   also getting antibiotics?
10  A    He was getting IV antibiotics.
11  Q    And what does it mean, IV antibiotics?
12  A    Well, there's two ways to administer it.  IV, which goes
13  into a vein, or with pills.  The type of infection he had was
14  best managed with the IV antibiotics.
15  Q    Okay.  So there was literally a line in his arms.
16  A    Correct.
17  Q    Okay.  And he had that line in his arms for several weeks.
18  A    Yes.
19  Q    Okay.  And, Doctor, do you have an opinion within a
20  reasonable degree of medical certainty that the delay in sending
21  Mr. Rodriguez to the hospital from the jail deviated or breached
22  the standard of care in the profession?
23  A    I do.
24  Q    Okay.  And what is that opinion?
25  A    My opinion is that there was a breach in the standard
```

1   medical care and that he should have been more vigorously

2   evaluated and sent to the hospital sooner.

3   Q    Okay.  And do you have an opinion of the degree of medical

4   certainty as to the standard of care provided to him by the LPNs

5   and the RNs who are seeing Mr. Rodriguez prior to him going to

6   the hospital?

7   A    I do.

8   Q    And what is that opinion?

9   A    That he should have been physically assessed by a

10  practitioner sooner.  And my opinion is that he should have been

11  assessed on Friday by a nurse practitioner, a PA, or a

12  physician.

13  Q    Okay.  And do you have an opinion with a reasonable degree

14  of medical certainty as to whether the delay in sending him to

15  the hospital was a contributing factor in him needing the open

16  appendectomy?

17  A    Yes.

18  Q    What is that?

19  A    Yes.  That the delay contributed to him having to have an

20  open appendectomy as opposed to a laparoscopic appendectomy.

21  Q    And along with that open appendectomy, the fact that he had

22  to go into an additional surgery performed by you.

23  A    Correct.

24  Q    Okay.  IN addition to the hospital, of course, that lasted

25  through June 3rd.

1    A     Correct.

2    Q     Okay.  And during that course of time he also -- the

3    medical records indicate that he experienced bouts of nausea.

4    A     Correct.

5    Q     Do they indicate that he experienced bouts of vomiting?

6    A     Yes.

7    Q     Did it indicate that he experienced bouts of --

8              MR. NINOSKY:  Objection.

9              THE COURT:  It's leading.

10   BY MR. SALEEM:

11   Q     Okay.  Do you remember what other types of complaints that

12   you mentioned that he underwent while he was in the hospital?

13   A     Well, you can imagine with that degree of inflammation it

14   will take a while for the intestines to come back and feel

15   hungry again where you actually felt that you wanted to sit down

16   and eat something, so he struggled with that.  He had episodes

17   of rapid heartrate with that infection in his system.  He had an

18   inflammatory response in his system that he had a rapid

19   heartrate that had to be slowed down until the body and the

20   antibiotics, you know, got ahead of the infection.

21   Q     And was there any indication that Plaintiff experienced

22   pain while he was in the hospital?

23   A     Yes.

24   Q     Okay.

25   A     Yeah.

```
 1   Q    And what type of pain would one -- did he experience?
 2   A    Abdominal pain.  He had a pretty good size incision and it
 3   hurts.
 4   Q    Okay.  And how long would you expect -- was he experiencing
 5   that pain for?
 6   A    He was experiencing the pain for most of the
 7   hospitalization from either the wound, which then the pain
 8   quiets down, you know, weeks after the wound.  And then pain
 9   from having the tube in your side which irritates the muscle.
10   Every time you move around the tube pulls.
11   Q    Okay.  When you say every time you move around, so he could
12   experience pain when?  Anytime he moves?
13   A    When he had the drain in, it gets a little bit
14   uncomfortable.
15   Q    Okay.  One second.
16            THE COURT:  We really need to hurry this along.
17            MR. SALEEM:  Yes, I understand.
18            I have no further questions, Your Honor.
19            THE COURT:  Thank you very much, Counselor.
20            Mr. Ninosky, you may cross-examine the witness.
21            MR. NINOSKY:  Thank you, Your Honor.
22                         CROSS-EXAMINATION
23   BY MR. NINOSKY:
24   Q    Good afternoon, Doctor.
25   A    Hi.
```

```
 1   Q    Doctor, I'm going to maybe start a little bit in reverse --
 2   A    Okay.
 3   Q    -- with the hospital course, first of all.  When he came to
 4   the hospital, he probably came around 12:30 or so.  Does that
 5   sound about right to you?
 6   A    Correct.
 7   Q    And he was evaluated by Dr. Sha (phonetic) in the emergency
 8   room, was he not, sir?
 9   A    Correct.
10   Q    He's an emergency room physician, right?
11   A    Correct.
12   Q    And I know you kind of gave a little bit of a time frame
13   for the jury, but I think skipped a couple of parts.  When Dr.
14   Sha did an assessment he felt that there could be a small bowel
15   obstruction, correct?
16   A    Correct.
17   Q    And, in fact, he started his workup -- I shouldn't say
18   started his workup, but because he had concerns of the small
19   bowel obstruction which he came to on his own, right?  I mean,
20   that was his assessment.
21   A    Correct.
22   Q    That wasn't called ahead by Paula Dillman, right?
23   A    I don't know, but I don't disagree with you.  I'm not
24   disagreeing with you.
25   Q    Okay.  So let's do it this way.
```

1    A    Yes.

2    Q    There's nothing in the record that indicates that.

3    A    Correct.

4    Q    That might be a more fair way of doing it.

5    A    Fine.

6    Q    And he ordered an x-ray, right?

7    A    Yes.

8    Q    He didn't order a CT scan.  He ordered an x-ray.

9    A    Correct.

10   Q    So the first thing that he did, because he wanted to rule

11   out a small bowel obstruction, was an x-ray.

12   A    Correct.

13   Q    It wasn't until he did a CT scan, that's when it was

14   determined that he had the appendicitis, right?

15   A    Correct.

16   Q    Okay.  So Dr. Sha was thinking small bowel obstruction just

17   like Ms. Dillman-McGowan, correct?

18   A    Correct.

19   Q    And when he ordered the testing, the first test that he did

20   kind of showed small bowel obstruction, right?

21   A    Correct.

22   Q    But ultimately he -- because he needed additional testing,

23   that's when the appendicitis was revealed.

24   A    Correct.

25   Q    Okay.  So it wasn't quite he just walked in, went right to

1   CT, and then to surgery.  It took a little bit of time.

2   A    Correct.

3   Q    In fact, I think he came in around 12:30.  I don't think he

4   left the ED until 8:30-ish.

5   A    Well --

6   Q    And my guess is you're not even starting a procedure until

7   after 9:00-ish.  Does that sound about right to you?

8   A    Correct.  I saw him around 5:00 that night, a little bit

9   after 5:00.  The CT scan came back near 5:00.

10  Q    And after that came back, then they knew they had a

11  surgical situation --

12  A    Correct.

13  Q    -- and they needed to get you involved.

14  A    Correct.

15  Q    And you weren't involved until that time.

16  A    Correct.

17  Q    And generally speaking, somebody doesn't walk in off the

18  street into your practice and say, "I've got belly pain.  You've

19  got to check me out."  Generally speaking, there's other

20  providers ahead of you.

21  A    Correct.

22  Q    Okay.  So usually by the time you have an opportunity to

23  examine a patient you have probably at least a little bit more

24  time of a history, is that correct?

25  A    Correct.

```
1   Q     You might have diagnostic testing or not, correct?

2   A     Correct.

3   Q     And that diagnostic testing could be lab results.

4   A     Correct.

5   Q     Okay.  Could be urine results.

6   A     Correct.

7   Q     Okay.  Because I think you told us, you know, things -- you

8   have to work things up and one way to do that is through

9   diagnostic testing, right?

10  A     That's one way.

11  Q     Okay.  Right.  You do a history, fair?

12  A     Correct.

13  Q     Do a physical exam.

14  A     Yes.

15  Q     Okay.  And you would agree with me that a lot of the

16  symptoms that we're talking about in this particular case like

17  nausea and vomiting, that could be a whole host of things that

18  could cause nausea and vomiting, correct?

19  A     Correct.

20  Q     And I think way back this morning you had said about doing

21  -- when you have a potential diagnosis you try to rule out the

22  most serious thing first.  Isn't it that you're trying to rule

23  out the most common thing first, Doctor?

24  A     Combination of both.

25  Q     Because if I say to you right now I have abdominal pain, I
```

1   could have cancer, could I not?

2   A    Sure.

3   Q    But you're not going to just send me out for a pet scan to

4   see if I have cancer just because I complain about abdominal

5   pain.

6   A    Correct.

7   Q    Okay.  And you would agree with me that sometimes the best

8   test is just a little bit of time.

9   A    Correct.

10  Q    Especially when we're talking about symptoms such as nausea

11  and vomiting.  That can be pretty benign.

12  A    Correct.

13  Q    Okay.  So you would -- and you told us that

14  gastroenteritis, which is a fancy way of saying your stomach is

15  upset and you're having some belly ache, right?

16  A    Correct.

17  Q    Okay.  You told us that it's reasonable to have

18  gastroenteritis as a result of Naproxen use.

19  A    Correct.

20  Q    Or that type of medication.

21  A    Yes.

22  Q    Okay.  So that, to you, is a reasonable thought process.

23  A    Yes.  Uh-huh.

24  Q    Okay.  You also told us that, you know, you can have

25  abdominal pain for a number of reasons, correct?

1  A     Correct.

2  Q     And we went through everything from gastroenteritis to

3  appendicitis to I think you said gall bladder.  There's a whole

4  bunch of things.

5  A     Yes.

6  Q     Okay.  So that's why it's important to, again, work through

7  a process to figure out what's getting better, what's making it

8  worse, that type of thing, right?

9  A     Correct.  Uh-huh.

10 Q     Okay.  And in this particular instance -- boy, that got

11 loud, didn't it?  Wow.  In this particular case, I mean, you

12 could see a thought process going on, can't you?  I mean,

13 there's an assessment.  There's a call for orders.  They're

14 thinking about gastroenteritis, correct?

15          MR. SALEEM:  Objection.

16          THE COURT:  Basis?

17          MR. SALEEM:  Unclear what the question is.

18          THE COURT:  Would you re-ask the question, sir?

19 BY MR. NINOSKY:

20 Q     Did you understand me?

21 A     To a degree.

22 Q     Okay.  Well, then I want to make sure I'm clear for it.  In

23 this particular instance, you would agree that certainly when

24 there was a complaint of abdominal pain the first time that it

25 is documented is the 16th, correct?

1   A     Correct.

2   Q     And you said that based upon that note it was either the

3   14th or the 15th, how it was written, correct?

4   A     Correct.

5   Q     Now, you didn't read Susan Roberts' deposition, but I

6   represent to you that she said it would have been the 15th.

7   A     Fine.

8   Q     Okay.  All right.  And I don't think you're going to

9   quibble about that.  And I also think when you talked to him

10  about a history he said four days, correct?

11  A     Correct.

12  Q     And that would have been back to the 16th.

13  A     Fine.

14  Q     So we're kind of right around that 16th-ish.

15  A     Correct.

16  Q     Fair enough?

17  A     Correct.

18  Q     Okay.  By the way, I didn't see anything in your

19  documentation about any difficulties in communicating with Mr.

20  Rodriguez, correct?

21  A     Correct.

22  Q     You were able to get a history from him?

23  A     Yes.

24  Q     You didn't indicate that he had any sort of difficulties

25  articulating what his symptoms were, correct?

1   A     Correct.

2   Q     From your view, he gave you a sufficient history.

3   A     Yes.

4   Q     Okay.  And from your view, he understood what you were

5   asking of him.

6   A     Yes.

7   Q     Okay.  And I've reviewed PrimeCare records.  I have

8   reviewed records from other providers at Reading Hospital.  I

9   have reviewed records --

10          MR. SALEEM:  Objection, Your Honor.  Why is Mr.

11   Ninosky testifying as to what he's been doing?

12          THE COURT:  It's cross-examination now.

13          MR. SALEEM:  I understand, but there's not a question

14   there.

15          THE COURT:  Okay.  I'm going to overrule the objection

16   and see if a question is going to come.

17   BY MR. NINOSKY:

18   Q     I've got a stack of records over there about a foot high,

19   both PrimeCare records, Reading Hospital records, St. Joseph's

20   records, records from before he was in jail right up until when

21   you discharged him.  I don't see anywhere in those records of a

22   person having difficulty talking with Mr. Rodriguez and him

23   understanding the process to obtain medical care.  I don't see

24   anybody -- no healthcare provider has indicated that he didn't

25   understand or wasn't able to participate in his care.  Would you

1    agree with me on that?

2    A    Yes.

3    Q    Okay.  So from your view, there's no issues with him being

4    able to explain himself and what symptomology that he would have

5    had, fair?

6    A    When I talked to him, yes.

7    Q    Sure.  And at that point he was getting ready to go to

8    surgery, right?

9    A    Yes.

10   Q    Okay.  You would agree with me, and I think I saw it in

11   your report, that an appendicitis can be a difficult thing to

12   diagnose.

13   A    Correct.

14   Q    In fact, I think you said in your report that you've seen

15   many cases of delayed diagnosis, correct?

16   A    I have.

17   Q    And just because there was a delay in the diagnosis, that

18   doesn't mean there was malpractice every time, does it, sir?

19   A    Correct.  It does not mean that there has been malpractice.

20   Q    Right.  Because sometimes things just take a little time to

21   get it boiled down to what the problem is, correct?

22   A    Yes.

23   Q    And in this particular case, you had said that there was a

24   decline in his presentation in the jail, but there was

25   documented vomiting in the late evening of Thursday into early

1    Friday, correct?

2    A    Correct.

3    Q    And then we went through the chart notes, and I'm not going

4    to put them up because it's getting towards the end of the day,

5    but you saw those chart notes where he was assessed by nurse in

6    place during the day on Friday, correct?

7    A    Correct.

8    Q    And it indicated there had been no new vomiting, correct?

9    A    No --

10   Q    No emesis.  I mean, I can dig it out if you like.

11   A    No.  I'll accept that, you know, that he may not have

12   vomited.

13   Q    During the day.

14   A    During the day.

15   Q    Okay.  So it wasn't as if we had intractable vomiting, but

16   rather he had vomited in the early morning hours or late evening

17   and then we go a period of time where he wasn't vomiting.

18   A    Correct.

19   Q    Okay.  And we know that at least he ate lunch, at least

20   some of his lunch.  I'm not saying he had a buffet, but he

21   certainly was able to eat.

22   A    No.  I would disagree with that.

23   Q    You would?  So when it says that he was able to eat lunch,

24   that's inaccurate?

25   A    Can you show me?  I don't --

```
 1   Q     Absolutely.  It's going to be 73 and we're going to pull it

 2   out for you.  And it's a note by Lauren Becker, sir.  I'll tell

 3   you what.  To move it along, I'm just going to bring it up to

 4   you.  The jury has already seen this.

 5   A     Okay.

 6   Q     I don't want you to think I'm pulling a -- Your Honor, may

 7   I approach?

 8             THE COURT:  Oh, certainly, Counselor.

 9   BY MR. NINOSKY:

10   Q     Do you mind if I kind of invade your space?

11   A     No, no, fine.

12   Q     Okay.  See the note by Lauren Becker, sir?

13   A     Yes.

14   Q     You see that she was assessed during -- that the patient

15   was assessed twice during the day, fair?

16   A     Right.

17   Q     Said that he was feeling weak.  I get it.

18   A     Right.

19   Q     Had no appetite, but reported no emesis since early

20   morning.

21   A     Correct.

22   Q     Okay.  His vital signs are stable.

23   A     Correct.

24   Q     No fever.

25   A     Right.
```

```
1   Q    He reported eating nothing for breakfast and a small amount
2   for lunch, so he did eat for lunch.
3   A    A small amount.
4   Q    Fair.  But that was more than he ate for breakfast, right?
5   A    Correct.
6   Q    So the fact that he isn't throwing up and the fact that
7   he's actually increasing his food intake, that's a good thing,
8   isn't it?
9   A    I don't agree with your assessment that he didn't vomit.
10  When somebody vomits, they usually vomit every six to eight
11  hours.  You fill up your stomach, then you vomit.  And then you
12  fill better after you vomit.  And then the promise goes on and
13  six to eight hours you vomit again.  And a small amount of
14  lunch, you can call it lunch.  I don't know if it was one sip
15  and they're constituting it as lunch.  So in my mind in total of
16  the whole chart, he's not getting better.
17  Q    So you're disagreeing with me because you're not exactly
18  sure to the extent that he ate lunch.
19  A    Correct.
20  Q    And you're disagreeing with me because it's possible that
21  you may go hours without vomiting, so the fact that he went 12,
22  at least 12 hours at that point without vomiting, that may not
23  be a sign of him getting better.
24  A    Correct.
25  Q    However, if you're sitting there real-time, would you agree
```

1    with me that it could be a sign that he's getting better?

2    A    Yes.

3    Q    Okay.  And that's the tough part, isn't it, when we know

4    the ultimate outcome and what the diagnosis was, but when you're

5    looking at it from stages, you know, you would agree with me

6    that it's reasonable to think that, yeah, that's an improvement,

7    right?

8    A    Yes.

9    Q    Okay.  And when you're treating real-time, I mean that's

10   kind of what you're looking for, isn't it?

11   A    Yes.

12   Q    Okay.  And I'm not going to go through all the pages or of

13   the vital signs.

14   A    Correct.

15   Q    But you would agree with me that in the entire time up and

16   through you doing his surgery his vital signs were taken a

17   number of times at the Berks County Jail.

18   A    Yes.

19   Q    Okay.  And at every one of those times the vital signs were

20   within normal limits.

21   A    There was one time where the heart rate was elevated or the

22   heart rate was lower, but they were within a general range of

23   normal.

24   Q    And I think you told us that 56, the pulse that was a

25   little low, that was also when he had complained about vomiting,

1    right?

2    A    Correct.

3    Q    Never saw another pulse that was that low, did you, Doctor?

4    A    No.

5    Q    Okay.  And so there we have a documented instance of a low

6    pulse during a time frame when he had vomiting and we don't have

7    that low pulse again, do we?

8    A    No.

9    Q    And we also don't have documented anywhere else up until

10   Paula Dillman seeing him, frankly ten minutes before she sees

11   him, of any other complaints of vomiting, correct?

12   A    Yeah.  We have no documentation.

13   Q    Well, we know that at times he would complain and there

14   would be a response, correct?  This whole thing started with him

15   complaining of abdominal pain, right?

16   A    Correct.

17   Q    And we have gone -- we spent most of the day going through

18   the response to that complaint, correct?

19   A    Correct.

20   Q    All right.  And you would also agree with me and you were

21   shown on the 20th in the morning when he had severe abdominal

22   pain, which by the way, that was the only time it was documents

23   in the Berks County Jail severe abdominal pain, correct?

24   A    Correct.

25   Q    And that was during a vital signs check, nothing special.

1   It was the same vital signs check that had been done twice on

2   Saturday and twice on Sunday.  Fair statement, sir?

3   A    No.  I don't believe that the assessment over the weekend

4   rises to the level of standard medical care.

5   Q    That's not what I'm asking you.  What I'm saying to you is

6   he had his vital signs checked twice on Saturday, no doubt about

7   that.

8   A    Correct.  Correct.

9   Q    He got his vital signs checked twice on Sunday.  No doubt

10  about that.

11  A    Correct.

12  Q    Okay.  And that was done by registered nurses both times, I

13  believe, but whatever.

14  A    Okay.  Fine.  Fine.

15  Q    A nurse.  Now, on Monday morning his vital signs were

16  checked again, this time by a medical assistant, right?

17  A    Correct.

18  Q    And at that point it was actually documented that he had a

19  complaint.  He was complaining of abdominal pain, right?

20  A    Correct.

21  Q    That was documented.

22  A    Correct.

23  Q    So we have documented situations where he complains that

24  are in the record.  Correct, sir?

25  A    Correct.

1  Q    But we also have a period of time where we don't have any

2  complaints documented, correct?

3  A    Correct.

4  Q    Yet the same assessments that are going on by multiple

5  people have no indication other than their normal vital signs

6  and obviously there were no complaints articulated by the

7  patient because there's nothing charted, correct?

8  A    There was nothing charted.

9  Q    You would agree with me that it's at least possible that

10 the reason why there isn't any complaints charted is because he

11 didn't make any.

12          MR. SALEEM:  Objection.  Calls for speculation.

13          THE COURT:  It's overruled.

14          THE WITNESS:  That is a possibility.

15 BY MR. NINOSKY:

16 Q    Certainly.  Because we know in other instances where

17 there's complaints they are documented, right?

18 A    Correct.

19 Q    And you would expect that nurses, which by the way they

20 weren't sued.  So these people on Saturday and Sunday, they're

21 not sued.

22          MR. SALEEM:  Objection.

23          MR. NINOSKY:  Okay.

24          MR. SALEEM:  Argumentative.

25          MR. NINOSKY:  I'm just trying to give a factual

 1  predicate, Your Honor.

 2          THE COURT:  If the objection is argumentative, this is

 3  cross-examination.  I'll overrule that objection.

 4  BY MR. NINOSKY:

 5  Q    So the nurses that --

 6  A    They work for PrimeCare.

 7  Q    Sir, they weren't sued, okay.  So they were never, in no

 8  document are they sued.  Those nurses -- you would presume, sir,

 9  that if complaints were made to them that they would document

10  it, right?

11  A    Yes.

12  Q    Just like the other instances when complaints were made

13  there was documentation such as Suzy documented when there were

14  complaints given to her, correct?  You would expect that.

15  A    Correct.

16  Q    Okay.  You would also expect that if they had complaints

17  that they would report them to a provider, which is what

18  happened in this particular case with Suzy and Allison Young,

19  correct?

20  A    Correct.

21          MR. SALEEM:  Assumes facts not in evidence.

22          MR. NINOSKY:  He's an expert.  I mean --

23          THE COURT:  The objection was it assumes facts not in

24  evidence, but those facts are in evidence.

25          MR. SALEEM:  Can we approach, Your Honor?

```
 1              THE COURT:  Certainly.  Counsel, please approach.

 2              (Sidebar)

 3              MR. NINOSKY:  I don't have much more.

 4              MR. SALEEM:  (Inaudible).

 5              MS. RAMEAU:  So he's asking him, right, to speculate

 6   as to whether -- the doctor has already testified that there was

 7   no proper assessment, okay.  And my understanding of his

 8   testimony is that had there been an actual assessment that

 9   perhaps it would have yielded some sort of complaint or, you

10   know, some change in the treatment plan.  So now he's asking him

11   to vouch for how accurate PrimeCare personnel documented.

12   That's --

13              THE COURT:  He said he can't (inaudible) because

14   there's nothing there.  That means (inaudible).

15              MR. NINOSKY:  Right.

16              THE COURT:  (Inaudible).

17              MR. NINOSKY:  That's correct.

18              THE COURT:  So (inaudible).

19              MS. RAMEAU:  That's all right, Your Honor.  We can

20       move on.

21              THE COURT:  All right.  Thank you, Counsel.

22              (Sidebar)

23              THE COURT:  Mr. Ninosky, you may proceed, sir.

24              MR. NINOSKY:  Thank you, Your Honor.

25   BY MR. NINOSKY:
```

1    Q    You had indicated the -- you performed your surgery and

2    then you followed him for a couple of months, fair?

3    A    Correct.

4    Q    And you had seen the note there from July where he still

5    had the drain, is that correct?

6    A    Correct.

7    Q    But he was ambulating well.

8    A    Yes.

9    Q    Eating whatever he wanted.

10   A    Yes.

11   Q    Basically resuming normal activities.

12   A    Yes.

13   Q    Okay.  And then I think the last time you saw him was in

14   August, fair?

15   A    Correct.

16   Q    And you discharged him.

17   A    Correct.

18   Q    Okay.  He never came back to you.

19   A    Correct.

20   Q    So from your view he was resolved by, I think it was August

21   7th.

22   A    Yes.

23   Q    Okay.  Because there's no further treatment, you didn't

24   bring him back, and he hasn't come back to you.

25   A    Correct.

```
 1  Q     Okay.  Sir, those are all the questions I have for you.
 2  A     Thank you.
 3  Q     Thank you.
 4              THE COURT:  Thank you very much, Mr. Ninosky.
 5              Mr. Saleem, you may redirect the witness.
 6              MS. RAMEAU:  Can we brief, Your Honor, for just a
 7  moment?
 8              THE COURT:  Certainly, yes.
 9                       REDIRECT EXAMINATION
10  BY MR. SALEEM:
11  Q     Doctor, what effect does a person's age or size bear on
12  their vital signs?
13  A     Once the patient reaches adulthood their vital signs should
14  be the same.
15  Q     Okay.  And what, if any, significance is the fact that Mr.
16  Rodriguez' vital signs remained in the normal range throughout
17  the course of his time at Berks County?
18  A     When a patient gets ill the vital signs can change, but
19  they don't always change.
20  Q     Okay.
21  A     And a person who's larger can have an intraabdominal
22  process where his vital signs may not change up until he becomes
23  very ill.  And so it's a variable piece of information.  It
24  helps you if they're abnormal to realize that something is going
25  on, but if they're normal it doesn't rule out a process going on
```

1  within the abdomen.

2  Q    Okay.  And it was discussed that Mr. Rodriguez didn't make

3  any -- there's no documentation of any complaints from Mr.

4  Rodriguez on the 18th and 19th.  Does the fact that there was no

5  complaints, does that necessarily mean that he was fine and

6  didn't have any complaints?

7  A    No.  The documentation on Saturday and Sunday is very poor

8  and in looking back at those notes I can't tell whether he ever

9  had an abdominal assessment other than there are no complaints

10  there, whether the patient offered no complaints, whether the

11  patient was feeling better, whether the patient was feeling

12  worse, whether the patient was hungry, whether the patient was

13  not hungry.  You can't tell because the documentation is so poor

14  on Saturday and Sunday that a reasonable practitioner could not

15  look at that and say that an adequate assessment was done.

16  Q    Okay.  And the only basis that we would have -- evidence

17  that we would have is if somebody had actually made a

18  documentation of that in the chart, is that right?

19  A    Correct.

20  Q    Okay.  And the extent of the -- your opinion with a

21  reasonable degree of medical certainty as to the extent of the

22  damage that you saw to Mr. Rodriguez' appendix was due to a

23  delay in him being treated.

24          MR. NINOSKY:  Objection.

25          THE COURT:  It's outside the scope of the cross.  It's

1    close enough.

2              MR. NINOSKY:  Okay.

3              THE COURT:  I'll allow it.  I'll overrule the

4    objection.

5              THE WITNESS:  My findings on Monday at the time when I

6    operated with a high degree of medical certainty that he had

7    appendicitis going on for quite some time and definitely 24 to

8    48 hours before he presented to the emergency room, and I

9    suspect longer.  You can't tell --

10             MR. NINOSKY:  Objection.  Move to strike.  You already

11   upon this, Your Honor, to preclude just that testimony.

12             MS. RAMEAU:  Can we approach, Your Honor?

13             THE COURT:  Certainly.  Counsel, please approach.

14             (Sidebar)

15             MR. NINOSKY:  The Court has already ruled that he

16   cannot talk about the extent of the hours or the delay.  It's

17   noted in his report.  You've already sustained one objection as

18   to that very question.  Now he just -- frankly, Your Honor, he

19   knows the issues in the case as to what's in the report, which

20   isn't in the report, and now he's going to volunteer that in

21   response to Counsel's question.  I would ask that the witness be

22   cautioned to only answer questions that are directed to him as

23   opposed to going off the reservation giving stuff that you've

24   already ruled out.

25             MS. RAMEAU:  But wait a minute, Your Honor.  Okay.

1    Let's be reasonable here because you are trying to get this jury

2    to think that given the extent of this man's disease that he was

3    perfectly fine on the 18th and the 19th, right?  So you opened

4    the door.  That's what I think.  You opened the door.

5              MR. NINOSKY:  I don't think so, Your Honor.

6              MS. RAMEAU:  I beg to differ.

7              MR. NINOSKY:  That's shocking.

8              THE COURT:  (Inaudible).

9              MR. NINOSKY:  That's what he just said, but that isn't

10   anywhere.  That isn't documented anywhere in any other opinion

11   that we've been given at this point.

12             MR. NINOSKY:  That tends to contradict his claim that

13   if -- he's saying there were no complaints.  He was perfectly

14   fine because, you know, whenever he complains it's documented in

15   the file, so there was no complaint, meaning he had no pain,

16   okay.  So he was getting better.  But that's not true given the

17   extent of the disease, Your Honor.

18             This is a disease process we're talking about.  He's

19   an expert.  He saw it for himself.  And he testified that it was

20   way advanced, that it's one of the worst he's seen and he's done

21   hundreds, that it's among the top ten.  So it's he's misleading

22   the jury and he opened the door when he did that for us to now

23   come in, right, and address the issue.  I think it's proper

24   cause, proper testimony.

25             MR. NINOSKY:  Frankly, I'm offended that she's going

1    to say anything about me misleading the jury after some of the

2    statements that have been made in this Court.  However, I didn't

3    open any door.  The Court has already ruled on that issue.

4    There was never a dispute that there were no complaints during

5    those days.  He made a big deal about that on direct.

6              THE COURT:  (Inaudible).

7              MR. NINOSKY:  Thank you.

8              (End of Sidebar)

9              THE COURT:  Ladies and gentlemen of the jury, the last

10   answer given by the doctor, I am going to strike that testimony,

11   which means you may not consider it in any way.

12             Is there any juror that cannot follow that

13   instruction?  If so, please raise your hand?

14             UNIDENTIFIED JUROR:  What was the last statement that

15   he made?

16             THE COURT:  Well, if you can't remember it, best not

17   to remind you.  So I'm going to assume you definitely can follow

18   the instruction.

19             UNIDENTIFIED JUROR:  If I can't remember, I won't.

20             THE COURT:  Very well.  Thank you very much.

21             Mr. Saleem, you may continue, sir.

22   BY MR. SALEEM:

23   Q    The fact that Mr. -- Doctor, can an inmate who is in a jail

24   walk to a hospital by himself?

25             MR. NINOSKY:  Objection.

```
 1              THE COURT:  I'm sorry, sir.

 2              MR. NINOSKY:  Outside the scope.

 3              MR. SALEEM:  Can an inmate who is in a jail walk to a

 4    hospital by himself?

 5              THE COURT:  The question is whether a person in --

 6              MR. SALEEM:  In a jail can walk to a hospital by

 7    himself.

 8              THE COURT:  What is the relevance of that?

 9              MR. SALEEM:  it's to establish that he's in the care

10    of the jail and under their control.

11              THE COURT:  I think that's already established, but I

12    certainly don't think that's anything that's rebutting anything

13    put forward by cross.

14              MR. SALEEM:  Okay.  I'll move on, Your Honor.  Okay.

15              THE COURT:  The objection is sustained.

16    BY MR. SALEEM:

17    Q    Okay.  Then just the fact -- you were asked about whether

18    or not you could understand Mr. Rodriguez when you communicated

19    with him, is that fair?

20    A    That is fair.

21    Q    Okay.  And when you were dealing with him you had already

22    made a diagnosis as to what his condition was.

23    A    Correct.

24    Q    You had already performed an operation on him.

25    A    Correct.
```

1  Q    Okay.  And you had already performed two operations on him.

2  A    Correct.

3  Q    Okay.  Operations that you found to be one of the top ten

4  that you've seen, correct?

5  A    Correct.

6  Q    Okay.  And just because you were able to understand

7  someone, does that necessarily equate that they are a good

8  historian in terms of their complaints?

9  A    Not necessarily.

10 Q    Okay.  And it was also mentioned that when Mr. Rodriguez

11 went to the hospital that he was initially assessed for a

12 possible bowel obstruction, is that right?

13 A    Correct.

14 Q    Okay.  And Mr. Rodriguez didn't come straight from home.

15 He came from being examined by other medical providers, right?

16 A    Correct.

17 Q    Okay.  And usually when someone comes to another hospital

18 setting they would get information from those medical providers

19 as to the reason why that person is coming to the hospital, is

20 that fair?

21 A    Yes.

22 Q    Okay.  And I'm just going to show you what's been marked as

23 PCM76, which is part of the medical records.  According to this

24 document which is from PrimeCare Medical, what is the reason or

25 the -- this is a referral from PrimeCare to Reading Hospital, is

1   it not?

2   A    Correct.

3   Q    Okay.  And based upon this document, what is noted as the

4   chief complaint for Mr. Rodriguez needing to go to the hospital?

5   A    Possible bowel obstruction.

6   Q    Thank you.  I have no further questions.

7            THE COURT:  Thank you, sir.

8            Mr. Ninosky, any recross?

9                       RECROSS-EXAMINATION

10  BY MR. NINOSKY:

11  Q    And, Doctor, the Dr. Sha thought that that was reasonable

12  when he worked him up, correct, for a small bowel obstruction?

13  A    Correct.

14  Q    And just a couple of things.  You said that normal vital

15  signs may not rule out disease process, correct?

16  A    Correct.

17  Q    But it also could be an indication of no disease process,

18  fair?

19  A    Correct.

20  Q    Just like lab results.

21  A    Correct.

22  Q    In this particular case, labs were drawn, correct?

23  A    Correct.

24  Q    And that's appropriate.

25  A    Yes.

1   Q    And there was no indication of infection in those lab

2   results, were there?

3   A    They were slightly abnormal.  The white count was normal.

4   The bands were -- the neutrophils were slightly abnormal, but

5   they were not grossly abnormal.

6   Q    There you go.  So we have -- again, we have lab work that

7   was worked up that was reviewed in real time.  It doesn't show

8   really an abnormality, fair?

9   A    Correct.

10  Q    And the fever, infection can have or cause someone to have

11  a fever, right?

12  A    Correct.

13  Q    At no point did he have a fever.

14  A    Correct.

15  Q    And, again, I know you said sometimes you may, sometimes

16  you may not, but when you're trying to make decisions in real-

17  time these are the types of things that you're looking at,

18  correct?

19  A    Correct.

20  Q    Vital signs, lab results, you know, those types of things,

21  fair?

22  A    Correct.

23  Q    Okay.  Your Honor, that's it.  Thank you.

24          THE COURT:  Thank you, Counselor.

25                      FURTHER REDIRECT EXAMINATION

```
 1   BY MR. SALEEM:

 2   Q    Just the fact that there's no fever, is that enough of a

 3   basis for you to rule out a diagnosis of appendicitis?

 4              MR. NINOSKY:  Objection.

 5              THE COURT:  I think the doctor has already answered

 6   that question.

 7              MR. SALEEM:  Right.  But it was just mentioned just

 8   right now on re --

 9              THE COURT:  I know it was.  It's rare that I allow re-

10   redirect, but it is your witness.  But I think the doctor has

11   already indicated that just because you don't have a fever does

12   not mean you don't have an appendicitis, so I think it would be

13   redundant.

14   BY MR. SALEEM:

15   Q    Okay.  And then just regarding the same type of fact that

16   there is no elevation in a blood test, is that a hallmark

17   necessary to rule out appendicitis?

18   A    No.

19              THE COURT:  And I think he testified to that before.

20   BY MR. SALEEM:

21   Q    And why not, Doctor?

22   A    Appendicitis --

23              MR. NINOSKY:  Objection.

24              THE COURT:  I'll overrule it and allow the answer.

25              THE WITNESS:  Appendicitis can present in many ways
```

1    and the hallmark of appendicitis is abdominal pain and

2    tenderness.  And the prime way is with physical examination of

3    the abdomen to rule out an abdominal process.

4    BY MR. SALEEM:

5    Q    And Mr. Rodriguez was presenting with abdominal pain as of

6    at least -- he was complaining of abdominal pain to a nurse on

7    the 16th that it previously occurred on the 14th or 15th,

8    correct?

9    A    Correct.  He experienced abdominal pain and exhibited

10   tenderness.

11              THE COURT:  Any re-recross?

12              MR. NINOSKY:  Just one.

13              THE COURT:  Sure.

14                        FURTHER RECROSS-EXAMINATION

15   BY MR. NINOSKY:

16   Q    And you're talking about the hallmark and the abdominal

17   pain, you said it a little bit different in your report.  You

18   said the hallmark --

19              MR. SALEEM:  Objection.  Report not in evidence.

20              THE COURT:  Excuse me.

21              MR. SALEEM:  The report is not in evidence.

22              THE COURT:  Yes, but he can cite it as prior statement

23   of the doctor.

24   BY MR. NINOSKY:

25   Q    The hallmark is the pain in the lower right side of the

1    abdomen, correct, sir?

2    A    Yes.

3    Q    That's the hallmark, the lower right quadrant, fair?  Is

4    that what you said in your report?

5    A    Yes.

6    Q    Okay.  Nothing further, Your Honor.

7                        FURTHER REDIRECT EXAMINATION

8    BY MR. SALEEM:

9    Q    And on April 17th Mr. Rodriguez was complaining of pain to

10   the lower right quadrant, correct, Doctor?

11   A    Yes.

12   Q    Okay.

13           THE COURT:  Anything further of the doctor?

14           All right, Doctor.  Thank you very much.  You've been

15   here for quite some time.  You are excused, sir.

16           (Witness excused.)

17           (End of witness testimony 4:43 p.m.)

18                          * * * * *

19

20

21

22

23

24

25

26

1            **C E R T I F I C A T I O N**

2

3        I, Crystal Thomas, court approved transcriber,

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in

6 the above-entitled matter, and to the best of our ability.

7

8

9

10 _____

11 Crystal Thomas, CET-654

12

13

14 Date:  June 9, 2017