```
                 UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF PENNSYLVANIA

RAFAEL RODRIGUEZ,                  . Civil Action No. 16-1033
                                   .
      Plaintiff,                   .
                                   . 601 Market Street
          vs.                      . Philadelphia, PA
                                   .
PRIMECARE MEDICAL, INC. SUSAN,     .
RORBERTS, LPN, ALLISON YOUNG, RN,  . March 23, 2017
PAULA DILLMAN-MCGOWAN, CRNP,       . 9:02 a.m.
and ELIZABETH GARCIA, LPN,         .
                                   .
      Defendants.                  .
. . . . . . . . . . . . . . . . . . .
.
        TRANSCRIPT OF TESTIMONY OF PAULA DILLMAN-MCGOWAN
               BEFORE HONORABLE EDWARD G. SMITH
                  UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Plaintiff:        AFSAAN SALEEM, ESQ.
                          THE RAMEAU LAW FIRM
                          16 Court Street, Suite 2504
                          Brooklyn, NY  11241
                          (718) 852-4759
                          rameaulawny@gmail.com


For the Defendant:        JOHN R. NINOSKY, ESQ.
                          JOHNSON DUFFIE STEWART & WEIDNER
                          301 Market Street
                          PO Box 109
                          Lemoyne, PA  17043-0109
                          (717) 761-4540
                          jninosky@johnsonduffie.com


Audio Operator:           Matt Sheetz
TRANSCRIBED BY:           Valori Weber
                          Weber Reporting Corporation
                          2755 Commercial Street SE, #101-216
                          Salem, OR  97302
                          (970) 405-3643
            Proceedings recorded by electronic sound
     Recording, transcript produced by transcription service.
```

<u>**I N D E X**</u>

<u>**Page**</u>

<u>**WITNESS FOR THE PLAINTIFF**</u>

PAULA DILLMAN-MCGOWAN

Direct Examination by Ms. Rameau ........................ 3

Cross-Examination by Mr. Ninosky ....................... 67

Redirect Examination by Ms. Rameau .................... 124

Recross-Examination by Mr. Ninosky .................... 151

Further Redirect Examination by Ms. Rameau ............ 152

1              MS. RAMEAU:  Yes, Your Honor.  Plaintiff calls Paula

2    Dillman-McGowan.

3              (Witness summoned)

4              THE COURT:  Good morning, ma'am.

5              THE WITNESS:  Good morning.

6              THE CLERK:  Remain standing and raise your right hand.

7              Do you swear or affirm that the testimony you're about

8    to provide in the issue now before this Court shall be the

9    truth, the whole truth, and nothing but the truth so help you

10   God?

11             THE WITNESS:  I do.

12             THE COURT:  Thank you very much, ma'am.  Ma'am, you

13   may be seated.  And, ma'am, would you please state your full

14   name, spelling your last name for the record.

15             THE WITNESS:  Paula Dillman-McGowan, D-I-L-L-M-A-N

16   hyphen M-C-G-O-W-A-N.

17             THE COURT:  Thank you very much, ma'am.

18             Counsel, you may proceed.

19                     PAULA DILLMAN-MCGOWAN,

20   a witness, having been first duly sworn, was examined and

21   testified as follows:

22                     DIRECT EXAMINATION

23   BY MS. RAMEAU:

24   Q    Good morning, Ms. McGowan.

1    A    Good morning.

2    Q    Now, Ms. McGowan, on Monday you were here when Dr. Brown

3    testified, correct?

4    A    Yes.

5    Q    And you understand Dr. Brown to be the Chief of Surgery at

6    Reading Hospital, is that right?

7    A    Yes.

8    Q    The treating physician in this case, correct?

9    A    The treating general surgeon, yes.

10   Q    The treating physician once the Plaintiff got to Reading

11   Hospital, correct?

12   A    Correct.

13   Q    The surgeon, right?

14   A    Yes.

15   Q    And you heard Dr. Brown detail his extensive training and

16   surgical experience, correct?

17   A    Yes.

18   Q    You also heard him testify that what you did in this case

19   relative to our client, Rafael Rodriguez, fell below the

20   standard of care.  You heard that, right?

21   A    Yes.

22   Q    But you disagree with Dr. Brown, correct?

23   A    Yes.

24   Q    You don't think you did anything wrong, correct?

25   A    Yes.

1   Q     And you heard Dr. Brown detail the state of Rafael

2   Rodriguez' stomach at the time of the surgery on April 20, 2015,

3   correct?

4   A     Yes.

5   Q     The extent of Rafael Rodriguez' disease process.  You heard

6   that testimony, correct?

7   A     Yes.

8   Q     But you didn't think that -- you still don't think that you

9   did anything wrong, correct?

10  A     Yes.

11  Q     Did you learn anything at all, Ms. McGowan, from Dr.

12  Brown's testimony?

13  A     Yes.

14  Q     Is there anything that if you could go back that you would

15  do differently?

16  A     Absolutely not.

17  Q     So you've learned nothing, correct?

18          MR. NINOSKY:  Objection.  Argumentative and asked and

19  answered.

20          MS. RAMEAU:  Withdrawn.

21  BY MS. RAMEAU:

22  Q     You wouldn't change a thing, correct?

23  A     Absolutely not.

24  Q     Now I want to begin, Ms. McGowan, with a discussion about

25  your background and level of experience in medicine.  You are

1   what's called a certified registered nurse practitioner, right?

2   A    That is correct.

3   Q    You hold an advanced degree in nursing, correct?

4   A    Yes.

5   Q    You hold a license that allows you to practice medicine,

6   correct?

7   A    I hold a license that allows me to practice advanced

8   nursing care.

9   Q    Like a doctor somewhat, correct?

10  A    Similar to the fashion in which a physician practices.

11  Q    Well, if you so choose actually you could go out into the

12  public, into the population at large and collaborate with

13  physicians and open up a practice, correct?

14  A    Yes.

15  Q    A clinic where you can diagnose and treat disease, correct?

16  A    Yes.

17  Q    Much like a physician, right?

18  A    Yes.

19  Q    A clinic where you can prescribe medication, right?

20  A    Yes.

21  Q    Much like a physician, right?

22  A    Yes.

23  Q    Have your own patients, right?

24  A    Yes.

25  Q    Like a doctor, right?

1    A    Yes.

2    Q    And you have had this license to practice in your field for

3    a number of years, is that right?

4    A    Yes.

5    Q    You have over a decade of experience, in fact, in your

6    field, correct?

7    A    Yes.

8    Q    Years of clinical experience under your belt, right?

9    A    Yes.

10   Q    And that is in part why you are the one in charge of

11   supervising the RNs and the LPNs at the Berks County Jail,

12   correct?

13   A    That's incorrect.  I do not supervise the RNs and LPNs at

14   the jail.  I provide patient care to patients that are

15   incarcerated at the facility.

16   Q    So you have no responsibility over the RNs and the LPNs at

17   the Berks County Jail, is that right?

18   A    My responsibility and supervision, as you would call it,

19   over the nursing staff is to assure that they execute or carry

20   out the orders that I give them.

21   Q    So when you tell them to do something, right, when you tell

22   them to do something or give them an order your job is to see to

23   it that it is done properly, right?

24   A    Yes.

25   Q    So in a sense you are in charge, right, to that extent,

1    correct?

2    A    I believe I am in charge of providing patient care.

3    Q    And being in charge of providing patient care is, you'll

4    agree with me, a tremendous responsibility, correct?

5    A    Absolutely, yes.

6    Q    Primarily because the health and the safety of the prison

7    population is in your hands, correct?

8    A    It's partially in my hands, correct.

9    Q    But also because, as you said, you know, part of your job

10   is to see to it that the nurses who practice with you properly

11   execute your orders, correct?

12   A    Yes.

13   Q    And sometimes the nurses, they call you, right?

14   A    Absolutely.

15   Q    They call you when you're on the premises, right?

16   A    They approach me when I'm on the premises.

17   Q    And when you're off the premises they call you if they need

18   you, correct?

19   A    Yes.

20   Q    They call you sometimes with questions, is that right?

21   A    Yes.

22   Q    They call you for clarity in case they need to resolve any

23   confusion, correct?

24   A    Yes.

25   Q    But, of course, you have some level of trust, right, in the

```
 1   RNs and the LPNs that you work with, is that right?

 2   A     Absolutely.

 3   Q     You trust the RNs and the LPNs who work with you.  You

 4   trust Allison Young, for example, who we saw testify via video,

 5   correct?

 6   A     Absolutely.

 7   Q     You trust the Defendant, Susan Roberts, who is sitting next

 8   to you throughout the course of this trial as well, correct?

 9   A     Yes.

10   Q     You trust that they're both capable of conducting a proper

11   abdominal assessment, right?

12   A     Yes.

13   Q     Now I want to talk to you briefly about this thing called a

14   sick call process.  You are familiar with that term.

15   A     Yes.

16   Q     And what that is is that involves a triage process,

17   correct, a process of prioritizing which medical complaints to

18   address first and which medical complaints can wait, is that

19   right?

20   A     Yes.

21   Q     That's what triage is, right?

22   A     Yes.

23   Q     Figuring out who needs medical care ASAP and who can wait,

24   right?

25   A     Correct.
```

```
 1   Q     Now you don't participate in the triage process, correct?

 2   A     No.

 3   Q     You leave that to the RNs and the LPNs you work with, I

 4   should say, to figure out who to see first and who can wait, is

 5   that right?

 6   A     Yes.

 7   Q     And you also don't attend this process called sick call

 8   where, you know, the medical complaints made previously are

 9   addressed, correct?

10   A     No.

11   Q     You leave that to the RNs and the LPNs you work with to

12   resolve these issues, correct?

13   A     Yes.

14   Q     Now sick call is something that is normally conducted in

15   the housing units themselves, right?

16   A     To my knowledge, yes.  The majority sick call is conducted

17   on the housing unit.  Occasionally a patient may be brought to

18   the medical unit to have their sick call complete.

19   Q     Understood.  Now the housing unit would have been where

20   Rafael Rodriguez was housed prior to April 17th, correct?

21   A     Yes.

22   Q     And you don't go down there very often, right?

23   A     The only time I enter a housing unit is if there is a

24   medical emergency and an advanced level provider is required to

25   be on the housing unit.  For instance, if someone were to
```

1  require CPR, if someone were to have a seizure, if a nurse was

2  uncomfortable with a situation at a housing unit and I was

3  within the facility, that that nurse would then contact the

4  medical department either by phone or have an officer radio to

5  the department that an advanced level provider is required on

6  the housing unit.

7  Q     Okay, understood.  I just want to clarify.  So you don't go

8  down to the housing unit unless there happens to be what you

9  consider an emergency ongoing in the housing unit, correct?

10 A     Well, not what I consider to be an emergency.  It's what

11 the patient considers to be an emergency.

12 Q     Understood.

13 A     It's what the correctional officer considers to be an

14 emergency or what the licensed nurse considers to be an

15 emergency or even if the medical assistant is on the housing

16 unit and she is uncomfortable with something.

17 Q     Understood.

18 A     So I really don't consider -- I'm not aware of what's

19 occurring on the housing unit for it to be determined to be a

20 medical emergency or not.

21 Q     I understand, but let's say, for example, a patient needs

22 CPR, right?

23 A     Yes.

24 Q     You might consider that to be an emergency, is that right?

25 A     Yes.

```
 1   Q     Let's say, for example, a patient happens to be bleeding
 2   profusely as a result of an assault, right, bleeding that is
 3   uncontrolled, right?  You would consider that to be a medical
 4   emergency, right?
 5   A     Yes.
 6   Q     Now, but a patient experiencing abdominal pain is not
 7   necessarily compelling enough to get you down there to the
 8   medical floor, is that right?  Withdrawn.  It's withdrawn.  Now,
 9   so if I understand what you said correctly, you leave it to the
10   RNs and the LPNs you work with generally to determine and to
11   convey to you, you know, what emergencies there might be taking
12   place in the medical unit, is that right?  And the correctional
13   officers too, right?
14   A     Not within the medical unit.
15   Q     Well, I meant -- I'm sorry.  I stand corrected.  I meant
16   within the housing unit.
17   A     Right.  Within the general housing unit.
18   Q     And, I mean, that's understandable, right, because you
19   can't get yourself involved in every single medical complaint of
20   the Berks County Jail, correct?
21   A     Correct.
22   Q     But you do get more actively involved when a patient asks
23   to see a provider, is that right?
24   A     If a patient asks to see a provider, I will be involved.
25   If a custody staff member requests that a patient see a
```

```
 1   provider, if a nursing staff member requests that the patient be
 2   seen by a provider.  Occasionally our physicians will request
 3   when they are not within the building that we follow up with a
 4   patient they're following, that we see them.
 5   Q    Uh-huh.
 6   A    We have a health service administrator and a director of
 7   nursing.  Those people can request that we see a patient.  So
 8   there's a multitude of ways that patients can be seen by a
 9   provider.
10   Q    I understand.  Now, and the reason you would get involved
11   once a patient asks to see a provider is because when a patient
12   requests to see a provider that might be an indication that the
13   patient is getting worse, right?
14   A    When a patient requests to see a provider, it can be an
15   indication that I requested that they request to see me.
16   Q    Okay.  Let me just stop you and clarify my question.  I
17   would like, if you don't mind, to limit your questions -- your
18   response to my question.
19        MR. NINOSKY:  Your Honor, and that's why I'm standing.
20   The witness is attempting to answer the questions and she's
21   continually trying to be cut off, so I would respectfully ask
22   that she be permitted to answer the question because obviously
23   they've been responsive to the questions that have been asked so
24   far.
25        MS. RAMEAU:  I'm not trying to cut her off, Your
```

```
 1   Honor.  I'm just trying to save us some time because I know
 2   she'll have an opportunity to explain her testimony when Mr.
 3   Ninosky stands before this jury to do his cross-examination.
 4              THE COURT:  Understood.  Why don't --
 5              MS. RAMEAU:  So I'm just trying to save the Court some
 6   time.
 7              THE COURT:  Why don't you reask the question --
 8              MS. RAMEAU:  Okay.
 9              THE COURT:  -- and allow her to answer the question.
10              MS. RAMEAU:  I'll do that, Your Honor.
11              MR. NINOSKY:  Thank you, Your Honor.
12   BY MS. RAMEAU:
13   Q    So if a patient, Ms. McGowan, asks to see a medical
14   provider, it could be because the patient is getting worse,
15   right?
16   A    Yes.
17   Q    Now I understand that there could be other reasons, right,
18   but it could very well be because the patient was getting worse,
19   is that fair to say?
20   A    Yes.
21   Q    Now because this maybe an indication that the patient's
22   condition is getting worse, when that happens you get yourself
23   more actively involved, right?
24   A    Yes.
25   Q    And when a patient asks to see a provider it may also be an
```

1   indication that whatever the RNs and the LPNs you work with had

2   been doing to help the patient is not working, is that right?

3   It may be an indication of that as well, is that right?

4   A    It may be an indication of that.  It also may be an

5   indication that the patient feels more comfortable seeing a

6   provider.  It can be an indication --

7   Q    I understand there can be a multitude of possibilities, but

8   I'm asking you about this one possibility for now.  Okay.  Later

9   you can, you know, respond to that in Mr. Ninosky's questions

10  about it.  All right.  Just for now, try and answer my

11  questions.  Is that all right?

12  A    Yes.

13           MR. NINOSKY:  Your Honor, again, she is cutting the

14  witness off.

15           THE WITNESS:  Yes.  I'm sorry.

16           MS. RAMEAU:  It's okay.  It's okay.  It's all right.

17  No worries.

18           MR. NINOSKY:  Your Honor, again, she's cutting the --

19           MS. RAMEAU:  Now --

20           MR. NINOSKY:  Your Honor, respectfully, again, she's

21  cutting the witness off in the middle of an answer.  Whether I

22  ask questions or not really isn't relevant to the fact that this

23  witness is trying to give a responsive response to the questions

24  asked.

25           MS. RAMEAU:  Your Honor, can we approach?  This is

1    inappropriate for the jury.

2            THE COURT:  Certainly.  Counsel, please approach.

3            (Sidebar)

4            MS. RAMEAU:  He's trying to cut off the flow of my

5    cross, Your Honor.  That's what he's doing, you know.

6            MR. NINOSKY:  I'm waiting for a flow.

7            MS. RAMEAU:  It's cross-examination.  I'm asking a

8    question and the question is framed a certain way and she can

9    answer it yes or no.  Okay.  But instead she's going into, you

10   know, other possibilities and such and he can do that when he

11   gets up to do his cross-examination, but for no I just want the

12   witness to answer my questions.  I don't want to waste Your

13   Honor's time.  I don't want to waste the jurors' time.

14           MR. NINOSKY:  Every response thus far, I suggest to

15   the Court, has been responsive to the question, has not been

16   going off some beaten path.  The question's been asked.  A

17   responsive response has been given that have been cut off by

18   Counsel which is not fair to that witness who is being accused

19   of malpractice to explain her answers.

20           MS. RAMEAU:  She can explain it when you cross her,

21   right?  So --

22           THE COURT:  Most of the questions call for yes or no

23   answers (inaudible).  Sometimes they need to be explained.  I

24   think if she can (inaudible).  I think it's going just fine.

25   It's fast and sometimes that's tough (inaudible) cutting her

1   off.  (Inaudible).

2           MS. RAMEAU:  It's cross-examination, Your Honor.

3   That's the way it's supposed to be conducted.

4           THE COURT:  Unless they don't like it.  Unless they

5   don't like it.  I think it's (inaudible), but it is important

6   that (inaudible).  When she's questioning, she may not question

7   as fast as you.  She may not (inaudible), but so far I have seen

8   nothing wrong.

9           MS. RAMEAU:  Thank you, Your Honor.  Thank you.

10          THE COURT:  Just continue with your questioning.

11  Thank you.

12          (End of Sidebar)

13  BY MS. RAMEAU:

14  Q   Ms. McGowan, I don't want to give you a hard time, okay.  I

15  just want you to let me know if you don't understand a question

16  and I'll repeat it, okay?

17  A   Okay.

18  Q   All right.  Now, we talked about patients asking to see a

19  provider.  Do you remember those questions?

20  A   Yes.

21  Q   And how that might be an indication that the patient was

22  getting worse.  You remember that?

23  A   Yes.

24  Q   Now, you'll agree, Ms. McGowan, that having a patient ask

25  to go to the hospital is akin to having a patient ask to see a

1  provider, right?

2  A     Yes.

3  Q     Because that might also be an indication that the patient

4  is getting worse, correct?

5  A     Yes.

6  Q     That might also be an indication that whatever the RNs and

7  the LPNs had been doing to try and help the patient is not

8  working, correct?

9  A     Yes.

10 Q     So it's fair to say that you also get more actively

11 involved when the patient asks to go to the hospital, correct?

12 A     Yes.

13 Q     Now, on April 17th at about 7:00 p.m. you had already left

14 the Bergs County Jail, correct?

15 A     Correct.

16 Q     You had gone home, right?

17 A     Correct.

18 Q     You had finished your shift, correct?

19 A     Yes.

20 Q     But at about 7:00 p.m. you got a call while you were at

21 home and you learned that Rafael Rodriguez had asked to go to

22 the hospital, correct?

23 A     No, that's incorrect.

24 Q     Well, do you not recall getting a call while you were at

25 home on April 17, 2015 --

1    A    Oh, I'm sorry, on April --

2    Q    -- from Susan Roberts, your codefendant.

3    A    I'm sorry.  On April 17th, yes.

4    Q    April 17th.

5    A    Yeah.  I just, I was --

6    Q    From Susan Roberts, your codefendant --

7    A    I received --

8    Q    -- telling you -- let me just finish.  Telling you that

9    Rafael Rodriguez had made it very clear that he wanted to go to

10   a hospital.  Do you remember that now?

11   A    No, I was not aware that he wanted to go to the hospital.

12   Q    Okay.  Well, let me just show you this document to see if

13   it refreshes your recollection in that regard.  Just a moment,

14   Your Honor.

15             THE COURT:  Certainly, Counselor.

16             MS. RAMEAU:  Oh, yes, Your Honor.  I'm showing

17   Plaintiff -- the record reflect that I'm showing Plaintiff's

18   Exhibit 2 PCM73.  Let the record reflect that I'm showing the

19   witness PCM73.

20             THE COURT:  It will be just a moment for the

21   technology to begin.

22             MS. RAMEAU:  Okay.

23   BY MS. RAMEAU:

24   Q    Now, Ms. McGowan, now please take a look at the document.

25   Can you see it?

1    A    Yes.

2    Q    I don't think the jurors can see it, Your Honor.

3          THE CLERK:  It's coming up.

4          MS. RAMEAU:  Okay.

5          THE CLERK:  It just takes a minute.  There you go.

6    BY MS. RAMEAU:

7    Q    Now, you had an opportunity while you prepared to testify

8    today to review Rafael Rodriguez' charge, correct?

9    A    Yes.

10   Q    And you also went over the chart, correct?

11   A    Yes.

12   Q    Now I want to turn your attention to the document that's on

13   the screen in front of you.  Now you recognize that to be a

14   chart note, correct?

15   A    Correct.

16   Q    And this note was written by one of the RNs that you --

17   LPNs, rather, that you work with, correct?

18   A    Yes.

19   Q    They are your codefendant, Susan Roberts, correct?

20   A    Yes.

21   Q    And, well, it appears that the note was entered into the

22   computer at 7:11 p.m., correct?

23   A    Correct.

24   Q    Now that note seems to indicate that at 7:00 p.m., and I'm

25   going to show you the rest of the note, that Rafael Rodriguez

1    indicated that he wanted to go to the hospital.  Do you see

2    that?

3    A    That's what is written in the note.

4    Q    Understood. So your testimony is that you had no idea about

5    that, right?

6    A    That's absolutely correct.

7    Q    Nobody told you he wanted to go to a hospital, right?

8    A    No.

9    Q    Nobody told you that he was upset and demanded to be sent

10   to a hospital, right?

11   A    Correct.

12   Q    All right.  Let's move on.  I'm actually done with the

13   projector, Your Honor, for now.  Now, the week of April 13, 2015

14   through the 17th, you were among the providers at the facility,

15   correct?

16   A    Correct.

17   Q    And you were there on the 14th, right?

18   A    The only day I'm not in the facility is typically on

19   Wednesday because I'm in another facility that day, so I'm not

20   sure what day of the week that was.

21   Q    Okay.  That's understood.  I understand, Ms. McGowan.  So

22   the 17th would have been a Friday, right?

23   A    Correct.

24   Q    You were there on the 17th, correct?

25   A    Correct.

1    Q     And the 16th happened to be a Thursday, right?

2    A     Correct.  Yes.

3    Q     So you wouldn't have been there, is that what you're

4    saying, or is it --

5    A     No, I was there.

6    Q     -- you were there on Thursday?

7    A     I wouldn't have been there on the 15th.

8    Q     Understood.

9    A     I would not have been in the facility on the 15th.

10   Q     Understood.  So the 16th would have been a Thursday, right?

11   A     Yes.

12   Q     And you were there that Thursday, correct?

13   A     Correct.

14   Q     Now the 15th was a Wednesday, correct?

15   A     Correct.

16   Q     But you weren't there, correct, because you don't work at

17   the Berks County Jail on Wednesdays, right?

18   A     Correct.  Yes.

19   Q     And you were there on the 14th, right?

20   A     Yes.

21   Q     Which was a Tuesday.

22   A     Yes.

23   Q     All right.  Now you work from 8:00 to 4:00 Monday through

24   Friday, is that right?

25   A     Typically, yes, depending on patient need.

```
 1   Q    Understood.  And sometimes after 4:00 you're on call,

 2   right?

 3   A    There's always a provider that's on call when we are not in

 4   the facility.

 5   Q    And the week of the 14th you were the one on call, correct?

 6   A    Yes.

 7   Q    Now you didn't see Rafael Rodriguez on the 14th, right?

 8   A    No.

 9   Q    You didn't see Rafael Rodriguez on the 16th, correct?

10   A    Correct.

11   Q    And you didn't see Rafael Rodriguez on the 17th, correct?

12   A    Correct.

13   Q    But that's okay with you because the RNs and the LPNs who

14   work with you saw Rafael Rodriguez, correct?

15   A    Yes.

16   Q    Now let's talk about what happened specifically on Friday,

17   April 17, 2015.  Now, I want to start in the very early morning

18   hours while you were home, okay?

19   A    Okay.

20   Q    I'm talking right after midnight on the 17th.  Now

21   obviously you weren't at the facility at the time, correct?

22   A    Correct.

23   Q    You were at home in bed, right?

24   A    Yes.

25   Q    And at that time you got a call from the Berks County Jail,
```

1    right?

2    A     Yes.

3    Q     And it was Allison Young, wasn't it?

4    A     Yes.

5    Q     One of the nurses that you work with, right?

6    A     Yes.

7    Q     The one we saw testify via video, correct?

8    A     Yes.

9    Q     And Allison Young told you that Rafael Rodriguez was

10   complaining of abdominal pain, isn't that right?

11   A     Allison Young reviewed his vital signs, told me that he was

12   vomiting, and that he had some abdominal discomfort, yes.

13   Q     So what she told you was that he was still vomiting,

14   correct?

15   A     I believe that she told me that's what the patient stated

16   and that she had witnessed him vomit in the medical department.

17   Q     So if she told you that that's what the patient stated you

18   had no reason to doubt --

19   A     Correct, yes.

20   Q     -- the fact that Rafael Rodriguez had been vomiting before

21   when he said that he was still vomiting, correct?

22   A     Correct.

23   Q     And you ordered Allison Young early in the morning while

24   you were home to bring Rafael Rodriguez to the medical office,

25   correct?

1   A     To the medical department, yes.

2   Q     I'm sorry, to the medical department for an assessment, is

3   that right?

4   A     Correct.

5   Q     And for her to palpate his abdomen, right?  So assess it,

6   correct?

7   A     Correct.

8   Q     So Allison Young, pursuant to your order, had Rafael

9   Rodriguez brought to the medical department, correct?

10  A     Correct.

11  Q     And when Rafael Rodriguez got to the medical department he

12  vomited on the floor of the medical department, correct?

13  A     Okay.  I wasn't sure where he vomited, but yes, he vomited

14  --

15  Q     But you knew that he vomited in the medical department,

16  correct?

17  A     -- in the medical department, correct.

18  Q     In plain view of Allison Young, is that right?

19  A     I don't know if Allison was with him when he vomited.

20  Q     Well, she told you that she took a look at the vomit,

21  right?

22  A     Correct.

23  Q     That she observed the vomit on the floor of the medical

24  department, correct?

25  A     Well, sometimes patients vomit in their toilets and they'll

```
 1   come or in the bathroom in the medical unit and we'll go into

 2   the bathroom to observe it.  Sometimes they'll vomit in a

 3   nemesis vase.  And I don't --

 4   Q    I understand that.

 5   A    I don't where she --

 6   Q    But my question was Allison Young, when she spoke with you

 7   subsequent to that, made it clear to you that she had an

 8   opportunity to observe the vomit herself, correct?

 9   A    Correct.  Yes.

10   Q    And she was able to describe it in fact, correct?

11   A    Yes.

12   Q    And your response to Allison Young when she told you that

13   Rafael Rodriguez vomited in the medical department was to order

14   her to have Rafael Rodriguez sit in the medical department and

15   have him try and drink and eat something, is that right?

16   A    Yes.

17   Q    Now, there's no indication anywhere in the PrimeCare

18   medical records that Rafael Rodriguez ever had anything to drink

19   or to eat at the time you ordered him to have something to drink

20   and to eat, correct?

21   A    I believe Allison reported that he tolerated water and some

22   pretzels.

23   Q    But I'm talking about early in the morning now.

24   A    Yes.

25   Q    While you were home in bed.
```

1    A     That's when I wanted him to be closely observed, monitored.

2    Q     Okay.  Well, let me show you a document to see if that

3    refreshes your recollection about the fact that it is not

4    documented in the medical records that Rafael Rodriguez was in

5    fact able to tolerate water or food at the time you ordered that

6    he be provided water and food.  Your Honor, can we have a

7    moment, please?

8              THE COURT:  Certainly, Counselor.

9    BY MS. RAMEAU:

10   Q     Okay.  So, Ms. McGowan, with permission from the Court, I'd

11   like to show you portions of the medical records within the time

12   range that we're talking about.  And I want you to have a look

13   at it, okay.  Just take a look to see if you see anywhere, okay,

14   where it's reflected that this order that you gave while you

15   were at home that Rafael Rodriguez be given water and food,

16   where exactly the records reflect that Rafael Rodriguez did in

17   fact have water and food.

18             MR. NINOSKY:  And, Your Honor, at this point I don't

19   know what documents were presented to the witness, but I would

20   ask that if Counsel is going to give witnesses and asking for

21   that type of a representation that page 184 be provided to the

22   witness as well.

23             THE COURT:  My concern is it appears that you just

24   handed one very large group of documents to the witness.  And I

25   don't know whether it's going to be necessary that she review

```
 1   that entire --
 2           MS. RAMEAU:  I understand, Your Honor.
 3   BY MS. RAMEAU:
 4   Q    I'll take it back, Ms. McGowan.  Let me just --
 5   A    Can I answer the question, please?
 6           THE COURT:  Sure, if you want to.
 7           MS. RAMEAU:  Or actually, I'm going to withdraw the
 8   question for now.  Let me just find the record and we'll get
 9   back to it.
10      Okay.  That question is withdrawn.
11           THE COURT:  Very well.
12   BY MS. RAMEAU:
13   Q    Okay, now.  So hours after that telephone call with Allison
14   Young, after the conversation about Rafael Rodriguez vomiting in
15   the medical department, you got behind the wheel of your car,
16   right, and you drove to work, is that right?
17   A    Yes.
18   Q    On the 17th.
19   A    Yes.
20   Q    You went back to the Berks County Jail, is that correct?
21   A    Yes.
22   Q    Like you did, you know, pretty much every day, right?
23   A    Correct, yes.
24   Q    And you got there about 8:00, is that right?
25   A    Yes.
```

1    Q    So now you're back at work again.  I just want to make it

2    clear that we're talking about the same day, right?  You got the

3    call early morning hours and then some hours later you went back

4    to work on the 17th on the same day, correct?

5    A    Correct.

6    Q    Now at 8:00 once you got to work only hours after speaking

7    with Allison Young about the vomit, you didn't go down to the

8    medical unit to assess Rafael Rodriguez, is that right?

9    A    Rafael --

10   Q    It's a yes or no question, ma'am.  You didn't, did you?

11   A    It's really not a yes or no question.

12   Q    Well, did you go down to the medical unit to see Rafael

13   Rodriguez when you got to work at 8:00 --

14   A    Mr. --

15   Q    -- on April 17th?

16   A    Mr. Rodriguez was not in the medical unit.  He was in the

17   general housing unit.

18   Q    Okay.  Well, I meant the housing unit.  I'm sorry.

19   A    And I don't --

20   Q    I'll rephrase the question.  Now when you got to work,

21   right, the early morning hours of April 17th after talking to

22   Allison Young the night before about Rafael Rodriguez indicating

23   that he was still vomiting, right, about Rafael Rodriguez

24   vomiting in the medical department, okay, hours after that you

25   go to work, right?  Right?  You get to work at 8:00 on the 17th,

1    correct?  So but when you get there you didn't go down to the

2    housing unit to have a look at Rafael Rodriguez for yourself,

3    correct?

4    A    We don't go to the housing units.

5    Q    Okay.  I'm not asking you about what you do.  I'm asking

6    you specifically what you did.

7              MR. NINOSKY:  Your Honor, may we approach, please?

8              THE COURT:  Certainly.  Counsel, please approach.

9              MS. RAMEAU:  I'll withdraw the question, Your Honor.

10   Withdrawn.

11             MR. NINOSKY:  I would still like to approach.

12             THE COURT:  I think it has more to do with something -

13   - Counsel.

14             (Sidebar)

15             MR. NINOSKY:  I respectfully request that Counsel be

16   advised do not get in the face of the witness.  We have a

17   podium.  There's no reason for her to get directly in the

18   witness' face.  It's been going on throughout this examination.

19   I don't know if she's trying to physically intimidate this

20   witness or not, but I would ask that there be space got.

21             MS. RAMEAU:  I tell you, for you to try and talk about

22   somebody trying to intimidate someone, it's comical because

23   that's what you do every single day in this courtroom.

24             THE COURT:  I appreciate ii.

25             MS. RAMEAU:  Comedy.

```
 1              THE COURT:  And (inaudible).  But you do have to let
 2   her answer.
 3              MS. RAMEAU:  Yes, Your Honor.
 4              THE COURT:  She has answers to them and we're not
 5   getting the answers.  We're just getting the question and
 6   (inaudible).
 7              MS. RAMEAU:  Okay.
 8              THE COURT:  Be a little more careful.
 9              MS. RAMEAU:  Okay.
10              THE COURT:  All right.
11              MS. RAMEAU:  Thank you.
12              MR. NINOSKY:  Thank you, Your Honor.
13              (End of Sidebar)
14              THE COURT:  Counsel, you may proceed.
15   BY MS. RAMEAU:
16   Q    Yes.  So, I'm sorry.  So your testimony is that you don't
17   go down to the housing unit, right?
18   A    I do not see patients on the housing unit, right.
19   Q    Now, you didn't call to have Rafael Rodriguez brought up to
20   the medical unit for you to have a look at him when you got to
21   work at 8:00 on the 17th, is that right?
22   A    No.
23   Q    And you didn't call to have him brought to you on the
24   medical unit at 10:00 in the morning -- at 9:00 in the morning,
25   correct?
```

1    A    Correct.

2    Q    You didn't call to have him brought to you for you to

3    assess him at 10:00 in the morning, correct?

4    A    Mr. Rodriguez was not assessed by me on Friday, the 17th.

5    Q    He wasn't assessed by you at all, all day, correct?

6    A    On Friday, yes, correct.

7    Q    And at 4:00 in the afternoon you got behind the wheel of

8    your car and you left the facility, correct?

9    A    Correct.

10   Q    But, Ms. McGowan, I just want to understand something here,

11   you were on the premises, right?  Right?

12   A    Correct.

13   Q    But you didn't see him, right?

14   A    That is correct.

15   Q    You were on the premises, but you didn't assess him, right?

16   A    I was on the premises of a 1,200 bed facility.

17   Q    You were on the premises and you didn't assess him, is that

18   right?

19   A    That's correct.

20   Q    Now, so let's go back now to the morning of April 17th.

21   Now, you did receive information, did you not, that Rafael

22   Rodriguez had not eaten breakfast the morning of April 17th, is

23   that right?

24   A    I didn't receive that information.

25   Q    So you had no idea how he was doing that morning, correct?

A     No, the nurse on the unit would have received that
information.

Q     Well, I'm not asking you about the nurse on the unit.  I'm
asking you about you in particular.  So your testimony is that
the morning of April 17th you had no idea how Rafael Rodriguez
was doing, is that right?  Is that fair to say?

A     That's correct, yes.

Q     And you didn't call down the unit, to the nurse you were
just referring to, to try and inquire as to how Rafael Rodriguez
was doing, is that right?

A     Our mornings are typically very busy at the facility.  We
have a lot of detox patients that we need to treat.  We have
patients from the previous day that need to be seen.  We depend
on our nursing staff to come to us with their concerns after
they've triaged a patient.

Q     That's very interesting.  My question was you didn't call
any of the nurses that are in the housing unit to inquire as to
how Rafael Rodriguez was doing the morning of April 17, 2015,
correct?

A     I don't call the nurses on the housing units at all to
inquire about any patients.

Q     And you don't call even when in the middle of the night you
get a call from a nurse saying that someone is complaining that
they're still vomiting and when they're brought up to the
medical floor they vomit again.  In spite of that, right, you

1    just don't inquire, right?  Is that fair to say?

2    A    When patients are medically stable we depend on the nurses

3    to triage patients beyond when we are not available or when we

4    are in the building.  So if a patient is ill in the middle of

5    the night and they stabilize, we're just going to wait for the

6    next day for the patient to complain and for the nurse to triage

7    that patient and bring it to our attention.

8    Q    I understand.  So you allow the nurses, the LPNs and the

9    RNs, right, to determine what it is that you do, is that fair to

10   say?

11   A    That's absolutely incorrect.

12   Q    Okay.  So you wait to get information relative to a patient

13   from the nurses, the LPNs and the RNs to determine what it is

14   that you should do, is that fair to say?

15   A    Correct.  If the patient is complaining.

16   Q    Understood.

17   A    If there are concerns that the patient has or the nurse

18   has, she will approach the provider.

19   Q    So let's say that you were to learn that the morning of

20   April 17, 2015, that Rafael Rodriguez had no appetite, right,

21   would that have been a fact that would have been of some

22   significance to you?

23   A    Absolutely not.  He had been awake most of the night.  He

24   was resting in the medical department at some point under

25   observation of the nursing staff.  He tolerated some solids and

```
 1   liquids.  He may have returned to the general housing unit and
 2   slept through breakfast and that's why he did not eat breakfast.
 3   Q    Understood.  So any indication that Rafael Rodriguez was
 4   suffering from what's called anorexia, right, which is lack of
 5   appetite, the morning of the 17th is really of no consequence to
 6   you, correct?
 7   A    That's absolutely incorrect.  One missed meal does not
 8   quantify anorexia.
 9   Q    I see.  Now, you also had information that Rafael Rodriguez
10   had later eaten that day a small lunch, is that right?  Do you
11   remember getting that information?
12   A    I don't recall receiving that information.
13   Q    You never got that information?
14   A    I don't recall receiving it, no.
15   Q    So you had no idea whether he had been eating in the
16   afternoon on April 17th, is that right?
17   A    That's correct.
18   Q    Okay.  I'll move on.  But isn't it your position that there
19   was an improvement in his condition when he ate the pretzels and
20   had the water?
21   A    Absolutely.
22   Q    That is your position, right?
23   A    Uh-huh.
24   Q    That he was doing better.
25   A    He had no further vomiting.
```

```
1    Q    He had no -- he stopped vomiting, right?

2    A    He rested comfortably.

3    Q    He rested comfortably and he had water, is that right?  And

4    he had pretzels?

5    A    He tolerated solids and liquids and was resting comfortably

6    with no further report of vomiting to me that morning.

7    Q    Understood.  So at 4:00 when you left the facility you

8    figured Rafael Rodriguez was perfectly fine, that he was all

9    right, correct?

10   A    I believe Rafael Rodriguez was stable when I left the

11   facility.

12   Q    Now --

13   A    I would have no other reason to not believe that.  I had no

14   further nursing encounters that day.

15   Q    Understood.  But once you got home later that evening on

16   April 17, 2015, after you thought he was getting better, right,

17   because he had the pretzels, because he had the water, and

18   because he was resting comfortably, Rafael Rodriguez was still

19   complaining of abdominal pain, isn't that right?

20   A    He must have complained again of some symptom that the

21   nurse felt was something she needed to bring to my attention.

22   Q    Right.  And she did bring it to your attention, right?

23   A    Correct.

24   Q    And the nurse that you're talking about who brought these

25   symptoms -- and we're talking about the same abdominal symptoms,
```

1    is that right?

2    A    I believe it's a different location of the pain.

3    Q    But it's still within the abdomen, right?

4    A    Correct.

5    Q    So and the nurse who brought that to your attention happens

6    to be your Codefendant, Susan Roberts, right?  The young woman

7    who's seated at the table.

8    A    Correct.

9    Q    Blond hair.  Now Susan Roberts had a discussion with you

10   about an encounter that she had with Rafael Rodriguez, is that

11   right?

12   A    She --

13   Q    On the 17th in the evening.

14   A    Well, she brought to my attention that he was having

15   abdominal pain and pain that had radiated into his groin.

16   Q    Now she also told you that she proposed to Rafael Rodriguez

17   -- withdrawn.  She also told you that she asked Rafael Rodriguez

18   what kind of medication he wanted for the pain, isn't that

19   right?  To which Rafael Rodriguez responded, "None.  They don't

20   work anyway."  Do you remember that?

21   A    Mr. Rodriguez was not being administered medication for

22   pain.  He was being administered medication to treat his

23   abdominal upset, his GI upset.

24   Q    Now I'm not asking you why he was being provided

25   medication.  I'm asking you, and I'm only asking you, about an

```
 1    encounter between Ms. Roberts and Rafael Rodriguez on the 17th.
 2    Just a moment.  Your Honor.
 3              THE COURT:  Yes, Counselor.
 4              MS. RAMEAU:  Can I use the overhead projector?
 5              THE COURT:  Certainly.
 6              MS. RAMEAU:  Thank you.
 7    BY MS. RAMEAU:
 8    Q    All right, Ms. McGowan.  Just a moment.  Okay.  Now we're
 9    looking at the same note we discussed earlier, okay.  Now this
10    note relates to a call about Rafael Rodriguez, correct?
11    Withdrawn.  Now take a look at the top of the note.  Again, this
12    note was authored by Susan Roberts, correct?
13    A    Yes.
14    Q    And this note indicates here that patient was asked which
15    meds he wanted and he replied, "None.  They don't work anyways."
16    Do you see that?
17    A    Yes.
18    Q    And it's put in quotes, right?
19    A    That's correct.
20    Q    And that's an indication that that's exactly what Rafael
21    Rodriguez said, correct?
22    A    Correct.
23    Q    Now, the note seems to reflect that Mr. Rodriguez was
24    agitated.  You see that?
25    A    Yes.
```

```
1   Q    Now, in your experience as a medical provider, I mean
2   you've seen people in pain, right?
3   A    Yes.
4   Q    And that time people were in pain can appear to be
5   agitated, is that right?
6   A    Yes.
7   Q    Now let's look further down.  I see an additional quote.
8   It says here, "You guys don't even know what you're doing.  No
9   one is trying to help me."  Do you see that?
10  A    Yes.
11  Q    Now the note also says here that patient reminded that he
12  was assessed last evening by myself and third shift.  Patient is
13  now stating that the pain is going lower.  Do you see that?
14  A    Yes.
15  Q    Now the fact that this note indicates that the pain is
16  going lower, is that of any significance to you?
17  A    I was not aware of that note.
18  Q    So no one told you that the pain was going lower, right?
19  A    I was told that the pain is in the lower quadrants and into
20  the testicle.
21  Q    I see.  So Susan Roberts didn't communicate to you the fact
22  that Plaintiff indicated to her that the pain was going lower,
23  correct?
24  A    Well, he communicated to her that he had epigastric pain,
25  right upper quadrant, left upper quadrant pain on the 16th, and
```

1    then this evening he is communicating to her that the pain was

2    in the lower quadrants of the abdomen and into the groin.  So he

3    communicated --

4    Q     I see.

5    A     -- his pain to her.  She communicated the pain to me.

6    Q     So at that point you were made aware of the fact that

7    Rafael Rodriguez was affected by abdominal pain in both the

8    right lower and the left lower quadrant, correct?

9    A     And into the testicle.

10   Q     And into the testicles as well, correct?

11   A     Yes.

12   Q     And these facts were of no significance to you, rather,

13   correct?

14   A     That's absolutely incorrect.

15   Q     I see.  So they were significant, right?

16   A     Yes.  And it did --

17   Q     They were significant -- let me just ask the next question.

18   They were significant.  However, you didn't get behind the wheel

19   of your car to drive back to the Berks County Jail to conduct an

20   assessment of Rafael Rodriguez for yourself, a provider's

21   assessment, correct?

22   A     That is correct.

23   Q     Now let's take a look at this note further.  Now this note

24   states that Plaintiff said that he wanted to go to the hospital.

25   It also said that Plaintiff walked away from the med cart and

1    continued to put down the medical department.  Now, is it fair

2    to say that that is a characterization by Susan Roberts of what

3    Rafael Rodriguez actually said?

4         MR. NINOSKY:  Objection.

5         MS. RAMEAU:  Withdrawn.  It's withdrawn.

6    BY MS. RAMEAU:

7    Q    Now let's read further.

8         MR. NINOSKY:  Your Honor, may we approach?

9         THE COURT:  Certainly.  Counsel, please approach.

10        MS. RAMEAU:  Your Honor, I can move on.  I'll move on.

11        (Sidebar)

12        THE COURT:  Okay.

13        MR. NINOSKY:  We'll see where she moves on to, but so

14   far, so good.

15        THE COURT:  Okay.

16        (End of Sidebar)

17   BY MS. RAMEAU:

18   Q    Now, you testified that the fact that he complained of both

19   lower right and lower left quadrant pain and the testicular

20   pain, that you found that to be significant.

21   A    Yes.

22   Q    However, it didn't trigger a chance in your treatment plan,

23   correct?

24   A    That is incorrect.

25   Q    Well, did you come back to see about him?

```
1   A     I changed my treatment plan.

2   Q     How did you change your treatment plan?  What did you do?

3   A     I moved him to the medical unit for closer observation.  I

4   ordered vital sign checks.  I assured that 15 minute checks

5   would be completed by the custody department.

6   Q     Understood.  Since you brought up the topic of these 15

7   minute checks, let's talk about the 15 minute checks.  Now, you

8   ordered these 15 minute checks for Rafael Rodriguez.  However,

9   these 15 minute checks are not conducted by RNs, are they?

10  A     No.

11  Q     These 15 minute checks are not conducted by LPNs, is that

12  right?

13  A     Correct.

14  Q     They're not conducted by doctors, correct?

15  A     Correct.

16  Q     They're not conducted by physician's assistants, correct?

17  A     The 15 minute checks are conducted by --

18  Q     They are not conducted by physician's assistants, correct?

19  A     That is correct.  Yes.

20  Q     These 15 minute checks are not conducted by medical

21  professionals at all, right?

22  A     Yes.

23  Q     The 15 minute checks that you ordered are conducted by

24  correctional officers, right?

25  A     That is correct.
```

```
 1   Q    And when you ordered the 15 minute checks you had

 2   absolutely no idea what the 15 minute checks entailed, isn't

 3   that right?

 4   A    That is correct.

 5   Q    You didn't know what you were orderings, isn't that right?

 6   A    That's incorrect.

 7   Q    Now you testified previously in this case, correct?

 8   A    Yes.  I knew --

 9   Q    At a deposition, correct?

10   A    Correct.  Yes.

11   Q    Now before you gave your testimony at the deposition you

12   took an oath, is that right?

13   A    That is correct.

14   Q    You raised your hand and you took an oath, right?

15   A    Yes.

16   Q    This was an oath to tell the truth, right?

17   A    Yes.

18   Q    And you knew it was important to tell the truth when you

19   were deposed in this case, correct?

20   A    Yes.

21   Q    Now, Your Honor, Counsel, for the record, I'm on page 93 of

22   the witness' deposition transcript starting at line 7.  Now, Ms.

23   McGowan, at the deposition were you asked the following

24   questions and did you give the following answers -- 7, line 7?

25   Question.  "What are the medical checks?"  Your answer, Ms.
```

McGowan.  "The officer walks around the unit every 15 minutes
and checks on the patient."  Question.  "What is the officer
looking for?"  Answer.  "I don't know what the officer looks
for.  I just ordered the medical checks.  I don't know what is
in their prescription, what is in their description to do
medical checks."

Question.  "But you're the one giving the order to do the
medical checks."  Your answer, Ms. McGowan, "Right, which they
will look in the cell and then what they do beyond that, I don't
know."  Question.  "But do you know when you are ordering
medical checks what you're wanting the officer to look for?"
And your answer, Ms. McGowan, "We do not give them specific
instructions.  They walk to the cell every 15 minutes and
visualize the patient."  Question.  "Do you know what the
officer is supposed to look for?"  Answer.  "No.  It's the
standard check."

Question.  "How would the officer what the patient is?  The
officer needs to report something to the medical staff."
Answer.  "Yeah.  I don't know what the officer would know that -
- I don't know how the officer would know that."  Question.
"I'm just confused because you're ordering medical checks, but
your understanding, you don't know what the officer is looking
for."  Your answer, Ms. McGowan, "The officer, the 15 minute
medical checks is standard within the facility for every single
patient.  It does not vary.  The officer presents to the medical

1   cell door every 15 minutes and views the patient."

2        Question.  "What are they viewing?  Are they just viewing

3   to see if they're alive?"  Your answer.  "I don't know what

4   they're viewing because I'm not -- I just every 15 minutes the

5   officer goes to the cell door."  Question.  "Does he then make

6   some sort of notation?"  Your answer, Ms. McGowan, "I don't

7   know."  Question.  "Do you ever review the officer's medical

8   checks?"  Your answer, Ms. McGowan, "No."  Question.  "What is

9   the purpose of ordering medical checks?  Your order, Ms.

10  McGowan?"  "That the patient is checked every 15 minutes."

11  Question.  "But you don't know how checked for what."  Your

12  answer.  "No, no.  It's the officers checking, not the nursing

13  staff."  Question.  "What is the purpose of checking the vital

14  signs?"  Which one?  That's the end of the impeachment.

15       Ms. McGowan, when you were asked those questions, you'd

16  give those answers.

17  A    You just advised me or questioned me that I did not know

18  what orders I gave and I answered that is incorrect.  I know

19  what orders I gave.  I --

20  Q    Well, I was asking you about medical checks, Ms. McGowan.

21  A    No, you were not.  You were asking me about what orders I

22  gave and I went -- I would like to make it clear that I was very

23  well of what orders I gave.  A 15-minute medical check is

24  conducted by the custody department.  I am not involved in the

25  training.  I am not involved in the education of what the

```
1    custody staff members do, so I am fully aware of what order I
2    gave.
3    Q    Now were you asked those questions I just asked you and did
4    you give those answers at the deposition?
5    A    Yes.
6    Q    Now, let's move on to something else.  Now, assuming that
7    you thought Rafael Rodriguez was getting better because he has
8    eaten pretzels and such and had water earlier in the day, by the
9    end of the day, right, you had information that he wasn't doing
10   so well, isn't that right?
11   A    I had information that he had some additional complaints
12   and he had some additional concerns related to his pain.
13   Q    But you didn't make yourself available to Rafael Rodriguez
14   by driving back to the Berks County Jail to conduct a provider's
15   assessment of Rafael Rodriguez, correct?
16   A    The patient was stable.
17   Q    My question was you didn't get behind the wheel of your car
18   to get back to the facility to conduct a provider's assessment
19   of Rafael Rodriguez, correct, the night of the 17th.
20   A    The patient was stable.  I did not feel that that was
21   necessary.
22   Q    So you didn't do it because you didn't think it was
23   necessary, right?
24   A    I did not do it because the patient was stable.
25   Q    He was stable, but he was also asking to get to a hospital,
```

1    right?

2    A    I was not aware of that.

3    Q    No one told you that, right?  No one told you that, right?

4    You had no idea, correct?

5    A    Correct.

6    Q    Now you did order some tests for Rafael Rodriguez, is that

7    right?

8    A    Yes.

9    Q    You ordered a blood test and you ordered it stat, correct?

10   A    Yes.

11   Q    And what stat means is now, correct?  Right away, is that

12   right?

13   A    Stat in a correctional facility can -- is not consistent

14   with you may be -- where I work is not consistent with what you

15   may be thinking of as stat.  I ordered the blood work to be done

16   that day, so the nurse would have wrote stat for the bloodwork

17   to be done that day.

18   Q    Now you did order it stat.  You said stat, right, when you

19   ordered the blood test, is that right?

20   A    Yes.

21   Q    The nurse didn't come back -- come up with that on her own,

22   correct?

23   A    Correct.

24   Q    You ordered the blood test stat as opposed to routine,

25   correct?

1  A     Routine bloodwork in the facility is done on a Tuesday or a

2  Wednesday.

3  Q     You ordered the blood test stat as opposed to routine,

4  correct?

5  A     Correct.

6  Q     Now you ordered it stat on the 17th, but you didn't inquire

7  as to the results of the blood test on the 18th, the next day,

8  did you?

9  A     No.

10  Q     You didn't inquire as to the result of this blood test that

11  you had ordered stat on the 19th either, did you?

12  A     Any bloodwork that is critical --

13  Q     You didn't order the -- you didn't inquire into the results

14  of the blood test that you ordered stat on the 17th on the 19th,

15  did you?  That's the question.  Do you not want to answer my

16  question?

17            THE COURT:  Can you answer the question?

18            THE WITNESS:  Any bloodwork that is abnormal, the lab

19  will immediately -- will call the facility and report those

20  abnormalities to us, to the nursing staff.  The nursing staff

21  will then in turn call the provider and alert them to the fact

22  that the lab work is abnormal.  I do not routinely call in to a

23  facility to review normal results.

24  BY MS. RAMEAU:

25  Q     Now I see you turning your attention directly to the jury

1  as you speak, right?

2  A    Yes.

3  Q    That's an indication of your preparation to testify at the

4  trial, correct?

5          MR. NINOSKY:  Objection, Your Honor.

6          THE COURT:  I will sustain that objection, although

7  you are free to ask her what preparation she might have done in

8  preparation for her testimony.

9  BY MS. RAMEAU:

10  Q    Now I want to direct your attention to these test results,

11  right, the lab work that you had ordered stat, all right.

12          (Attorneys confer)

13  BY MS. RAMEAU:

14  Q    Now, Ms. McGowan, take a look at the top right corner of

15  the document.  Do you see this area here?

16  A    Yes.

17  Q    Now it says that the blood was collected on April 17, 2015,

18  do you see that?

19  A    Yes.

20  Q    At 4:00 in the morning, correct?

21  A    Yes.

22  Q    That it was received by the lab on April 17th at 11:30 at

23  night that same day, correct?

24  A    Yes.

25  Q    And that a result was issued on April 18th at 6:55 in the

1    morning.  That's a Saturday, correct?

2    A    Correct.

3    Q    But you didn't inquire as to the results of the blood test

4    over the weekend, did you?

5    A    There's a policy --

6    Q    My question was you didn't inquire as to the results of the

7    blood test that you had ordered stat over the weekend, correct?

8    A    There was not a need for me to inquire.

9    Q    I see.  You didn't need to look into it, correct?

10   A    Normal lab work.

11   Q    Understood.  Now we're going to turn your attention to the

12   area where it says clinical report.  Do you see that?

13   A    Yes.

14   Q    And there's an area here that says clinical abnormalities,

15   summary.  Do you see that?

16   A    Yes.

17   Q    And it says glucose is elevated, correct?

18   A    Yes.

19   Q    Which is consistent with diabetes, right?

20   A    That result right there --

21   Q    I'll withdraw that.  Now I'll turn your attention to the

22   second line where it says (inaudible), right?

23   A    Yes.

24   Q    And it says 81.7.  Do you see that?

25   A    Yes.

```
1    Q    And it says lanced, right?

2    A    Yes.

3    Q    7.1, right?

4    A    Yes.

5    Q    And this lab, the lab who conducted this testing, was sure

6    to note that this was somewhat of a clinical abnormality, is

7    that right?

8    A    Yes.

9    Q    Now I want to turn your attention to April 20, 2015.  It's

10   Monday morning again, is that right?

11   A    That is correct, yes.

12   Q    And you went back to work, right?

13   A    Yes.

14   Q    At the Berks County Jail, correct?

15   A    Yes.

16   Q    Now once you got there at 8:00 you didn't go in to see

17   Rafael Rodriguez right away, did you?

18   A    Correct.

19   Q    You didn't see him at 8:00, right?

20   A    Correct.

21   Q    You didn't see him at 9:00, correct?

22   A    Yes.

23   Q    You didn't see him at 10:00, right?

24   A    Yes.

25   Q    At about 10:30 there was a loud scream coming from the
```

```
 1   medical unit, is that right?

 2   A    I don't recall a loud scream.

 3   Q    You don't?  You didn't hear it, right?

 4   A    I don't recall hearing it.

 5   Q    But didn't one of your assistants tell you that Rafael

 6   Rodriguez had been screaming at the top of his lungs on the

 7   medical unit at about 10:30 in the morning that Monday?

 8   A    Yes.

 9   Q    And so at that time finally you saw Rafael Rodriguez for

10   the first time, correct?

11   A    Yes.

12   Q    And for the first time, you were able to lay eyes on him,

13   right?

14   A    Yes.

15   Q    For the first time, you were able to lay hands on him,

16   right?

17   A    Yes.

18   Q    And you examined him, correct?

19   A    Yes.

20   Q    And you made certain notes in your chart, right?

21   A    Yes.

22   Q    And you noted that his abdominal pain started two to three

23   days prior, correct?

24   A    Yes.

25   Q    Well, that's not exactly accurate, is it?
```

1   A    Well, that would be what the patient subjectively stated to

2   me.

3   Q    Just a moment.

4            (Attorneys Confer)

5   BY MS. RAMEAU:

6   Q    Okay.  Now, Ms. McGowan, this is a note that you authored,

7   correct?

8   A    Yes.

9   Q    And the note indicates that Mr. Rodriguez had been having

10  abdominal pain for two to three days.  Do you see that?

11  A    Complaining of abdominal pain over the past two to three

12  days.

13  Q    So, and your testimony to this jury is that you got that

14  directly from the client, right?

15  A    Yes.

16  Q    From the patient rather, correct?

17  A    Yes.

18  Q    Now, but you had been getting complaints as far as April

19  16th about Rafael Rodriguez complaining of abdominal pain,

20  correct?

21  A    From nursing staff, yes.

22  Q    So when you wrote down in this medical record that he had

23  been experiencing abdominal pain for two to three days, you knew

24  full and well that that was inaccurate, correct?

25  A    No, that's not inaccurate.

1  Q    It's not.  Okay.

2  A    The patient was complaining of two to three days of

3  abdominal pain.  That would have been --

4  Q    But you knew he had been having abdominal pain as far back

5  as, at the very least, the 16th if not the 15th or the 14th,

6  correct?

7  A    The patient complained of two to three days of abdominal

8  pain.  That would have -- not including Monday.  That would have

9  reflected Sunday, Saturday, Friday.

10  Q    Now, let me focus your attention on this document, right.

11  Now this document indicates a call, right, that you received

12  while you were home, correct?

13  A    Correct.

14  Q    On the 16th, is that right?

15  A    Yes.

16  Q    And it indicates that Rafael Rodriguez had been complaining

17  of abdominal pain, right, as far as April 16, 2015, is that

18  right?

19  A    The subject component of my note is everything that the

20  patient says to me.  It has nothing to do with what I am aware,

21  what my interpretation of his presentation is.  So the

22  subjective is what the patient is telling me or what you go to

23  your healthcare provider's office and you tell your healthcare

24  provider.  It doesn't reflect anything that I knew.

25  Q    I see.  I see.  So the fact that it happened to be

```
 1   documented in his chart that -- withdrawn.  So let's talk about
 2   what two days before would be, right?  For example, you know
 3   that the pain started two to three days before.  Now, this note
 4   was made on the 20th, correct?
 5   A    Correct.
 6   Q    So two days before the 20th would mean that the pain
 7   started on the 18th on the Saturday, right?  The Saturday while
 8   you were at home.
 9   A    That's what the patient reported to me, two to three days.
10   Q    And, but you knew that wasn't true, right?
11              MR. NINOSKY:  Objection.  Asked and answered.
12              THE COURT:  It's cross-examination.  Well, it's direct
13   examination of an adverse witness.  I'll overrule the objection
14   at this point with the understanding that we do have to move it
15   along.
16   BY MS. RAMEAU:
17   Q    You knew that he had been complaining.  You'd been getting
18   calls, in fact, of him experiencing abdominal pain and vomiting,
19   right, as far back as the 17th, correct?
20   A    That's -- okay.  Yes, I was aware, but that note does not
21   reflect my interpretation, my assessment, my plan.  That is
22   everything the patient stated to me regarding their complaints.
23   Q    I see.  Now you documented here that Rafael Rodriguez
24   reported his pain to be at a level of 10 out of 10, correct?
25   A    Correct.  That's what the patient stated.
```

1    Q    Well, isn't it a fact that when you asked him to rate his

2    pain from a level of 10 out of 10, he told you that his pain was

3    at a level of 20, isn't that right?

4    A    Well, I would have wrote 20 if he told me 20.

5    Q    Well, you wouldn't have written 20 because the range is 1

6    to 10, so you wrote 10, right?

7    A    I explained the pain -- any time I interact with a patient

8    that has a pain complaint I explain to them the pain scale, 0 is

9    no pain and 10 is the worst pain of your life, so where would

10   you rate that?  And that's the number that they give me that I

11   put on the pain scale.

12   Q    Okay.  So you documented in your note that Rafael Rodriguez

13   had the highest pain level given the scale that you had given

14   him, correct?

15   A    The scale that I give to everyone, yes.

16   Q    And you learned some other information from Rafael

17   Rodriguez that day, correct?

18   A    Correct.

19   Q    You learned that he had been vomiting, is that right?

20   A    That he vomited, yes.

21   Q    Did you ask him whether he had vomited over the weekend?

22   A    I would have just generally asked about vomiting.  Do you

23   have any nausea, vomiting, diarrhea?

24   Q    And did he?

25   A    He had vomiting.

1    Q    Over the weekend, right?

2    A    Well, he had vomiting.  Can I see my note, please?  Can I

3    refer to my note?

4    Q    Sure.

5    A    Thank you.

6    Q    Here you go.

7    A    So he had vomiting.  He vomited ten minutes ago.  He had

8    diarrhea.  His last episode of diarrhea was the day before.  He

9    was nauseated.

10   Q    My question was, was he vomiting over the weekend?

11   A    I was not aware that he was vomiting over the weekend.

12   Q    Did you ask him whether he vomited over the weekend?

13   A    I asked him about nausea and vomiting, diarrhea, belly

14   pain.

15   Q    But you knew that you left him in the medical unit on

16   Friday, right, with 15 minute checks being conducted by

17   correctional officers with no medical experience, right.  And

18   you come back to work on the 20th, right, and you don't ask him

19   how he was doing over the weekend?

20   A    And vital signs were checked over the weekend.  He

21   encountered nursing over the weekend at med passes.

22   Q    So you didn't ask him how he was doing over the weekend, is

23   that it?

24   A    I asked him what his symptoms were, how he was feeling.  He

25   rated his pain as a 10.

1    Q    So was he vomiting over the weekend.  That's my question.

2    A    He was vomiting.  He vomited that morning.

3    Q    Was he vomiting over the weekend is what I'm asking about.

4    A    My note does not reflect him telling me he vomited over the

5    weekend.

6    Q    And your note does not reflect his condition over the

7    weekend, correct?

8    A    No.

9    Q    You didn't think that that was important to document the

10   state of a patient that you left in a medical cell, right, in

11   the medical unit being subjected to 15 minute checks which you

12   don't understand, right?  Given your testimony previously, you

13   didn't think to ask him how he was doing over the weekend?

14             MR. NINOSKY:  Your Honor, may we approach?

15             THE COURT:  Certainly.  Counsel, please --

16             MS. RAMEAU:  I'll withdraw the question, Your Honor.

17             MR. NINOSKY:  I would still like to approach.

18             MS. RAMEAU:  I'll withdraw the question.

19             THE COURT:  Mr. Ninosky would still like to approach.

20             (Sidebar)

21             THE COURT:  Mr. Ninosky.

22             MR. NINOSKY:  Certainly they're entitled to get into

23   what the physical presentation was for the patient.  I also

24   understand the pain and suffering component in the case.

25   However, Dr. Brown said she met the standard of care with her

1    assessment on the morning of the 20th, so I don't know this line

2    of questioning where we're going.  It really isn't relevant

3    because Dr. Brown had no criticism of this witness and said on

4    the direct questions she specifically stated she met the

5    standard of care with her evaluation on the Monday morning,

6    April 20th.  This --

7              MS. RAMEAU:  Your Honor, do I have to respond to this?

8    I don't think I should have to.  This is cross-examination.

9    It's proper cross.  He's just trying to interrupt my flow.  I

10   just want to be able to finish my cross, Your Honor.  I don't

11   want to waste your time, okay.  I'm almost done.

12             THE COURT:  (Inaudible) the objection.

13             MS. RAMEAU:  Thank you, Your Honor.  Thank you.

14             (End of Sidebar)

15   BY MS. RAMEAU:

16   Q    All right.  So let's continue with our discussion about

17   what happened on April 20th.  So when you saw him you finally

18   conducted your abdominal assessment, right, a provider's

19   assessment, correct?

20   A    Yes.

21   Q    And what you did was to palpate his abdomen, correct?

22   A    Yes.

23   Q    In all four quadrants, right?

24   A    Yes.

25   Q    And you noted absolutely no rebound tenderness, correct?

```
1    A     That's correct.

2    Q     None?

3    A     Yes.

4    Q     Do you not understand that Rafael Rodriguez had an

5    appendicitis, right?

6    A     Can you repeat the question?

7    Q     You did not understand that Rafael Rodriguez suffered an

8    appendicitis, correct?

9    A     Yes.

10   Q     An appendicitis with zero rebound tenderness, correct?

11   A     Yes.

12   Q     Now, let's talk about the right lower quadrant pain, right.

13   Now Rafael Rodriguez did in fact exhibit symptoms of right lower

14   quadrant pain, isn't that right?

15   A     Yes.

16   Q     It's in this chart, correct?

17   A     Yes.

18   Q     On April 17th, right, Rafael Rodriguez had both right and

19   left lower quadrant pain, is that right?

20   A     And testicular pain.

21   Q     And testicular pain, right?

22   A     Yes.

23   Q     Did the fact that his abdominal pain was both in the right

24   lower quadrant and the left lower quadrant cause some sort of

25   confusion, right, in terms of what was happening with Rafael
```

1   Rodriguez?

2   A     When a patient presents with pain in certain area of the

3   bodies there are different things that you associate, different

4   diseases that you associate with that pain complaint.

5   Q     Did you pick up a book or any reference materials in order

6   to get an understanding of the significance of Rafael Rodriguez

7   experiencing pain in both the right and the left lower quadrant?

8   Did you?

9   A     No.

10  Q     So at the time of this incident, your mechanical

11  understanding of medicine was that appendicitis was only

12  consistent with pain in the right lower quadrant, correct?

13  A     Appendicitis typically presents with pain in the right

14  lower quadrant along with fever, along with nausea and vomiting,

15  along with an elevated white blood cell count.

16  Q     Understood.  So you mentioned fever, so now let's talk

17  about fever.  The morning of April 20th Rafael Rodriguez did not

18  have a fever, correct?

19  A     That's correct.

20  Q     And so now you know that Rafael Rodriguez had an

21  appendicitis without a fever, correct?

22  A     That's correct.

23  Q     And you heard Dr. Brown testify about the extent of the

24  disease process at the time of surgery, correct?

25  A     That's correct.

Q    Your Honor, can we approach?

            THE COURT:  Certainly.  Counsel, please approach.

            (Sidebar)

            MS. RAMEAU:  Your Honor, can I have a morning break.
I --

            THE COURT:  Do you want to take a break?

            MS. RAMEAU:  Yes, please.

            THE COURT:  Certainly.

            MS. RAMEAU:  And, Your Honor, could you -- the white
noise?  Okay.  Can you admonish the witness that she's not to
talk to her lawyers in the middle of my cross-examination?

            THE COURT:  (Inaudible), Mr. Ninosky.

            MR. NINOSKY:  I understand.

            MS. RAMEAU:  Oh, okay.

            MR. NINOSKY:  Thank you, Your Honor.

            (End of Sidebar)

            THE COURT:  Members of the jury, we are going to stand
in recess for 15 minutes.  I'm going to again caution you that
you should keep an open mind about this case until all the
evidence is in on both sides, so you should refrain from
discussing it with each other or with anyone else, including
members of your family or allow anyone to talk to you about it.
Do not form any opinions about this case until you retire to the
jury room after my instructions.

      We'll stand in recess for 15 minutes.

```
 1                THE BAILIFF:  All rise.

 2                (Jury exiting)

 3                (Recess taken from 10:19 a.m. to 10:33 a.m.)

 4                THE COURT:  All parties previously present are once

 5   again present.  The jury is present.  The witness is on the

 6   witness stand.  One party was a little slow getting in, but he

 7   is now present.

 8        Ms. Rameau, you may continue with your examination.

 9                MS. RAMEAU:  Yes, Your Honor.

10                     DIRECT EXAMINATION CONTINUED

11   BY MS. RAMEAU:

12   Q    Now, what you thought on the 20th that Rafael Rodriguez had

13   was a small bowel obstruction, correct?

14   A    Yes.  That's correct.

15   Q    But you noted no differential diagnosis in the chart,

16   correct?

17   A    Yes.

18   Q    But I'm trying to understand your thought process, right,

19   because you have no differential diagnosis and you come to the

20   conclusion that he had a small bowel obstruction, right?

21   A    It's not --

22   Q    It's withdrawn, Your Honor.  I'll withdraw the question.

23   Now, Ms. McGowan, you're not upset, right?

24   A    No.

25   Q    Because you're not the one who almost died, right?
```

```
1              MR. NINOSKY:  Objection, Your Honor.
2              THE COURT:  I'll sustain that objection.
3    BY MS. RAMEAU:
4    Q    Now I want to talk to you about this thing called a
5    provider's list, right.  On the 17th you scheduled to see
6    Rodriguez, Rafael Rodriguez, on the 20th.  On the 17th, that
7    Friday, you scheduled to see him on the 20th, correct?
8    A    Yes.  That's correct.
9    Q    That's like a doctor's appointment, right?
10   A    Yes.
11   Q    Now you knew that Rafael Rodriguez didn't have the ability
12   to take himself to the hospital.  You knew that, right?
13   A    Yes.
14   Q    You knew that you were his only option, correct?
15   A    Yes.
16   Q    So knowing full and well that he had no other option, that
17   he had no other choice, you made a conscious decision to have
18   him wait for two whole days, right, for the whole weekend,
19   correct?
20   A    It wasn't a conscious decision to not send someone to the
21   hospital.  No, that's incorrect.
22   Q    Well, it was your decision, right, to have him scheduled to
23   see you on the 20th, right?  It wasn't my decision, right?
24   A    He was scheduled for follow up on the 20th.
25   Q    Well, this was a decision that you made, right?
```

1    A     On the 17th.

2    Q     On the 17th you decided, right?  I didn't make the

3    decision.  You did.  To schedule to see him on the 20th,

4    correct?

5    A     Yes.

6    Q     So that was a conscious decision that came from you, right?

7    A     To schedule him --

8    Q     It didn't come from me.

9    A     To schedule him for follow up, yes.

10   Q     So and those two days that you skipped and not seeing him

11   happened to be a weekend, right?

12   A     Yes.

13   Q     Saturday and Sunday, right?

14   A     Yes.

15   Q     And you were on call, correct?

16   A     Yes.

17   Q     And now when you're on call no matter where you are, right,

18   no matter what you're doing, if your presence is necessary at

19   the jail, you've got to go back, right?

20   A     That's incorrect.

21   Q     I'll withdraw the question.  Now, you're not a lawyer,

22   right?  Are you?

23   A     No.

24   Q     You're not a mechanic or a businessman, correct?

25   A     Yes.

1    Q    You're in the business of saving lives, right?

2    A    (Inaudible).

3    Q    In the business of alleviating pain and suffering, am I

4    right?

5    A    Yes.

6    Q    So with all due respect, you don't have the luxury of --

7    withdrawn.  That's withdrawn.  I'll move on to some other

8    things.  So, Ms. McGowan, if you were to choose, right, if you

9    wanted to, tomorrow you could go out into the community at large

10   and collaborate with some physicians and open up a clinic to

11   treat the community at large, isn't that right?

12   A    Yes.

13   Q    And apply your mechanical understand of medicine to the

14   community at large, isn't that right?

15   A    Yes.

16   Q    Have you ever heard of the expression, Ms. McGowan, that

17   medicine is an art?

18   A    Yes.

19   Q    What do you understand that to mean?

20   A    Not every patient is the same.  Not every disease is the

21   same.  Not every treatment is the same.  All factors need to be

22   taken into consideration when you're caring for a patient and

23   their family.

24   Q    Nothing further, Your Honor.

25            THE COURT:  Thank you very much, Counselor.

1          Mr. Ninosky, you may question the witness.

2               MR. NINOSKY:  Thank you, Your Honor.  Thank you.

3                         CROSS-EXAMINATION

4     BY MR. NINOSKY:

5     Q    Before I ask you a little bit about your background, you

6     were asked at the very beginning if you learned some things from

7     Dr. Brown, but you weren't asked any questions as to what you

8     learned, so I'm going to ask you.  Did you learn from Dr. Brown

9     that he said that the nursing staff met the standard of care?

10    A    Yes.

11              MS. RAMEAU:  Objection.

12              THE COURT:  Basis?

13              MS. RAMEAU:  Can we approach?

14              THE COURT:  Sure.  Counsel, please approach.

15              (Sidebar)

16              MS. RAMEAU:  I'm sorry, Your Honor.

17              THE COURT:  That's okay.

18              MS. RAMEAU:  That question, it's objectionable.  It's

19    -- I don't know.  I don't understand how he's -- the question --

20    I am objecting as to form, right.  I'm objecting as to

21    relevance, right.  I'm objecting as to the fact that he's

22    testifying, in essence, in the question and I just don't think

23    it's a proper question.

24              THE COURT:  Mr. Ninosky.

25              MR. NINOSKY:  It was one of the first questions on her

1   examination was, "Did you learn something from Dr. Brown?"  She

2   said yes.  You never asked a follow up question.  I'm asking a

3   follow up question as to some of the things that Dr. Brown said.

4   Clearly it's in response to a question that was opened on direct

5   (inaudible).

6            THE COURT:  All right.

7            MS. RAMEAU:  Well, and -- yes, I'm sorry, Your Honor.

8            THE COURT:  (Inaudible).  If it starts to sounds like

9   you're testifying and just trying to use this witness

10  (inaudible).

11           MR. NINOSKY:  Sure.

12           MS. RAMEAU:  Thank you.

13           (End of Sidebar)

14           THE COURT:  Counsel, you may proceed.

15  BY MR. NINOSKY:

16  Q    Thank you, Your Honor.  I'll ask the question again because

17  I don't think you gave me an answer.  Did you learn from Dr.

18  Brown that the nursing staff met the standard of care?

19  A    Yes, I did.

20  Q    And did you learn from Dr. Brown that he said that what you

21  did on April 20th met the standard of care?

22  A    Yes, I did.

23  Q    And my last question, last question.  Did you learn from

24  Dr. Brown that the original diagnosis by the emergency room

25  physician was a small bowel obstruction, correct?

```
 1   A     Yes.

 2              MS. RAMEAU:  Objection.

 3              THE COURT:  Basis?

 4              MS. RAMEAU:  I'll withdraw it.  Withdrawn.

 5              THE COURT:  Very well.  Counsel, you may proceed.

 6   BY MR. NINOSKY:

 7   Q     And I'll just ask this now because it's tied in with that.

 8   You were asked if you had a differential diagnosis and you

 9   didn't have your record in front of you.  May I approach, Your

10   Honor?

11              THE COURT:  Certainly, Counsel.

12   BY MR. NINOSKY:

13   Q     On April 20th --

14              MS. RAMEAU:  Objection.  Can we approach, Your Honor?

15              THE COURT:  Certainly, Counsel.  Please approach.

16              (Sidebar)

17              MS. RAMEAU:  It wasn't that she didn't have a record

18   in front of her.  She said, "No, I didn't have a differential

19   diagnosis."  I don't know what he's trying to do, but the

20   witness is clear in her answer that she didn't have a

21   differential diagnosis.  I'm not sure what he's trying to show.

22              THE COURT:  (Inaudible).

23              MR. NINOSKY:  Exactly.

24              THE COURT:  And that would be appropriate (inaudible).

25              MR. NINOSKY:  Thank you.
```

```
 1              MS. RAMEAU:  1:45.
 2              (End of Sidebar)
 3              MR. NINOSKY:  Your Honor, may I approach, please?
 4              THE COURT:  You may, Counsel.
 5              MR. NINOSKY:  Thank you, Your Honor.
 6   BY MR. NINOSKY:
 7   Q    Paula, this is from your note and it's page 143.  What does
 8   that say?
 9   A    My assessment is abdominal pain.
10   Q    And?
11   A    Rule out obstruction.  Can I just speak on differential
12   diagnosis?
13   Q    Would you, please?
14   A    Let me just say that differential diagnosis are not
15   documented in patient's medical chart.  If there's something
16   that we think in our mind as we're talking to the patient, as
17   we're examining the patient, as we're receiving lab results and
18   input from nursing, input from family, looking at outside
19   medical records.  So it's just a process that's constantly
20   evolving and we're thinking about it.  We do not document.  I
21   mean, I could fill that whole block with a list of differential
22   diagnosis.  That's a waste of my time because I have those in my
23   mind.
24   Q    So you write down what you think is at the top of your
25   list.  Is that kind of a fair statement?
```

```
1   A      Sure.  Yes.

2   Q      Okay.  Let's --

3   A      And at the top of my list was abdominal pain.  The patient

4   was in severe abdominal pain.  And I believed at that time he

5   had an obstruction.

6   Q      You indicated severe abdominal pain, correct?

7   A      Yes.

8   Q      And at any point prior to that point was it brought to your

9   attention that he was in severe abdominal pain?

10  A      No.

11  Q      Anywhere in the chart that ever an indication of severe

12  abdominal pain?

13  A      No.

14  Q      And we're going to go through some of the specific notes,

15  but I think it's important that you explain to the jury your

16  educational background, okay.  We haven't really heard you

17  talking about what your training is.

18  A      I am a certified registered nurse practitioner.  I began my

19  nursing education upon graduating from high school.  I graduated

20  in 1995 from Reading Hospital School of Nursing with a diploma

21  in nursing.  At that time, I began working as a registered nurse

22  and continuing my education at Kutztown University where in 1997

23  I obtained a bachelor's of science degree in nursing.  I

24  continued to work in med-surge, correctional medicine, as a

25  pediatric nurse, and also was enrolled in Widener University
```

1    School of Nursing to obtain my masters of science degree as a

2    family nurse practitioner, in which I graduated in 1999.

3    Q    Describe for the jury what a nurse practitioner is.

4    A    I am a registered nurse.  I also hold a master's degree and

5    a certification as a family nurse practitioner.  What that means

6    is I am allowed to talk to patients, conduct a physical exam,

7    formulate a differential diagnosis, diagnose a patient, and

8    develop a treatment plan.  So I can prescribe your medication.

9    I can refer you to specialists when something is beyond my scope

10   of practice and you need outside care.  I can order lab results,

11   x-rays, CT scans, MRIs.

12   Q    And how long, Paula, have you worked in correctional

13   medicine?

14   A    I started out in correctional medicine when I was a nursing

15   student as a mental health worker at a state correctional

16   facility.  I did that from 1993 until 1997 when I entered my

17   master's program.  It was kind of like a part-time job.  I

18   worked as a mental health worker and as an RN and then I had to

19   leave that position because I needed to dedicate more time to my

20   job as an RN at Reading Hospital as well as my master's program.

21   Q    And what facility -- did you say what facility you worked

22   at for the mental health side there?

23   A    I worked at SCI Prattville.

24   Q    That's a state correctional facility.

25   A    Yes.

```
1    Q    Okay.  Now how long have you worked for PrimeCare?

2    A    I've been employed with PrimeCare Medical since 2003.

3    Q    So from 2003 until the present time, you're within

4    correctional medicine.

5    A    Yes.

6    Q    And you were asked questions on direct about that you could

7    go out and put your shingle out, so to speak, treat people in

8    the community, is that correct?

9    A    That is correct.

10   Q    So you've chosen to provide treatment to people that are

11   incarcerated, correct?

12   A    I worked as a family nurse practitioner in a family

13   practice office in Barnesboro, Pennsylvania.  I also worked at

14   Exeter Healthways in Exeter, Pennsylvania where unfortunately

15   some of the patients that I provided care to there became

16   incarcerated at the Berks County Jail, so they were my patients

17   in private practice and they became my patient at the prison.  I

18   mean, even now I left there in 2003 and just this year I had a

19   patient that was a pediatric patient of mine that's now

20   incarcerated, which is very sad, but it does happen.

21            MS. RAMEAU:  Objection as to relevance, Your Honor.

22            THE COURT:  I think she's finished with the answer.

23   I'll overrule the objection.

24            THE WITNESS:  I also am employed with a company --

25            MS. RAMEAU:  Objection.
```

1          THE COURT:  The objection is sustained to the extent

2     that I think Mr. Ninosky is going to ask another question.

3     BY MR. NINOSKY:

4     Q    Did you have additional employment?  Is that what you're

5     going on with?

6     A    Yes.  I currently work for a company called Logistics

7     Health Incorporated.  They're based out of Wisconsin and they

8     have a contract with the Department of Defense.  So maybe a few

9     times a month to a few times a year I will go out to reserve

10    centers, guard bases, and provide care to service members that

11    are in the Army National Guard or the Army Reserve, Navy

12    Reserve.

13          MS. RAMEAU:  Objection.  Can we approach, Your Honor?

14          THE COURT:  Certainly, Counsel.

15          (Sidebar)

16          MS. RAMEAU:  He's got her talking about (inaudible).

17    I think he's trying to elicit some sympathy that the jurors will

18    be able to somehow relate to this witness, that they have family

19    members in the Army.  I think it's improper.  I don't think Your

20    Honor should allow it.

21          THE COURT:  Mr. Ninosky?

22          MR. NINOSKY:  She's talking about her employment

23    experience.

24          MS. RAMEAU:  Which is irrelevant if it doesn't pertain

25    to her medical appointments or jobs.  It's not relevant.  It's

```
 1  got nothing to do with this case.

 2          THE COURT:  (Inaudible).

 3          MS. RAMEAU:  But I think he'd done enough of that,

 4  Judge.

 5          THE COURT:  I don't think he's done too much though,

 6  so I'm overruling the objection at this time.

 7          MR. NINOSKY:  Thank you, Your Honor.

 8          (End of Sidebar)

 9          THE COURT:  Mr. Ninosky, you may continue, sir.

10  BY MR. NINOSKY:

11  Q    Paula, you weren't able to complete that answer.  So,

12  again, what is that other company you work for and what do you

13  do?

14  A    Logistics Health Incorporated.

15  Q    Okay.

16  A    Basically it's a reserve readiness program and what it

17  helps the military commander of the unit do is determine how

18  many of their servicemembers are immediately deployable and how

19  many need additional medical care.

20  Q    Now, the Berks County Jail, why don't you give the --

21  because I don't think there is any way for Berks County.  Why

22  don't you describe for them just kind of how big the facility

23  is, how the medical department is set up, that type of thing,

24  and give a little bit of background.

25  A    The facility is a 1,200 bed facility.  We have inmates that
```

1   are incarcerated at the county level.  We accept inmates that

2   have violated their state parole.  So we are also a housing

3   facility for state parole offenders.  We also house inmates that

4   come from other counties where overcrowding is an issue and they

5   don't have enough room in that particular facility in that

6   county.  So we have about 1,200 beds.  We typically flow through

7   6,000 people a year.  Medically, we sometimes encounter 300

8   people a day through sick call, provider line, dental line,

9   psychiatric line.

10      We're staffed 24 hours a day with nursing, RNs and LPNs.

11  We have a health service administrator who is an RN who kind of

12  is the umbrella of the medical department.  We have a director

13  of nursing.  We have an x-ray technician that comes into the

14  facility to provide x-rays.  We have medical assistants,

15  emergency medical technicians, as I said, RNs, LPNs.  We have a

16  dentist, a psychiatrist, psychologists.  We have physicians that

17  come twice a week and myself and a physician's assistant.

18  Q    Now you said earlier that on Wednesdays you aren't at the

19  Berks County Jail.  Did I hear that correctly?

20  A    That's correct.

21  Q    Where are you on Wednesdays?

22  A    I'm at the Schuylkill County Prison.  I cover that facility

23  once a week onsite and then I cover call for that facility 24

24  hours a day 7 days a week.

25  Q    You had testified earlier -- I think I made a note -- that

1    you can't possibly get involved with every patient complaint.

2    Can you explain for the jury your answer, please?

3    A    Patients submit sick calls.  Sick calls are then evaluated

4    by the nursing staff.  And it's, as we heard before from Sarah

5    Hardy, I believe, sick call is triaged through the nurses.  So

6    they will bring to our attention people that they feel need to

7    be seen by the provider or people that at some point request to

8    be seen by the provider.

9    Q    Now, you were asked about abdominal -- this case has some

10   instances of abdominal complaints of pain.  How common of a

11   complaint is that by the inmates in the prison?

12   A    Unfortunately, abdominal pain, heartburn, constipation,

13   those are very, very common.  We're a lockdown facility, so

14   patients are locked down 20 hours a day.  That can affect the

15   motility of your gut contributing to constipation.  The food

16   there for many people is unpalatable.  It's too spicy.  It's too

17   bland.

18        So a lot of times the heartburn, so they can get heartburn

19   from the medication.  They can get constipation from the

20   lifestyle.  You know, there's one toilet, so they're in a cell

21   with another person and they have to defecate in front of that

22   other person.  Sometimes that can contribute to constipation.

23   And all of that together can contribute to abdominal pain in

24   addition to medication that we may prescribe.

25   Q    So it's something you've seen many times over the years?

1    A     Absolutely.

2    Q     You said it's a 1,200 bed facility and you went through all

3    the different types of providers that come provide care there.

4    What's the range of acuity as to the types of patients that you

5    folks are dealing with on a day in and day out basis?

6    A     Well, I always compare it to like your healthcare

7    provider's office.  That's essentially what I do.  I'm their

8    primary care provider.  Unfortunately, sometimes we're the only

9    primary care provider they have.  But we also treat a lot of

10   people that are detoxing from drugs and alcohol, which is

11   unfortunate.  We will treat -- we will be the liaison, the

12   collaborator, for patients that have cancer, patients -- we send

13   patients to the hospital that have heart attacks and they come

14   back and they need follow up care with cardiology.  They can

15   leave our facility and --

16             MS. RAMEAU:  Objection, Your Honor.  Can we approach?

17             THE COURT:  Certainly, Counsel.  Please approach.

18             (Sidebar)

19             MS. RAMEAU:  Now -- yes, Your Honor.  Now this is

20   becoming improper bolstering.  He's got her sitting up there

21   talking about how we do this and we're wonderful and we do that

22   and we treat this one and that one and do such a good job.  It's

23   improper.  He's allowing the witness to bolster herself and it's

24   not proper.  I think it should stop.

25             THE COURT:  Mr. Ninosky.

1      MR. NINOSKY:  It goes to the medical process.  She is

2 familiar with that in the prison, types of patients that she

3 treats.  (Inaudible) something very similar, very complicated.

4 It goes to her medical acumen, which is being questioned in this

5 case by the allegations by the Plaintiff.

6      THE COURT:  It goes to the background (inaudible).  It

7 goes to the background of the facility (inaudible).

8      MS. RAMEAU:  Fine.  Okay.

9      (End of Sidebar)

10      THE COURT:  Mr. Ninosky, you may proceed, sir.

11 BY MR. NINOSKY:

12 Q    You weren't able to complete your answer.  Can you complete

13 your answer?

14 A    We'll send patients out for dialysis three days a week.  If

15 a patient comes into the facility and they're receiving care

16 from another healthcare provider, whether it be a surgeon, if

17 they've had surgery within the time frame before they came into

18 the facility, we'll send them to their surgeon for follow up

19 care.  So it's anything from a laceration, a cut on the arm that

20 requires suturing, to someone that has cancer.

21 Q    It's just a full range of types of conditions --

22 A    It's a full range.

23 Q    -- that you deal with regularly?

24 A    Right.  But it is really like a primary care setting, a

25 community setting.  Anything emergent, we transfer immediately

1   to the emergency room.

2   Q    And, again, that's comparable for a family doctor's office.

3   A    Uh-huh.  Absolutely.

4   Q    Which you've worked in over the years?

5   A    Yes.

6   Q    Now, let's talk a little bit about appendicitis.

7   A    Okay.

8   Q    Have you trained as to what the classic symptoms are for an

9   appendicitis?

10  A    Yes.

11  Q    What are they?

12  A    Right lower quadrant pain, fever, nausea, vomiting, and

13  rebound tenderness.

14  Q    That's something that you have been trained in and you have

15  experienced over the years.

16  A    Yes.

17  Q    And you told us that abdominal complaints just generally

18  are one of the most complained of things that you're confronted

19  with, is that correct?

20  A    Yes.

21  Q    And did you remember when Dr. Brown said that it's

22  difficult to diagnose an appendicitis?

23  A    Yes.

24  Q    Now your involvement with Mr. Rodriguez started during the

25  evening of April 16th, correct?

1    A    Yes.

2    Q    And you received a phone call from Suzy Roberts, right?

3    A    Yes.

4    Q    Again, is that atypical for you to receive a phone call?

5    A    No.

6    Q    And when you're on call, you kind of expect to get some

7    phone calls?

8    A    Yes.

9    Q    Okay.  And even before we start talking about it, I think

10   it's important to explain to the jury kind of how the process is

11   set up for call and kind of the things, how you work with the

12   nursing staff.  So explain to the jury call and how it works.

13   A    There's a provider on call 24 hours a day, 7 days a week

14   when we are not inside the facility.  And the nursing staff can

15   call us for any reason at all.  So they typically call on

16   patients that just come into the facility and need medication

17   orders or detox orders, but they will also call us if they want

18   us to modify our treatment, if they'd like us to consider

19   modifying our treatment plan or if they're concerned about a

20   patient, they need medication for that patient, or they believe

21   or the patient requests medication and they believe that we may

22   need to order them medication that they cannot provide for them.

23   Q    And in this particular case, we know that there were phone

24   calls about medication, correct?

25   A    Correct.

```
1    Q    There was a phone call about vital signs.

2    A    Correct.

3    Q    And there was a phone call dealing with abdominal pain.

4    A    Correct.

5    Q    And you heard the nursing staff testifying that's testified

6    so far that they're trained to provide to you information about

7    abnormal vital signs and such.

8    A    Correct.

9    Q    And if there's a complaint that they feel is outside their

10   scope.

11   A    Yes.

12   Q    Okay.  Now, when you received a call from Suzy Roberts,

13   what information was provided to you?

14   A    That the patient had some GI upset, that they were taking

15   Naproxen, which you've heard before can cause -- any anti-

16   inflammatory, that that can cause some heartburn, some upset

17   stomach.  And so we reviewed the vital signs which were stable

18   and ordered medication.

19   Q    Now, Paula, the -- in fact, I think, if we could pull up

20   60, please.  The top portion first.  And was there questioning

21   about the type of pain that he was in?

22   A    Stomach pain.

23   Q    Okay.  And what was noted as far as the intensity?

24   A    Moderate.

25   Q    Is there any discussion about vomiting?
```

1  A    No.  Actually, there was no vomiting.

2  Q    And that would be a specific question that would be asked

3  of a patient?

4  A    Absolutely.

5  Q    Paula --

6        MS. RAMEAU:  Objection, Your Honor.  The document

7  speaks for itself.

8        THE COURT:  The objection is overruled.

9  BY MR. NINOSKY:

10  Q   Paula, you've been working at the Berks County Jail for a

11  number of years and you're familiar with these forms, right?

12  A   Correct.  Yes.

13  Q   And are these forms set up in, I think we heard yesterday,

14  in the SOAP format, correct?

15  A   Correct.

16  Q   Are they set up in a way so that as to have the nursing

17  staff obtain information that's important for you then to

18  utilize your clinical judgment?

19  A   For them to --

20        MS. RAMEAU:  Objection.  Can we approach?

21        THE COURT:  Sure.  Counsel, please approach.

22        (Sidebar)

23        MS. RAMEAU:  Is the form set up in a way to allow you

24  to elicit -- I mean, I don't know where to start.  I think -- I

25  just don't know.  I think the question is improper.  And I've

1   got a lot of basis.  I just can't articulate them right now.  Is

2   the form set up to allow you to elicit -- he can just ask the

3   witness what the form allows her to elicit, right, without the

4   predicate.

5           THE COURT:  Mr. Ninosky.

6           MR. NINOSKY:  I think the questions (inaudible).

7           THE COURT:  Yeah.  And (inaudible).

8           MS. RAMEAU:  Uh-huh.  He does.

9           THE COURT:  What he does is the document allows your

10  witness to (inaudible) and with respect to how these forms are

11  designed and (inaudible).  This one in particular at the top is

12  actually called an abdominal pain form.  So it's used presumably

13  (inaudible) every time the patient has a problem.

14          MS. RAMEAU:  That's fine, Your Honor.  I'll withdraw

15  the objection.  It's withdrawn.

16          (End of Sidebar)

17          THE COURT:  Mr. Ninosky, you may proceed, sir.

18  BY MR. NINOSKY:

19  Q    Thank you, Your Honor.  I'll ask it again, okay.  Is the

20  form set up in a way to elicit information to provide to a

21  provider so that the provider could utilize clinical judgment in

22  coming up with a treatment?

23  A    Absolutely.

24  Q    Or issuing orders.

25  A    Yes.

1   Q    Okay.  And as we heard earlier, and I'll try and move it

2   along, subjective is kind of what the patient says.

3   A    It's always what the patient says.

4   Q    Objective is what?

5   A    Objective is what you find on examination.

6   Q    And then as far as an assessment, what does that mean?

7   A    For me, that means creating a diagnosis.

8   Q    For this type of form, what does that mean?

9   A    That means a group of things that the nurse could select

10  from.  It's not really a diagnosis, but more of a symptom.

11  Q    And then the P is for the plan as to going forward.

12  A    The plan, correct.

13  Q    Okay.  So, at this point, there was a complaint of nausea,

14  but there was no complaint of vomiting.

15  A    Correct.  And that was in the evening on the 16th.

16  Q    And did everything else from, as you said, a gut

17  perspective, as far as bowel movements, urination and such, does

18  that appear to be normal?

19  A    Yes.

20  Q    And you said the vital signs were normal.

21  A    Yes.

22  Q    All right.  Now, if you could please go to the bottom of

23  the form.  Paula, we've heard a little bit about bowel sounds,

24  but you're going to talk about it again, I think, when you see

25  him on the 20th.  What are bowel sounds?

1   A    Bowel sounds are, as you guys have been told before by, I

2   believe Sarah, are just sounds that your belly makes when you're

3   listening with a stethoscope for movement of stool through your

4   colon.

5   Q    And why is that something important for a healthcare

6   provider such as yourself to know?

7   A    Bowel sounds indicate to us that the belly is working well.

8   If you have active normal bowel sounds, your belly is working

9   well.  There's nothing urgently acutely wrong with you.  When

10  you consider that in combination of other factors, vital signs,

11  what the patient is reporting to you, and then active bowel

12  sounds.

13  Q    And if you could go to 61, please, the top.  It says

14  palpation of the abdomen.  Describe what that entails.

15  A    Touching the abdomen.

16  Q    And what's the purpose of doing that?

17  A    To see how the abdomen feels.  You know, if you've had a --

18  experienced a pregnancy with one of your family members, you

19  touch the baby.  That's palpating the abdomen.  In medicine, you

20  want to touch the belly to see if it hurts somewhere or if there

21  -- sometimes in a profoundly constipated patient you can feel

22  stool in the belly, like a lumpy, hard area.

23  Q    And, Paula, this form is set up, right across the very top

24  it says, "Palpation of the abdomen.  If reveals rigid, guarding,

25  or rebound tenderness, provider must be notified," correct?

1    A    Yes.

2    Q    What's the significance of those particular findings as to

3    why a provider would need to be called?

4    A    Well, again, if, you know, you're -- as the provider, if

5    I'm hearing that the patient has a rigid abdomen or if they're

6    guarding, they're kind of like holding their hand over their

7    belly or they have rebound tenderness and their vital signs are

8    abnormal and they're vomiting, you take all of that into

9    account.  But that's something that if a nurse on her exam

10   completes, even if everything else is completely normal, she

11   must still review that finding with a provider.

12   Q    And we know that the quadrants were palpated by Suzy

13   Roberts, correct?

14   A    Yes.

15   Q    And it was reported to you where that pain was.

16   A    Yes.

17   Q    What was reported to you, Paula?

18   A    Upper, upper.

19   Q    What's the clinical significance potentially of upper

20   abdominal pain?

21   A    Well, when I looked at his vital signs being normal, the

22   fact that he was given Naproxen, also the report said he

23   complained of heartburn.  The upper abdominal pain led me to

24   believe that he had gastritis.  And when Dr. Brown was here, we

25   can -- you know, I recall him mentioning as he spoke about many

1    differential diagnosis --

2              MS. RAMEAU:  Objection.  Can we approach, Your Honor?

3              THE COURT:  Certainly, Counsel.

4              (Sidebar)

5              MS. RAMEAU:  Your Honor, I think it's improper for

6    this witness to now try and emphasize testimony from Dr. Brown

7    in her own testimony.  I just --

8              MR. NINOSKY:  She's not an expert.

9              MS. RAMEAU:  She's not an expert.  It's just not

10   proper.

11             THE COURT:  I'll sustain that objection.

12             MS. RAMEAU:  Your Honor, will you strike it?

13             THE COURT:  I will.

14             MS. RAMEAU:  Thank you.

15             (End of Sidebar)

16             THE COURT:  Ladies and gentlemen of the -- lady and

17   gentlemen of the jury -- excuse me -- you are to disregard the

18   last statement from the witness regarding what Dr. Brown had

19   testified about gastritis.  Is there any juror that cannot

20   follow that instruction?

21        Very well.  Mr. Ninosky, you may proceed.

22   BY MR. NINOSKY:

23   Q    What is gastritis?

24   A    Gastritis is irritation of the lining of your stomach.

25   Q    And can Naproxen cause an irritation in the lining of your

1  stomach?

2  A     Naproxen can cause that.

3  Q     Because what type of medication is it again?

4  A     It's an anti-inflammatory.

5  Q     So with the information that --

6            MS. RAMEAU:  Objection, Your Honor.  Can we approach?

7            THE COURT:  Certainly, Counselor.

8            (Sidebar)

9            MS. RAMEAU:  Your Honor, if he's looking to use this

10  witness as an expert, he needs to lay the proper foundation,

11  make an application, and have her admitted as an expert witness.

12  Because she's testifying about matters that are beyond -- I

13  mean, she's not an expert.

14            THE COURT:  Well, he's not asking her to form an

15  opinion.  He's asking her within her own expertise how she

16  treated the patient and why she (inaudible).

17            MS. RAMEAU:  Okay.

18            (End of Sidebar)

19            THE COURT:  Mr. Ninosky --

20            MS. RAMEAU:  It's withdrawn, Your Honor.

21            THE COURT:  Excuse me.

22            MS. RAMEAU:  The objection is withdrawn.

23            THE COURT:  Oh, very well.  Mr. Ninosky, you may

24  proceed, Counselor.

25  BY MR. NINOSKY:

1   Q    So what -- I don't think you completed that answer either,

2   so let's start again.  What type of medication is Naproxen?

3   A    It's an anti-inflammatory.

4   Q    And I think you were going to tell us can it cause

5   irritation of the stomach?

6   A    Yes.

7   Q    Okay.  So what was your thought?

8   A    So in everything that was being conveyed to me, the patient

9   was taking Naproxen and Robaxin for back pain.  The vital signs

10  were completely normal.  The pain was in the upper quadrant.  It

11  had started in a relatively recent time frame.  In my mind, one

12  of the differential diagnosis I had which is nowhere documented

13  in the chart because I said before we keep those in our mind, I

14  attributed all of that to gastritis.

15      And that was why I developed my treatment plan.  DCing the

16  Naproxen, which he had already received that evening because the

17  nurse had called me after she had administered her med pass, so

18  the stopping of the Naproxen would have started the next day.

19  And I ordered Maalox.  Even though he said that did not work

20  initially, that's not often uncommon.  I mean, you can take Tums

21  at home in the community and it won't work and then you need to

22  take something like Zantac or Pepcid to help it.  So I ordered

23  him also Pepcid and Prilosec to help calm down the gastritis

24  that Naproxen was causing.

25  Q    You had said earlier that the medication had been

1   administered as far, as the Naproxen, in the evening med pass.

2   A     Correct.

3   Q     So just within a couple of hours of when you would have

4   gotten this phone call?

5   A     Med pass is typically, to my understanding, after 7:00.  I

6   do not do a med pass.  I don't know that for certain, but it's

7   after 6:00, 7:00, and then I received that call after that time

8   frame.

9   Q     Now from your reviewing of the chart, were these orders

10  carried out?

11  A     Yes.

12  Q     Now sometime a little bit later did you receive another

13  phone call?

14  A     Yes.

15  Q     And who called you this time?

16  A     I believe the next phone call I received was from Allison

17  Young, and that was on third shift.  So third shift is between

18  the hours of 10:00 in the evening to 6:30 in the morning.

19  Q     Could you pull up 203, please?  Paula, I'm going to -- I'll

20  just come up to you.  The jury has seen it before.  Was that the

21  phone call from Allison Young?

22  A     Yes.

23  Q     And what was the reason you were called?

24  A     The only reason, based on looking at the note, that I was

25  called was because the patient had abnormal vital signs.

1   Q     Were the vital signs noted?

2   A     Yes.  The blood pressure was 100/60.  That's normal.  The

3   heart rate was 48 and the pulse ox was normal and the

4   temperature was normal.  The abnormal vital sign was the heart

5   rate of 48, but many of us -- to me, that was not significant

6   because many of us, when we're sleeping, our heart rate drops.

7   So if it's third shift, if it's 10:00 to 6:30, I'm thinking in

8   my mind, well, the patient's heart rate is low because they were

9   sleeping.  I, at that time, did not know why those vital signs

10  were obtained, so I thought, well, I better have the nurse bring

11  the patient to the medical department and assess him and then I

12  requested that I be called back with that assessment.

13  Q     So even though it's potentially in the middle of the night,

14  you actually solicited another phone call to get follow up

15  information on the patient?

16  A     Yes, because I didn't know what to do with the information

17  I received at that time.

18  Q     So you needed more information?

19  A     I needed more information, yes.

20  Q     And, Paula, did you receive more information?

21  A     Yes.

22  Q     And there was another phone call, correct?

23  A     Yes.

24  Q     204.  First of all, Paula, I see a blood pressure there.

25  A     Yes.

1  Q    Is that actually a better blood pressure than it was

2  before?

3  A    It's stable.  I mean, it's not better.  It's not worse.

4  It's within range.

5  Q    Within normalness?

6  A    Right.  It's within normalness.

7  Q    How about the pulse?

8  A    The heartrate is fine, 56.  We like -- you know, your

9  heartrate should be 60 to 120.  It's 56.  It's still at a time

10 when a patient should be sleeping, so they should have a lower

11 heartrate.

12 Q    And we've heard afebrile.  What does that mean?

13 A    No fever.

14 Q    And you had indicated before a fever can be a sign of

15 appendicitis, right?

16 A    Right.

17 Q    Right.  Could be a whole host of other reasons too.

18 A    Correct.

19 Q    All right.  So she's telling you that there is no fever.

20 And talk about the vomited once in medical.

21 A    It was reported to me that the patient vomited once in

22 medical.  No blood in the vomit.  It says, "States has been

23 going on for two days.  Abdominal assessment performed.  Bowel

24 sounds are present in all four quads."  Again, that's listening

25 with your stethoscope.  The abdomen was soft and rounded.  It

1   was tender to touch, but there was no rebound tenderness.

2   Because the nurses are really taught if there is rebound

3   tenderness, as you saw in that form, that it's something that

4   needs to be reported to a provider.  So we always assess for

5   rebound tenderness.

6   Q     And what --

7   A     The pain seems to be located in the center of the abdomen

8   and radiate out towards the back.  So I had gotten a call --

9   this is probably the third call I received.

10   Q     Yes.

11   A     In, let's say, like a six to eight hour time frame.  You

12   know, he had some abdominal discomfort at that time.  He was

13   vomiting, nausea.  The vital signs were all stable though.

14   Okay.  It could still be gastritis.  It could be

15   gastroenteritis.  At that point I was like, "Okay.  It's the

16   middle of the night.  Let's have the patient just rest in

17   medical and we'll see what happens."  So when I say have him sit

18   in medical, what you need to know is our medical unit is fairly

19   big.  We have two exam tables which are staggered when you go in

20   a healthcare provider's office which are not --

21        MS. RAMEAU:  Objection.  Can we approach, Your Honor?

22        THE COURT:  Certainly, Counselor.

23        (Sidebar)

24        MS. RAMEAU:  If I heard the witness correctly, I think

25   that she's trying to -- when she says our examining room is --

1  our capacities are very limited.  I don't know if she's trying

2  to lead the jury to believe that there is some lesser standard

3  that's acceptable within a correctional facility in terms of

4  what's appropriate, so that's really my concern because that

5  wouldn't be proper.

6          THE COURT:  Mr. Ninosky.

7          MR. NINOSKY:  She's going to say the reason why he

8  slept in a metal chair is because there's only so much space in

9  the room.  That's what she's going to say.

10          MS. RAMEAU:  Okay.  I'll withdraw.  I'll withdraw it,

11 Judge.

12          (End of Sidebar)

13          THE COURT:  Mr. Ninosky, you may proceed, sir.

14 BY MR. NINOSKY:

15 Q    Do you remember where you were in your answer?

16 A    So it has two exam tables.  That's where we see our

17 patients, like when you go into your healthcare provider's

18 office.  We then have two dental chairs.  We also have a bunch

19 of hard metal benches and some hard plastic chairs.  So these

20 are all the places that the patient can be in the medical unit.

21 When we're uncertain as a provider as to how to proceed with a

22 patient, we will lay them in the dental chair because that's the

23 most comfortable chair within the department outside of a cell.

24      So we kind of let the patient stay in the dental chair for

25 a little while.  We give them a blanket because it's cold in

1    there and we just continue to monitor them.  And that's what I

2    requested by having him sit in medical.  He had just received

3    Maalox, Pepcid, and Prilosec a few hours before that.  He had

4    already received the Naproxen, which I believed was contributing

5    to his discomfort.  I wanted to kind of see what he would do

6    with eating and drinking.  Was this a stomach virus?  Was this

7    something else?  Were the vital signs going to become abnormal?

8    Was the patient going to have a lot more pain?

9         Because also in that dental chair is the patient's ability

10   to sit up, move around.  They can walk to the nurse's station.

11   There's an officer's station right there.  So it's kind of like

12   you're going to see how they proceed through the course of the

13   time period.  You know, and some people will just lay there for

14   hours and not move at all and other people are standing, holding

15   their back, holding their belly because they're uncomfortable.

16   So it's just -- I guess it's kind of like an ER room where he

17   just like watch them and see what happens.

18        And so then I did want them to see if he responded to

19   eating and drinking something and I ordered lab work for that

20   morning.  Because now at this time it has to be after 12:00.

21   I'm not certain of what time it is, but I'm pretty sure it's

22   after 12:00 and stat lab work would be 4:00 in the morning they

23   would draw the bloodwork.

24   Q    I was just going to say explain to me how --

25   A    Yeah.

1   Q    -- or let's back up.  Let's talk about routine lab work.

2   How does it work within the prison environment?

3   A    Lab work is drawn by the medical assistants typically on

4   third shift unless we need it drawn at some other time like

5   would be stat.  Like if I have a patient during the day that I

6   think is not doing well, I'll be like, okay, I'll find a medical

7   assistant because I'm in the building.  I'll be like, "You need

8   to come and get the bloodwork.  You need to do it now.  Draw the

9   bloodwork now.  I don't want it to wait until Tuesday to get

10  drawn with routine bloodwork."  Routine bloodwork in our

11  facility is drawn on a Tuesday or Wednesday.  Why that is, I

12  can't explain it.  It's just a day that we picked to order

13  routine bloodwork.

14  Q    So stat means you want it drawn that day?

15  A    Right.

16  Q    Okay.  And that's what happened, we know, correct?

17  A    It's a little bit different.  A lot of people think, like

18  oh, ER, what is stat in the ER, what is stat in the hospital.

19  It's not the same in the correctional facility.

20        MS. RAMEAU:  Objection.  Can we approach, Your Honor?

21        THE COURT:  Sure, Counsel.

22        (Sidebar)

23        MS. RAMEAU:  Yes.  Is this witness testifying that

24  there is somewhat of a lesser standard of care that applies to

25  inmates incarcerated in the correctional facility?  That's --

1  first of all, it's not true.  Second of all, it violates the

2  Constitution.  Third of all, it's improper.

3          THE COURT:  I think she was trying to explain what the

4  word stat means in the prison environment (inaudible) in the

5  emergency room (inaudible).

6          MS. RAMEAU:  But stat means stat, Your Honor.

7          THE COURT:  We've heard this before.  (Inaudible).

8          MS. RAMEAU:  Okay.  Okay.  I understand, Your Honor.

9  I'll withdraw it.  It's withdrawn.

10         (End of Sidebar)

11         THE COURT:  Mr. Ninosky, you may proceed, sir.

12  BY MR. NINOSKY:

13  Q    I think you were saying that stat in the correctional

14  facility is a little different than when you're sitting in the

15  emergency room of a hospital.

16  A    Well, I want the jury to understand that.  It's not --

17  Q    Please.  I want you -- that's why I want you to answer the

18  question.

19  A    When you're in a hospital your stat is right then and there

20  with results within two hours.  You might have belly pain and go

21  to your healthcare provider's office and they give you a lab

22  slip for blood and they say to you, "Get this done today."

23  That's similar to my order for stat CBC and COD.  Let's get it

24  done today.

25  Q    And we'll talk about the labs.  Well, let's talk about the

1    labs now.  Did it happen?  Were they drawn?

2    A    Yes.

3    Q    Explain how things generally work for labs that you order

4    off hours or really at any other time.

5    A    As I said before, labs are drawn by the medical assistant

6    typically on third shift, which is before 6:00 in the morning.

7    I think --

8    Q    Let's talk about how you get the results.

9    A    Because -- and we order the labs before 6:00 in the morning

10    because you have to be fasting for many of the labs, blood

11    sugar, cholesterol.  So how do we get the results?  The results

12    are printed off of the computer, off of the printer the next day

13    if it's during the week or on a Monday if it's a weekend.  Now,

14    if there is an abnormality that is clinically significant, okay,

15    the lab will call us.  As I said before, will call the nursing

16    staff before 6:00 in the morning and report that.  They take the

17    nurse's name down and record it through their reporting and then

18    it is also faxed to the department.  So if there's a critically

19    abnormal lab, no matter whether it's a Saturday, a Sunday, a

20    Friday, or a Thursday, it's going to be reported to the nursing

21    staff which in turn are going to report it to us.

22    Q    You were shown the top portion of the document on your

23    direct exam.  I just want to hone in there on a couple of things

24    that I don't think you were asked about.  You were asked

25    questions about the glucose, and then there's (inaudible) BUN,

1    and also (inaudible).

2    A    They're not clinically significant abnormalities.

3    Q    How can you say that?

4    A    Because the lab establishes -- and what that is, I do not

5    know.  The lab establishes what they call to report as abnormal.

6    But what I can tell --

7              MS. RAMEAU:  Objection.  Can we approach, Your Honor?

8              THE COURT:  Certainly, Counselor.

9              (Sidebar)

10             MS. RAMEAU:  If she doesn't know what the values are,

11   right, how is she going to sit in here and interpret it, the lab

12   did this and the lab did that, but they're not significant

13   because.  She just testified that she doesn't know.  She's not a

14   hematologist.

15             THE COURT:  I think what she testified was that she

16   doesn't know what parameters they set up for (inaudible).  I

17   think the next question is going to be why does she not consider

18   that abnormal even if (inaudible).

19             MR. SALEEM:  But she's just -- she's stating that the

20   lab makes a determination as to when to call her, but the only -

21   -

22             THE COURT:  No, the lab never calls her.

23             MR. SALEEM:  But no, Your Honor.  She said that if the

24   lab finds something that's clinically -- well, they will call

25   the hospital or whatever, or the jail.  This own document, it

```
 1   has clinical abnormalities.  So now she's trying to interpret

 2   the mind of the lab as to when they're going to make a

 3   determination as to when to call or not when their own lab

 4   report has clinical abnormalities.  So she's trying to ascertain

 5   --

 6            THE COURT:  (Inaudible).

 7            MS. RAMEAU:  So I can do that at recross?

 8            THE COURT:  That's right.  Yeah.

 9            (End of Sidebar)

10            THE COURT:  Mr. Ninosky, you may proceed, sir.

11   BY MR. NINOSKY:

12   Q    Did you receive any phone call about any abnormality?

13   A    No.

14   Q    Any reason to believe that this is something that the lab

15   would call to say was clinically significant?

16   A    Since 2003, the lab has never called with that.

17   Q    Let's go to the bottom of 94, please.  And I know we're

18   getting a little bit ahead of the timeline, but since we have it

19   up I'm going to bring up the portion where the white blood count

20   is.  It's WBC, what does that mean?

21   A    White blood cell count.

22   Q    And there's a range there?

23   A    Uh-huh.

24   Q    Correct?

25   A    Uh-huh.
```

1   Q    You have to say something for me.

2   A    It's within normal range.  And I can guarantee that an

3   elevated white blood cell count is called to the facility.  If

4   someone's hemoglobin and hematocrit --

5   Q    Go ahead.  Stand up.

6   A    These numbers here, if they are low, they are called to the

7   facility.  There's also part of it called a platelet that's down

8   lower that helps with your blood clotting.  If that is low that

9   is called to the facility.  Those -- what I believe is called to

10  the facility, as in my experience been called at home then that

11  something is high or low as abnormal, are things that are urgent

12  emergent.  I've been called at home with a pregnant woman's

13  white blood cell count of 19,000 and I've said, "We need to call

14  the OB."

15  Q    Now, one other thing.  Obviously a white blood count of 7.8

16  is within a normal range too, isn't it?

17  A    Correct.

18  Q    Okay.

19          MS. RAMEAU:  Objection.

20          THE COURT:  Overruled.

21          MS. RAMEAU:  Witness is not an expert.

22          THE WITNESS:  Well, the range --

23          MS. RAMEAU:  Not in hematology.  She's not.

24          THE COURT:  The objection is overruled.

25  BY MR. NINOSKY:

1    Q    Paula, is 7.8 within the range on the document?

2    A    The range is there.

3    Q    Now, Paula, you were asked a question about there being no

4    document in the chart about Mr. Rodriguez being able to drink

5    and also to keep food down.  Do you remember that question?

6    A    Yes.

7    Q    And then you were handed a stack of papers and --

8    A    Yes.

9    Q    -- there was nothing in that stack, was there?

10             MS. RAMEAU:  Your Honor, can we approach?

11             THE COURT:  Certainly.  Counsel, please approach.

12             (Sidebar)

13             MS. RAMEAU:  That question was withdrawn, Mr. Ninosky,

14   was withdrawn.

15             THE COURT:  (Inaudible).

16             MS. RAMEAU:  Yes, Your Honor.  That question was

17   withdrawn, okay.  I withdrew it clearly on the record in front

18   of the jury, so he shouldn't be making reference to that because

19   that's not proper.  Technically, it's not.

20             THE COURT:  Mr. Ninosky.

21             MS. RAMEAU:  It's not funny, not funny.

22             MR. NINOSKY:  Your Honor, first of all, there's been

23   nonstop objections.  Virtually everything has been objected to.

24   Virtually all of them have been overruled.  We're starting to

25   see a pattern of obstructionism here which I object to.

1    Secondly, she laid exactly the predicate.  I'm asking this

2    witness if there is a (inaudible).  That's all we're doing here.

3              THE COURT:  (Inaudible).  The objection is overruled.

4              (End of Sidebar)

5              THE COURT:  Okay, Counselor.  You may proceed.

6    BY MR. NINOSKY:

7    Q    Do you remember the question about no document talking

8    about his being able to keep liquids and solids down?  Okay.

9    I'm showing you what's document 184, page number 184.  Do you

10   see that?

11   A    Yes.

12   Q    First of all, Paula, let's look at the information, it says

13   task request.  Do you see that?

14   A    Yes.

15   Q    We've heard about tasks a little bit, but I think here

16   we're actually looking at one in the system.  Explain it for the

17   jury, please.  The process first and then we'll get into that.

18   A    Tasks are our way of communicating patients' medical needs.

19   So if the first shift tasks, they're scheduled to be seen,

20   physically touched, talked to.  The second shift task is

21   something that we're alerted to, whether it's a patient

22   complaint or something the nurse wants us to review or for us to

23   even review the vital signs that were taken by the nurses.

24   Q    Okay.

25   A    And that's typically the task process.

1    Q    And in this particular timeline, you had received a couple

2    of phone calls in the middle of the night.

3    A    Correct.

4    Q    And Allison Young is working the third shift, correct?

5    A    Correct.

6    Q    You had given her a request to monitor him in the medical

7    department.

8    A    Yes.

9    Q    And to see how he was doing.

10   A    Correct.

11   Q    Is this the typical way then that the third shift would

12   provide information to you for your thought process without

13   giving you another phone call in the middle of the night?

14   A    Correct.  Because the patient was stable, so they wouldn't

15   need to call me back.  They can either put it in the task or

16   they can put a chart note, which you've all seen chart notes

17   before, and then task us to review the chart note.

18   Q    So what information was provided to you?

19   A    The first part is basically what was contained in the

20   verbal order.

21   Q    And we have gone over that.

22   A    Right.  And then where we put them, which is why I wanted

23   to explain that medical department to you.  He is placed in the

24   dental chair.  The patient was able to sip water, keep it down.

25   He fell asleep for approximately two hours, gave a pretzel, and

```
1   he was able to hold them down also.  His vital signs were
2   rechecked.  They were stable.  And he voided, which means
3   urinate.
4   Q    And he, again, was given food, solid food, right?
5   A    Uh-huh.
6   Q    Didn't cause him to throw up.
7   A    Right.
8   Q    Same with the water.
9   A    Right.
10  Q    Okay.  Now, Paul, under updated notes.  Do you see that
11  there to the right?
12  A    Yes.
13  Q    Is that something you entered?
14  A    That's something I entered, yes.
15  Q    Explain for the jury what you entered there and what your
16  thought process was.
17  A    So in our computer system the nurse created -- can I stand?
18  Q    Your Honor, is that acceptable?
19         THE COURT:  Certainly.
20  BY MR. NINOSKY:
21  Q    Certainly.  And if you have to get to the other side, go
22  ahead, Paula.  You can leave the stand just to get the point if
23  you need to.
24  A    So in our computer system this is what was shown to me as I
25  was looking at this screen on the computer, okay.  And it was
```

1    created by Allison Young.  So then I, in turn, have to do

2    something with that task, so I complete that task by entering

3    this component over here and then it reflects what time I

4    completed that.  So --

5    Q    So at 11:36 what did you complete?  What did you do?

6    A    I reviewed what Allison had put in her task to me and then

7    I had scheduled him to be seen on Monday because that note

8    reflects that he is stable.  And I was going to await the labs

9    that I had -- that were just drawn that morning at 4:00 in the

10   morning and a nursing reassessment because a nurse had also been

11   tasked on Friday during the day to reassess the patient to see

12   for change in his status kind of like to re-triage him.  Is he

13   still okay or is he not okay?

14   Q    And, Paula, was he assessed by nursing on the first shift?

15   A    Upon chart review, yes.

16   Q    Yeah.  And I think it's going to be page 73, please, at the

17   top.  There you go.  Do you see the entry of Nurse Becker?

18   A    Yes.

19   Q    What information is contained there?

20   A    The note reflects the patient assessed during the 0600 and

21   1200 med pass.  Patient states feeling weak and having no

22   appetite, but reported no emesis -- which is vomiting -- since

23   early a.m.  The vital signs were stable.  That's what the DSS

24   means.  Afebrile, no temperature.  Patient reported eating

25   nothing for breakfast and a small amount for lunch.

```
 1   Q    Let's talk about the vomiting, the emesis.  There was
 2   documented vomiting one time in the medical department, correct?
 3   A    Right.
 4   Q    And then there was no complaints of vomiting through this
 5   note, correct?
 6   A    Correct.
 7   Q    Okay.  The --
 8   A    The patient tolerated the water and the pretzel, kind of
 9   went back to the unit.  Like I stated before, may have slept
10   through breakfast for all we know.
11             MS. RAMEAU:  Objection, speculation.
12             THE COURT:  I'll sustain the objection.
13             MS. RAMEAU:  Move to strike, Your Honor.
14             THE COURT:  What am I striking?  That he may have
15   slept?
16             MS. RAMEAU:  Yes.
17             THE COURT:  Ladies and gentlemen of the jury, the he
18   may have slept was somewhat speculative on the part of the
19   witness, so you will disregard that statement.  Thank you.
20       Mr. Ninosky, you may continue.
21   BY MR. NINOSKY:
22   Q    But we do see that he ate lunch, right?
23   A    Right.  He ate a small amount for lunch.
24   Q    So irrespective of the reason why he didn't eat breakfast,
25   he did eat lunch.
```

1   A      Correct.

2   Q      Generally from your perspective with that information,

3   Paula, what would you be thinking about as far as Mr. Rodriguez'

4   condition?

5   A      He's stable.

6   Q      Now --

7   A      And the nurse who was with him in the morning med pass, was

8   with him at the lunchtime med pass, didn't feel like she needed

9   a provider to see the patient.

10        MS. RAMEAU:  Objection.  The witness is testifying as

11  to the state of mind of a witness who is not on the stand.  It's

12  not proper.

13        THE COURT:  Counsel, please approach.

14        (Sidebar)

15        THE COURT:  (Inaudible).

16        MR. NINOSKY:  Yeah.

17        THE COURT:  So she (inaudible).

18        MS. RAMEAU:  But that wasn't the testimony.  The

19  testimony was that nurse felt like she didn't need to contact

20  me.  That is what the witness said.  That's why I objected.  She

21  can say that she didn't hear from anybody else, but she's not up

22  there to testify as to what other people are thinking and

23  feeling.

24        THE COURT:  I'll sustain the objection.

25        MS. RAMEAU:  Thank you.

```
 1              THE COURT:  (Inaudible).

 2              MR. NINOSKY:  Sure.

 3              (End of Sidebar)

 4   BY MR. NINOSKY:

 5   Q    Paula, are the nurses trained to bring to provider's

 6   attentions abnormalities?

 7   A    Yes.

 8   Q    Concerns that they think need to be looked upon?

 9   A    Yes.

10   Q    Did you receive any information during the afternoon about

11   any problems or any abnormalities or problems of Mr. Rodriguez?

12   A    No.

13   Q    Does that note reflect any problems or abnormalities?

14   A    No.

15   Q    Now, later on that evening you did receive another phone

16   call, correct?

17   A    Yes.

18   Q    And that was from Nurse Roberts.

19   A    Yes.

20   Q    And do you remember what information you were provided by

21   Nurse Roberts when she called?

22   A    That the pain is now in the lower abdomen and into the

23   testicle.

24   Q    Now, you were asked questions about whether you were told

25   he asked to go to the hospital or not, okay.  Would whether
```

 1    there's a request by the inmate matter when you're trying to

 2    decide whether it's appropriate to send them out or not?

 3              MS. RAMEAU:  Objection.  Can we approach?

 4              THE COURT:  If you would like to, certainly.  Counsel,

 5    please approach.

 6              (Sidebar)

 7              MR. NINOSKY:  The question (inaudible).

 8              MS. RAMEAU:  Okay.  The way the question sounds to me,

 9    Mr. Ninosky said something to the effect of when assessing

10    whether someone -- whether to send someone to the hospital, is

11    it for you to -- I was somewhat confused by the question,

12    frankly.  But my understanding was something to the effect of

13    when you're trying to determine whether to send someone to the

14    hospital do you try and understand what's in the person's mind

15    in order to determine to send that person to the hospital, which

16    I don't know that that's a proper question.

17              THE COURT:  Well, why don't we have Mr. Ninosky reask

18    the question and see.

19              MS. RAMEAU:  Okay.  Okay.

20              (End of Sidebar)

21              THE COURT:  Counsel, you may proceed.

22    BY MR. NINOSKY:

23    Q    You were asked on direct examination whether you were told

24    that Mr. Rodriguez wanted to go to the hospital.  Remember that?

25    A    Yes.

1    Q    And you said you don't remember.

2    A    Correct.

3    Q    Okay.  Would it matter anyway as far as you making your

4    independent judgment as to whether somebody should be sent out

5    to the hospital or not?

6    A    No.

7    Q    Why?

8    A    You need to look at the whole picture of the patient, what

9    their vital signs are, what the patient's complaints are related

10   to their physical symptoms, not just, "I'd like to go to the

11   hospital," what the nurse finds on her examination.  And based

12   on all of that together you're going to decide whether the

13   patient -- your treatment.  You're going to decide your

14   treatment plan and does that involve sending the patient to the

15   hospital.

16   Q    You received a phone call.  You can take that one down.

17   Thanks.  And if you want to put up 205 for me.  Well, we're

18   working on -- while she's working on that, I'm going to approach

19   and we'll start together.  It indicates that you got a phone

20   call from -- it says (inaudible), but that's Suzy Roberts,

21   right?

22   A    Correct.

23   Q    Okay.  What's the first thing that's documented there as

24   far as what she's putting into the chart?

25   A    Reviewed sick call form regarding abdominal pain.

1    Q    Okay.  So that would be that abdominal sick call form that

2    we've talked about before.

3    A    Yes.

4    Q    Okay.  Now I'm not going to put that back up there again

5    because I think the significant portion of it is were you

6    provided information about the location of the pain.

7    A    Yes.

8    Q    What were you provided?

9    A    Pain in both lower quadrants, the right lower quadrant and

10   left lower quadrant and into the testicle.

11   Q    Now, Paula, is that something that you would expect as a

12   typical presentation of an appendicitis?

13   A    Absolutely not.

14   Q    I mean, what is your thought process now, now that we have

15   this diffuse tenderness in both quadrants and into his

16   testicles?

17   A    Maybe there's something going on related to his urinary

18   system.  Maybe it's a kidney stone.  Maybe it's gastroenteritis.

19   Maybe it's constipation.  I mean, like I said, my differential

20   in my head, I could go on and on.

21   Q    So with that information that you were provided, what did

22   you do?

23   A    Well, Suzy had done the urine.  We reviewed the urine.

24   Q    Anything significant about the urine?

25   A    No.  There's nothing significant about the urine.  Yes,

1    there is protein in the urine and, yes, there is trace ketones,

2    but it's clinically not significant.  It's nothing that is a

3    problem.  She told me Chad did a testicular exam.  There was

4    nothing wrong with his testicles.  When you have a testicle

5    complaint in a male, the most important thing you worry about is

6    torsion.  It's one of the common complaints in your differential

7    diagnosis, so you want to make sure that the patient's testicles

8    are okay.  So then I decided, okay, patient is stable, but

9    they're complaining of abdominal pain, so I'm going to move him

10   to the medical housing unit.

11        Now, the medical housing unit, it's not a hospital.  It's

12   not an infirmary.  The best way for me to describe it to you is

13   it's a cell just like any other cell in a jail, but there is one

14   door that separates that unit from the nurses.  So that's the

15   importance of moving the patient to that unit.  There's also

16   custody staff that is available on that unit.

17   Q    Two things before we get to that, Paula.  Was there any

18   notation of a complaint of vomiting?

19   A    No.

20   Q    Was there any notation of a fever?

21   A    No.

22   Q    In fact, we know that all vital signs were within normal

23   limits, including his temperature, correct?

24   A    Yes.

25   Q    So the vital signs at this point were within normal limits,

1    were they not?

2    A     Yes.

3    Q     And you said that an officer is available in the unit and I

4    think you at least given testimony that they go by each medical

5    staff every 15 minutes, right?

6    A     Correct.

7    Q     Is that officer available to the inmate if the inmate had a

8    complaint?

9    A     I --

10         MS. RAMEAU:  Objection.  Calls for speculation.

11         MR. NINOSKY:  Well, Your Honor --

12         MS. RAMEAU:  Can we approach?

13         THE COURT:  Certainly.

14         (Sidebar)

15         THE COURT:  (Inaudible).

16         MS. RAMEAU:  It's rhetorical.  Maybe he can save it

17   for argument because, I mean, the way I heard it, Your Honor, it

18   sounds like he's asking the witness to testify about something

19   the witness already testified she knows nothing about, which is

20   the 15 minute checks.

21         THE COURT:  (Inaudible).

22         MR. NINOSKY:  She doesn't know as far as the security,

23   what their training is for security.  The purpose of the

24   question, that there's an available officer outside that guy's

25   window on a regular basis.  And if Rodriguez had (inaudible) he

```
1   could go to an officer just as we know he did that earlier when
2   he was on the block because that's how this whole thing started.
3   That wasn't (inaudible).
4              THE COURT:  I'm going to let her answer.
5              MS. RAMEAU:  Okay.
6              (End of Sidebar)
7   BY MR. NINOSKY:
8   Q    I'm going to step back just for a hair here.  We talked
9   about the sick call process where you could do the slips, right?
10  A    Yes.
11  Q    We also talked about that an inmate could go to an officer
12  to seek help, right?
13  A    Right.
14  Q    And we know from the prior testimony Mr. Rodriguez did
15  that, went to an officer because that's how Suzy was called to
16  the block to do an assessment on the 16h.  We know that.
17  A    Yes.
18  Q    Okay.  So, again, there's an officer that goes by the
19  medical unit cell every 15 minutes or so, right?
20  A    Yes.
21  Q    Would that officer be available for an inmate to seek some
22  sort of assistance?
23  A    Yes, because there's -- my understand, there's not that
24  much availability of officer patient interaction, or at that
25  point, it would be officer inmate interaction, in the general
```

1   housing unit.

2   Q     And there's an officer that staffs the medical unit at all

3   times?

4   A     There are actually three officers that staff the medical

5   unit, a female and male officer, and then an officer that does

6   the checks.

7   Q     Now you indicated that you wanted him moved to the medical

8   unit, correct?

9   A     Correct.

10  Q     And that's for closer observation.

11  A     Yes.

12  Q     Was there something else that you also ordered?

13  A     Well, I denied him exercise and I advised the nurse not to

14  change his cell because if this was an infectious process that

15  was going on, we want to limit the contact that the patient has

16  with other patients so that they don't also get sick.

17  Q     Did you do anything else as far as orders?

18  A     Vital signs twice a day for three days, so that would

19  increase the patient's encounters with the nursing staff.  Not

20  just to have an encounter with the nurse when the medical was

21  passed, but then also the patient would have their vital signs

22  taken by nursing at additional times during the day, two

23  additional times during the day.

24  Q     Paula, as part of your process for this increased

25  monitoring was it based upon your experience, and frankly what

1    we've seen in his case, and if there's abnormal findings they're

2    reported to a provider?

3    A    Yes.  So the patient with twice a day vital signs and a med

4    pass twice a day, the patient is actually being seen every shift

5    by some medical personnel, by some nurse, some licensed nurse.

6    Q    So it could be -- so upwards of four times a day there

7    would be a nurse that would have some interaction with Mr.

8    Rodriguez.

9    A    There would be four times a day that the patient through

10   the weekend would have interaction with a nurse.

11   Q    And from your experience, if there was something abnormal

12   or concern of the nurses of any of those four times a day, do

13   they contact the provider?

14   A    Yes.

15   Q    So as part of your thought process for your plan on Friday

16   evening, you knew that there was going to be eyes and ears on

17   Mr. Rodriguez, correct?

18   A    Through the weekend, yes.

19   Q    For somebody on the street, if they call their doctor's

20   office with a complaint of abdominal pain on a Friday and

21   they're told to come in on Monday for an appointment, does the

22   average person have a nurse doing vital signs twice a day on a

23   Saturday and a Sunday in between?

24   A    No.

25   Q    Were the -- from your review of the chart, Paula, were the

1  vital signs taken?

2  A    Yes.

3  Q    And we're getting toward close to lunch.  I won't go

4  through all of them, but were there --

5  A    There were no abnormal vital signs that would have been

6  needed to be called.  And also at the point when the nurse is

7  taking the vital signs, she's physically touching the patient to

8  check the pulse, whether it's count the pulse with your fingers

9  or put the pulse ox machine on the finger.  She's putting the

10 blood pressure cuff on.  So the patient also has the opportunity

11 to say, "Hey, I don't feel good.  There's something wrong.  I'm

12 vomiting.  There's the vomit in my toilet."

13      Because when those vital signs are being taken, most of the

14 time the nurse is going into the cell, into where they're living

15 to see is there food still in the Styrofoam food tray.  Is there

16 vomit in the toilet or on the floor.  Because -- and I'm saying

17 inmates right now because inmates in the cell don't have the

18 ability to clean up their vomit if they vomit on the floor or if

19 they urinate on the floor, if they spill their food.  They don't

20 have paper towels.  They just have one towel, to my knowledge.

21 Q    You never received any phone calls over the weekend, fair?

22 A    Correct.

23 Q    So last information that you would have had on Friday was

24 that vital signs were stable.

25 A    Correct.

```
 1   Q    And you were seeking increased monitoring.

 2   A    Increased monitoring, allow the Naproxen time to come out

 3   of the system, see how he responds to the new medication, await

 4   the lab work and see him on Monday morning.

 5   Q    Okay.  Now you did see him on Monday, April 20th, correct?

 6   A    Yes.

 7   Q    And we're going to pull up your note here a little bit, all

 8   right?

 9   A    Okay.

10   Q    Now you already talked about the subjective --

11   A    Correct.

12   Q    -- as far as that's what he's telling, you correct?

13   A    Right.

14   Q    And it indicates that vomiting, I think ten minutes ago,

15   correct?

16   A    Right.

17   Q    The last reported vomiting in the chart would have been

18   with Allison Young in the medical department either late 16th,

19   early 17th, correct?

20   A    Right.  On night shift, Thursday night into Friday morning.

21   Q    And the information that we had in between was that he was

22   able to tolerate solid food and water.

23   A    Correct, and eat lunch.

24   Q    And eat lunch, okay.  Now, but he did tell you that he

25   vomited.
```

1   A      Correct.

2   Q      And he also then told you that he had one episode of

3   diarrhea, correct?

4   A      Correct.

5   Q      And that was the day before.

6   A      Correct.

7   Q      All right.  Now, Paula, under the objective portion --

8   A      The objective portion of any note is what you're physically

9   seeing with the patient.  So my first concern in a patient that

10  has nausea, vomiting, diarrhea is what does their hydration look

11  like.  And we do that by looking at the skin.  So his skin was

12  warm and dry.  It was intact.  Turgor is like when you pull the

13  skin like this, it's a sign of dehydration.  If it tents, if it

14  stays up like this when you remove your fingers, it's

15  dehydration.  So he had good turgor.  We call this good turgor

16  when it does what my turgor does.

17       Your capillary refill.  Does your nail bed blanche?  If

18  you're dehydrated, your nail bed is not going to blanche.  So

19  and the two seconds is normal nail bed blanching.  I listened to

20  his heart and his lungs.  Those were normal.  And then listened

21  to his abdomen because he had abdominal complaints.  So I found

22  it to be soft and distended.  He had no bowel sounds in all four

23  quads and he had diffuse lower abdominal tenderness with no

24  rebound.

25  Q      Can I ask you a follow up question then?  Is there anything

1    else about the objective there?

2    A    No.

3    Q    You had gone through about hydration, correct?

4    A    Yes.

5    Q    And looking for signs of dehydration.

6    A    Correct.

7    Q    What is one of the main causes of dehydration?

8    A    Vomiting.

9    Q    Would you expect, from your experience, a patient that had

10   ongoing intractable vomiting, I think I heard, to have this type

11   of presentation?

12   A    No.

13   Q    So there's nothing objectively to show any sort of

14   dehydration?

15   A    There was nothing on my objective exam.  The vital signs

16   were completely normal and the skin assessment was normal for

17   dehydration.

18   Q    Now, you said the bowel sounds were absent.

19   A    Right.

20   Q    That's different, right?

21   A    That's correct.

22   Q    Okay.  And what can that be a sign or symptom of?

23   A    Well, usually when you have absent bowel sounds, and even

24   if I refer back to the form for the nurses, if they need to

25   complete -- I did not point this out, but if your nurse has

1    absent bowel sounds, she also must call that in addition to

2    their rebound and rigid guard.  Absent bowel sounds, there's

3    something going on in the belly that's not good and that's

4    something that needs to be further explored.

5    Q    And that would --

6    A    Because things aren't moving through the belly.  Everything

7    is at a standstill.

8    Q    Was also the description of pain different than what we've

9    seen to this point?

10   A    It was through the lower abdomen.  He didn't mention

11   testicular pain to me that day, but he had lower abdominal pain

12   on Friday.

13   Q    How about the severity?  Is that description of the

14   severity of pain different than what we've seen previously?

15   A    Well, I know how I do my pain scale, so he rated it as a

16   10, which told me that was the worst pain he's ever experienced

17   in his life.

18   Q    What was your plan?  Well, first, you already told us your

19   thought process was thinking about a bowel obstruction.

20   A    A bowel obstruction.

21   Q    Okay.  So what did you do then?

22   A    I sent the patient out via 911 to Reading Hospital.

23   Q    Did you ever think this man had an appendicitis?

24   A    No.

25   Q    Why not?

1  A    He didn't present with an appendicitis.  When I left work

2  on Friday, I never heard from the nurses again through the

3  weekend.  I saw him Monday when it was brought to my attention

4  that he was having complaints of severe pain in the medical

5  unit.

6  Q    And you didn't see him on the 17th.  Why not?

7  A    He was completely stable on the 17th.  He had been in the

8  medical department early that morning and kind of like the

9  middle of the night.  He slept in the dental chair with blankets

10 on him, took a sip of water, ate a pretzel.  His vital signs

11 stayed stable.  I knew nursing was going to check on him that

12 day and the standard is if the nurse checks on a patient and

13 there's an abnormality, they bring it to our attention and

14 nothing was brought to my attention.

15 Q    Your Honor, those are all the questions that I have for the

16 witness.  Thank you.

17         THE COURT:  Thank you, Mr. Ninosky.

18      Attorney Rameau, you may redirect the witness.

19         MS. RAMEAU:  Yes, Your Honor.  Thank you.

20         THE COURT:  Certainly.

21                   REDIRECT EXAMINATION

22 BY MS. RAMEAU:

23 Q    Now, you testified that you chose to provide care at a

24 correctional facility, is that right?  Was that your testimony?

25 A    I don't understand your question.

```
 1   Q    Well, didn't you say that you were working elsewhere and

 2   that you made a decision to go and work at a correctional

 3   facility, is that right?

 4   A    Yes.  Yes.

 5   Q    And because in part you have patients, you had patients

 6   that you knew well, right?

 7   A    Correct.

 8   Q    Who became incarcerated, right?

 9   A    Yes.

10   Q    And I believe you said that it was sad, is that right?

11   A    Correct.

12   Q    You have these individuals you knew before, right, that you

13   consider friends, is that right?  Patients, certainly?

14   A    I don't consider any of my patients my friends.  They're

15   patients.

16   Q    So these are patients you had before, right?

17   A    Yes.

18   Q    People that you knew before, right?

19   A    Correct.

20   Q    Now, Rafael --

21   A    Well, on a patient level, yes.

22   Q    But Rafael Rodriguez is not a patient that you knew before,

23   right?

24   A    Correct.

25   Q    He's not someone that you knew before you started working
```

1    at the Berks County Jail, right?

2    A     Correct.

3    Q     So Rafael Rodriguez is a stranger to you, correct?

4    A     Correct.

5    Q     Okay.  In fact, you testified previously that you had no

6    idea who he was outside of his medical chart, isn't that right?

7    A     Correct.

8    Q     So this discussion that you had with Mr. Ninosky on the

9    record before the members of the jury about the patients you had

10   previously and how sad it was, that has no bearing on your

11   relationship with Rafael Rodriguez, correct?

12                MR. NINOSKY:  Objection.  Argumentative.

13                THE COURT:  It's overruled.

14   BY MS. RAMEAU:

15   Q     Is that right?

16   A     Correct.

17   Q     Now, you had a discussion with Mr. Ninosky about abdominal

18   pain being common in the prison system, correct?

19   A     Correct.

20   Q     And you talked about that for a while, is that right?

21   A     Yes.

22   Q     Now, appendicitis happens to be a condition that is quite

23   common among young men within Rafael Rodriguez' age group as

24   well, isn't that right?

25   A     Yes.

```
1   Q    But you didn't consider that, did you?  Withdrawn.

2   Withdrawn.  Now, you remember talking to Mr. Ninosky about Dr.

3   Brown's testimony.

4   A    Correct.  Yes.

5   Q    Now Dr. Brown testified that while it may at times be

6   difficult to diagnose appendicitis, that once you get a patient

7   to a hospital it's really just a matter of putting a patient in

8   the CT scan, isn't that right?

9   A    Yes.

10  Q    Now, Dr. Brown also testified that you failed at what you

11  did in this case, that you breached the standard of care that is

12  applicable in the community at large, when you failed to send

13  Rafael Rodriguez to the hospital earlier.  You heard his

14  testimony, right?  Sooner.

15  A    Yes.  Yes.

16  Q    Now, you had a discussion with Mr. Ninosky about a series

17  of documents.  Just a moment, Your Honor.

18          THE COURT:  Certainly, Counselor.

19  BY MS. RAMEAU:

20  Q    You had a discussion with Mr. Ninosky about the forms that

21  are used to assess abdominal pain, correct?

22  A    Yes.

23  Q    And I believe you testified that the forms are intended to

24  elicit the proper information so that you can, you know, get the

25  diagnosis and do your job properly.  Was that the essence of
```

1   your testimony?

2   A    They're intended for the nurse to elicit information to

3   convey to the provider.

4   Q    Understood.  Now let me -- I'd like to show you PMC61, the

5   same form that you were discussing with Mr. Ninosky.  Your

6   Honor?

7               THE COURT:  Just a moment.

8   BY MS. RAMEAU:

9   Q    Okay.  Now, take a look at this form.  Now, the form here

10  says rebound tenderness, correct?

11  A    Yes.

12  Q    So, now you understand now that you -- a patient may be

13  experiencing a serious medical condition, right, without rebound

14  tenderness.  You now understand that, right?

15  A    Yes.

16  Q    So it's not the form, right.  It's the person doing the

17  assessment, the information, the way its elicited, and what you

18  do with it.  Is that right?  Is that a fair characterization of

19  the discussion?

20  A    Yes.

21  Q    In other words, you can't blame it on the form, right?

22  A    Correct.

23  Q    Because you're the provider, correct?

24  A    Yes.

25  Q    You're the one with the extensive knowledge and experience,

1  right?

2  A     Yes.

3  Q     You're the one who can go into the community at large and

4  treat patients, right?

5  A     Yes.

6  Q     Now you had a discussion with Mr. Ninosky about the

7  Naproxen.  You remember that?

8  A     Yes.

9  Q     And you indicated that it causes gastritis, right?

10 A     Yes.

11 Q     And that's a fancy word, a medical word for acid reflux and

12 heartburn, correct?

13 A     No.  It's irritation of the stomach lining.

14 Q     Okay.  So it's an irritation of the stomach lining, right.

15 Now you wouldn't feel that kind of thing in the area of your

16 belly button, would you?

17 A     You could.

18 Q     You could?

19 A     Yes.

20 Q     I see.  So your understanding is that an inflammation of

21 the abdomen, right, that is due to Naproxen can be felt in the

22 area of the belly button, correct?

23 A     Well, gastritis is not an inflammation of the abdomen.

24 It's an inflammation of the stomach.  The stomach is your organ

25 inside your abdomen.

```
1    Q    So your understanding is that an inflammatory process of

2    the abdomen, is that right?

3    A    Of the stomach.

4    Q    Due to -- of the stomach due to the use of Naproxen can be

5    felt in the area of the belly button, is that right?

6    A    Yes.

7    Q    Is it also your understanding that an inflammation of the

8    abdomen, or is it the stomach?  Which term would you prefer me

9    to use?  Is it the stomach or the abdomen?

10   A    The stomach.

11   Q    Okay.  So is it also your understanding that an

12   inflammation -- that an inflammatory process of the stomach,

13   right, due to use of Naproxen can also be felt in the lower

14   quadrants?  Is that your understanding?

15   A    No.

16   Q    No.  You don't think so, right?

17   A    No.

18   Q    That's inconsistent, correct?

19   A    Yes.

20   Q    So and you gave him -- when you thought he had gastritis,

21   you gave him a gastric cocktail, right?

22   A    Yes.

23   Q    Things like Pepcid, right?

24   A    Yes.

25   Q    Maalox, right?
```

```
1   A    Yes.

2   Q    A cocktail of drugs that are supposed to address gastritis,

3   correct?

4   A    Over time, not in one dose.

5   Q    Right.  I see.  But he didn't get any better, correct?

6   Withdrawn.  The pain by April 17th was located in the lower

7   quadrants, correct?

8   A    Yes.

9   Q    So at that point you had some idea that maybe it's not

10  gastritis, correct?

11  A    Yes.

12  Q    Now you testified time and time again that he was stable,

13  right?

14  A    Yes.

15  Q    That his vitals were just fine, correct?  That was your

16  testimony, right?

17  A    I didn't just determine that he was stable based on vital

18  signs.

19  Q    Well, your testimony was that the vitals were an indication

20  of how he was doing.  Am I right?

21  A    He was in -- he ate and drank.  He slept overnight.

22  Q    I see.  But I want to focus --

23  A    He had no further reports of vomiting.

24  Q    -- your attention and your -- okay.  I want to focus your

25  attention and your testimony right now on the vital signs,
```

1    right, and the significance of the vital signs.  Now, you do

2    rely on the vital signs in your assessment, correct?

3    A    Yes.

4    Q    Now you heard Dr. Brown's testimony about vital signs,

5    didn't you?

6    A    Yes.

7    Q    And you heard Dr. Brown say that you can't rely on vital

8    signs because they're not a good indicator of how a patient is

9    doing unless they are abnormal, correct?

10   A    Yes.

11   Q    You heard that testimony, right?  But you disagree with Dr.

12   Brown, correct?

13   A    I'm not disagreeing with Dr. Brown.

14   Q    Do you think you have more knowledge and experience in the

15   field of medicine than Dr. Brown?

16   A    I'm not --

17           MR. NINOSKY:  Objection.  It's argumentative.

18           MS. RAMEAU:  Your Honor, I'll move on.

19           THE COURT:  Very well.

20   BY MS. RAMEAU:

21   Q    Okay.  Now you testified that Rafael Rodriguez' vitals were

22   normal on April 18th, correct?

23   A    Yes.

24   Q    And April 19th, correct?

25   A    Yes.

1  Q    You heard Dr. Brown testify about the extent of the disease

2  process inside Rafael Rodriguez' abdomen, right?

3  A    Yes.

4  Q    You heard Dr. Brown testify that in his numerous years of

5  experience having done hundreds of appendectomy that Rafael

6  Rodriguez' case was one of the worst he had ever seen.  You

7  heard that, right?

8  A    It was in the top ten.

9  Q    It was in the top ten out of hundreds.  That's right.

10 A    Yes.

11 Q    Now, do you really believe that given the state of Rafael

12 Rodriguez' disease process, that he was perfectly fine on the

13 18th and the 19th or are you just saying that in order to avoid

14 responsibility for failing to properly send my client to the

15 hospital where he could get proper care?

16          MR. NINOSKY:  Objection.

17          THE COURT:  The objection is sustained.

18 BY MS. RAMEAU:

19 Q    Now, you had a discussion with Mr. Ninosky about --

20 withdrawn.  Just a moment, Your Honor.

21          THE COURT:  Certainly, Counselor.

22 BY MS. RAMEAU:

23 Q    Ms. McGowan, you had a discussion with Mr. Ninosky about

24 the word stat.  Do you remember that?

25 A    Yes.

```
 1   Q    About stat in a hospital, right, relative to stat in the
 2   correctional setting, right?
 3   A    Yes.
 4   Q    You're not suggesting to the members of the jury that there
 5   is a lesser standard of care that applies to inmates at a
 6   correctional facility, are you?
 7   A    Absolutely not.
 8   Q    Thank you.  Now you also had a discussion with Mr. Ninosky
 9   about some blood test, correct?
10   A    Correct.
11   Q    Now you're not a hematologist, right?
12   A    Absolutely not.
13   Q    You don't know how to read these things with specificity,
14   do you?
15   A    Not with specificity.
16   Q    Now take a look at the document that's on the screen,
17   PMC94.  Do you see up here where it says clinical abnormality
18   summary?
19   A    Yes.
20   Q    And it says polys (phonetic) 81.7.
21   A    Yes.
22   Q    That's 81.7 percent, correct?
23   A    Yes.
24   Q    And it also says --
25             MR. NINOSKY:  I don't think there was an answer to the
```

1    question, at least that I heard.  Maybe I just missed it.

2    BY MS. RAMEAU:

3    Q    I heard the witness say yes.  Was that a yes, Ms. McGowan?

4    A    Well, you have to look at the range.  I'm not sure if it's

5    a percentage or --

6    Q    Okay.  I'll show you the range shortly, okay.  It also says

7    lance, right?  You see that?

8    A    Yes.

9    Q    It says 7.1 percent.

10   A    I'm not sure if it's a percentage, but it says 7.1.

11   Q    I see.  So let's look at the range, okay.

12   A    Okay.

13   Q    Okay.  Now polys are a type of white blood cells, correct?

14   A    Correct.

15   Q    They're like the police, right, in the neighborhood.  If

16   something is out of whack the polys will go out and regulate,

17   correct?

18   A    Correct.

19   Q    And in the case of polys, the polys regulate bacterial

20   infections, is that right?

21   A    In addition to the white blood cell count.

22   Q    Do you know what the polys regulate, Ms. McGowan?

23   A    They're a component of the white blood cell count.

24   Q    And they regulate bacterial infection, correct?

25   A    Yes.

1    Q    Now take a look at the value, right, according to this

2    particular lab because different labs have different values,

3    correct?

4    A    Correct.

5    Q    Now, according to this lab, right, the normal range for

6    polys is within 36 and 78 percent, is that right?

7    A    Yes.

8    Q    Now if you do the average, right, that's 57 percent,

9    correct?

10   A    Correct.

11   Q    Now Rafael Rodriguez' polys were elevated at a level of

12   81.7 percent, correct?

13   A    Yes.

14   Q    Now let's take a look at the second page.  Do you see where

15   it says (inaudible)?

16   A    Yes.

17   Q    His (inaudible) were at a level of 7.7 percent, correct?

18   A    Yes.

19   Q    And the (inaudible) regulated viral infections, correct?

20   A    Yes.

21   Q    And that's low, right?

22   A    Yes.

23   Q    That's what you call a shift, correct?

24   A    Yes.

25   Q    Your Honor, can we approach?

```
 1              THE COURT:  Certainly, Counselor.

 2              (Sidebar)

 3              MS. RAMEAU:  (Inaudible) if that's okay with the

 4   Court.

 5              THE COURT:  Well, I'd rather finish this witness

 6   (inaudible).

 7              MS. RAMEAU:  I'm almost done.  That's fine.  I wanted

 8   to take a bathroom break, but I can wait.

 9              THE COURT:  Let's finish this witness.

10              MS. RAMEAU:  Okay.  Great.

11              (End of Sidebar)

12   BY MS. RAMEAU:

13   Q    All right.  So I want to talk to you about the discussions

14   about the pretzels and the water, okay.

15   A    Okay.

16   Q    All right.  So early in the morning, right, about 3:00 in

17   the morning or so he had water and pretzels, is that right?

18   A    Yes.

19   Q    So, but later at night you heard information that he was

20   still vomiting.  I just want to be clear, right.

21   A    Yes.

22   Q    Later the night of the 17th, correct?  This was hours after

23   he had had the water and the pretzels, correct?

24   A    Correct.

25   Q    That he even vomited in the medical department, correct?
```

1    A     No, that was before he had the water and the pretzels.

2    Q     I'm sorry.

3    A     He vomited in the medical department before he received the

4    water and the pretzels.

5    Q     Well, let me show you a document to see if it refreshes

6    your recollection about when exactly he had the water and the

7    pretzels.  All right.  All right.  Ms. McGowan, take a look at

8    this document, PCM184, the same document you discussed with Mr.

9    Ninosky, okay.

10   A     Yes.

11   Q     Related to Rafael Rodriguez having the water and the

12   pretzels.

13   A     Yes.

14   Q     Now it says here that the document was created by Allison

15   Young, correct?

16   A     Yes.

17   Q     On April 17, 2015, correct?

18   A     Yes.

19   Q     At 2:12 in the morning, right?

20   A     Yes.

21   Q     So let's talk about when he vomited in medical.  Okay.  All

22   right.  So we already discussed the fact that -- okay.  So, now,

23   we already discussed the fact that Allison Young noted the fact

24   that he had the water and the pretzel in the chart at 2:00 in

25   the morning, correct?  Was it 2:30?

```
 1   A     It was 2:12.

 2   Q     It was 2:12.  Thank you.

 3   A     You're welcome.

 4   Q     So now it's just over an hour later at 3:37 in the same

 5   day.

 6          MR. NINOSKY:  May we approach, Your Honor?

 7          THE COURT:  Certainly.  Counsel, please approach.

 8          (Sidebar)

 9          MR. NINOSKY:  I'm anticipating that there's going to

10   be a mischaracterization of testimony.  Allison Young testified

11   that she entered the chart notes at 3:37.  The care that was

12   rendered was prior to that.  There was a whole line of questions

13   on cross-examination of Allison Young to try to nail down when

14   that was, but at no point did she ever say that the treatment

15   was at 3:37.  So she's going to try to mischaracterize Ms.

16   Young's testimony to say that now he was vomiting after 2:12,

17   which is when the chart note, the task was entered by Allison

18   Young.  It's simply not accurate and consistent with testimony

19   that's already in the record.

20          MS. RAMEAU:  I don't know what he's saying here.  I'm

21   just -- I'm trying to figure this out myself.

22          THE COURT:  Then he is suggesting that the witness is

23   (inaudible).

24          MS. RAMEAU:  Okay.  Okay.

25          MR. NINOSKY:  That's correct.  And that is borne out
```

1    by the testimony.

2             THE COURT:   (Inaudible).

3             MS. RAMEAU:   All right.

4             MR. NINOSKY:   Correct.  And that's what Allison Young

5    testified to already.

6             MS. RAMEAU:   So she entered the note that -- I'm

7    sorry.  She entered a note at 2:15 or 2:13 that he had the

8    pretzels, right.  And then -- so, I see, okay.

9             MR. NINOSKY:   She did two chart notes around 3:37-ish.

10   I forget when the second one is.  Documenting all of the

11   encounters.  All of that happened beforehand.  The task was --

12            MS. RAMEAU:   Is that you saying that or is that what

13   the evidence has shown?

14            MR. NINOSKY:   Your --

15            MS. RAMEAU:   Because if you remember correctly when we

16   were doing Allison Young --

17            THE COURT:   It's so close to lunch.  Let's get going.

18            MS. RAMEAU:   Okay.

19            MR. NINOSKY:   Yeah.  And that's why I don't want to go

20   down the wrong path with her mischaracterizing the testimony,

21   which is where this is going which is the purpose of my -- I'm

22   anticipating and I'm raising an objection if there's a

23   mischaracterization as to what we already have testimony on.

24            THE COURT:   Understood.  Thank you.

25            MS. RAMEAU:   So what's the ruling, Your Honor?

```
 1              THE COURT:  You can ask (inaudible).

 2              MS. RAMEAU:  Oh, is that what you're doing?  I'm about

 3   to mischaracterize.

 4              MR. NINOSKY:  Well, if she's going to say to this

 5   witness that 3:37 is --

 6              MS. RAMEAU:  I'll move on.

 7              (End of Sidebar)

 8              THE COURT:  Ms. Rameau, you may continue.

 9   BY MS. RAMEAU:

10   Q    Yes, Your Honor.  So if I understand your testimony

11   correctly, right, this note here, right, that's dated -- it's

12   time stamped rather 3:37 indicating that Rafael Rodriguez

13   vomited on K unit, which would be an hour and 27 something

14   minutes after the note we just discussed.  That's the time stamp

15   --

16              MR. NINOSKY:  Objection, Your Honor.  This is exactly

17   what we had --

18              MS. RAMEAU:  I'm discussing the timestamp.

19              MR. NINOSKY:  This is exactly what we had a sidebar

20   about.

21              THE COURT:  I believe the witness may be able to

22   resolve the issue.

23              MS. RAMEAU:  Clarify, right.

24              THE COURT:  I'll overrule the objection.

25   BY MS. RAMEAU:
```

1   Q     So you testified earlier that he had the pretzels at 2:13,

2   correct?

3   A     No, I did not testify that.  I testified earlier that the

4   task was generated by Allison Young at 2:12.

5   Q     Understood.  Okay.  So this entry here that is timestamped

6   3:37, right, indicating that Rafael Rodriguez was describing

7   brown and red vomit, even though it's later in time, it's

8   actually prior in occurrence, is that right?

9   A     Yes.

10  Q     Okay.

11  A     Because my note reflects -- the chart note reflects that it

12  was prior.

13  Q     I understand.  I just wanted to clarify that with you.

14  It's okay.  I'll move on now.  So he's brought over to medical,

15  to the medical department, and he's assessed, right, early in

16  the morning on April 17th.  Now let's just fast forward on April

17  17th to let's say 6:00 in the morning, correct?

18  A     Correct.

19  Q     Okay.  So you talked about med pass, right?

20  A     Correct.

21  Q     And there are nurses on the unit and they're passing out

22  medication, correct?

23  A     Yes.

24  Q     And your testimony is that he was assessed at 6:00 in the

25  morning, right?

```
 1   A     The note says the patient was --

 2   Q     The note says that, right?

 3   A     Yes.

 4   Q     And again at noon, right?

 5   A     Yes.

 6   Q     The note also indicates that he was feeling weak, had no

 7   appetite, but reported no more vomiting, right?

 8   A     Correct.

 9   Q     And it says that he's afebrile.

10   A     Yes.

11   Q     And that he had a small amount for lunch, correct?

12   A     Yes.

13   Q     Now did you put in a call to inquire specifically as to

14   what exactly a small amount for lunch meant?  You didn't, did

15   you?

16   A     I was not even aware of that note.

17   Q     Oh, you had no idea about it.

18   A     No.

19   Q     No idea.  Okay.  So let's move on.  Now you are home at

20   7:00 at night, right, and you get another phone call about

21   Rafael Rodriguez, correct?

22   A     Yes.

23   Q     This was after the pretzels, right?

24   A     Yes.

25   Q     Just so we're clear.  And it's after the water too, right?
```

```
1   A    And after lunch.

2   Q    And after the small lunch that you can't really

3   characterize because you don't really know what that means and

4   you didn't know anything about it, correct?

5             MR. NINOSKY:  Objection.  Argumentative.

6             THE COURT:  I'll sustain that argumentative objection.

7   BY MS. RAMEAU:

8   Q    Well, you just testified that you had no idea about that

9   particular note pertaining to the lunch, correct?

10  A    I just saw the note right now.

11  Q    Okay.  Now let's move on.  So this note here indicates that

12  at 7:00 p.m. he's still having abdominal pain, correct?

13  A    Yes.

14  Q    And that he's fussy and agitated, correct?

15  A    Correct.

16  Q    Now this is after the pretzels and after the water, right?

17  A    And after lunch.

18  Q    And after the small lunch that you can't really

19  characterize for the jury, correct?

20  A    And dinner that's not documented.

21  Q    And didn't know about, is that right?

22  A    Correct.

23             MR. NINOSKY:  Your Honor, can we approach?

24             THE COURT:  Sure.

25             (Sidebar)
```

```
 1              MR. NINOSKY:  I --

 2              MS. RAMEAU:  I just wanted to clarify, Your Honor.

 3              MR. NINOSKY:  I certainly understand being able to

 4    redirect.  It sounds to me like we're doing everything again.

 5    We have a busy schedule to try to keep on and we're just

 6    rehashing the same stuff over and over.

 7              THE COURT:  (Inaudible).  How much more do you have,

 8    Counsel?

 9              MS. RAMEAU:  I'm sorry, Your Honor.

10              THE COURT:  How much more do you have?

11              MS. RAMEAU:  Not much at all.  Not much at all.  I'm

12    almost done.

13              THE COURT:  (Inaudible).

14              MR. NINOSKY:  Right now there might not be any, but

15    we'll have to see.

16              MS. RAMEAU:  Okay.  Thank you.

17              (End of Sidebar)

18    BY MS. RAMEAU:

19    Q    You had a discussion with Mr. Ninosky about, you know, how

20    to determine whether you send a patient to the hospital.  Do you

21    remember that?

22    A    Yes.

23    Q    And you testified that in order to decide whether to send

24    someone to a hospital you base your decision on a multitude of

25    things, right?
```

1   A     Yes.

2   Q     You don't just send a patient to a hospital because the

3   patient says, "I want to go to the hospital," correct?

4   A     Correct.

5   Q     That's reasonable, right?

6   A     Right.

7   Q     But you will agree that if a patient is begging to go to a

8   hospital that that might be an indication that the patient is

9   not doing well, correct?

10  A     Correct.

11  Q     It might be an indication that whatever the RNs and the

12  LPNs had been doing is not working for the patient, right?

13  A     Correct.

14  Q     You wouldn't assume that a patient is lying, right?  You

15  wouldn't assume that a patient is malingering, right?

16  A     No.

17          MR. NINOSKY:  Objection, Your Honor.

18          THE COURT:  I'll overrule the objection.  Let's finish

19  up and we'll get to lunch.

20  BY MS. RAMEAU:

21  Q     Yes, Your Honor.  Now you had a discussion with Mr. Ninosky

22  about testicular pain.  Do you remember that?

23  A     Yes.

24  Q     That Mr. Rodriguez had a testicular exam, right?

25  A     It was documented, yes.

1  Q    That was documented, an examination of his testicles,

2  right?

3  A    Yes.

4  Q    Conducted by a male nurse by the name of Chad Walters, is

5  that right?

6  A    Yes.

7  Q    Now you were here yesterday when your Codefendant Susan

8  Roberts testified that she doesn't know whether she discussed

9  with Chad Walters the fact that in addition to experiencing

10 testicular pain that Rafael Rodriguez was also having abdominal

11 pain, correct?

12 A    Yes.

13 Q    She testified that she has no idea whether she put it in

14 the proper context, right, for Nurse Chad Walters, correct?

15              MR. NINOSKY:  Objection, outside the scope.

16              THE COURT:  Counsel, this is outside the scope of the

17 cross-examination.

18              MS. RAMEAU:  He asked her about testicular pain, Your

19 Honor.  It's within the scope.

20              THE COURT:  Well, that's true.  He didn't talk to her

21 about the actual -- he didn't talk to her --

22              MR. NINOSKY:  But it's also mischaracterization as

23 well.

24              MS. RAMEAU:  Can we approach?

25              THE COURT:  No, let's not approach.  I'll overrule the

1    objection.  You may continue with your examination.

2    BY MS. RAMEAU:

3    Q    Thank you.  So you really -- you have no idea if and to

4    what extent your Codefendant, Susan Roberts, put Plaintiff's

5    complaint of testicular pain within the proper context with the

6    abdominal pain, correct?

7    A    Correct.

8    Q    And I'm not so much concerned about Chad Walters.  I'm

9    concerned about you.  Did you put Plaintiff's complaint --

10          MR. NINOSKY:  Objection, Your Honor.

11          THE COURT:  I think the start of that was

12   objectionable, but I'll overrule the objection for now and allow

13   you to finish your question.

14   BY MS. RAMEAU:

15   Q    Thank you, Your Honor.  Did you put Plaintiff's complaint

16   of testicular pain within the proper context with the abdominal

17   pain within your own mind?

18   A    Yes.

19   Q    And in spite of that, you weren't even thinking about an

20   appendicitis, right?

21   A    It was --

22   Q    It's withdrawn.  I'll withdraw it.  Now I want to talk to

23   you about this discussion you had with Mr. Ninosky about

24   patients on the medical unit being seen four times a day.  Do

25   you remember that?

1    A    Yes.

2    Q    So four times a day an inmate on the medical unit is seen

3    by either an RN, correct?

4    A    They have a nursing encounter four times a day.

5    Q    An LPN, correct?

6    A    He had a nursing encounter four times a day.

7    Q    I'm asking you generally, okay.

8    A    Yes.

9    Q    So four times a day an inmate on the medical unit --

10   A    Well, generally patients don't have encounters on the

11   medical unit four times a day with nurses.

12   Q    Okay.  So this is a special case, right?

13   A    This was increased monitoring.

14   Q    Increased monitoring, right?  So he was having increased

15   monitoring with RNs and LPNs, right?

16   A    Yes.

17   Q    Because you thought there was a concern, right?

18   A    I thought there was -- the patient had continued

19   complaints.

20   Q    Yet you didn't make yourself available to conduct your own

21   provider's assessment, right?

22   A    Correct.

23   Q    I mean, you testified that he got to see all these people,

24   but he didn't see you, right?

25   A    Correct.

```
 1   Q    You're the provider, correct?  You're the one with the
 2   knowledge and experience.
 3   A    It was not necessary for Mr. Rodriguez to see me.
 4   Q    Withdrawn.  I'll withdraw the question.  I'll move on.
 5            MR. NINOSKY:  Your Honor, you can't withdraw a
 6   question in the middle of an answer.  I object to the withdrawal
 7   of a question.
 8            THE COURT:  Ms. Rameau, that is the --
 9            MS. RAMEAU:  I can withdraw that question.  It's
10   withdrawn.
11            THE COURT:  That form of questioning would be
12   improper, but I'll allow you to continue.
13   BY MS. RAMEAU:
14   Q    You had a discussion with Dr. Ninosky about the average
15   person calling a doctor and, you know, getting an appointment
16   within two days.  Do you remember that?  Do you remember that?
17   A    Yes.
18   Q    Now, the average person is not incarcerated and locked up
19   in a cell, right?
20   A    Correct.
21   Q    So the average person can go to the emergency room,
22   correct?
23   A    Or they can stay at home on their couch and drink Gatorade.
24   Q    The average person can go to the emergency room, correct?
25   A    Yes.
```

```
1   Q     And be subjected to a CT scan, correct?

2   A     Yes.

3   Q     Revealing the proper diagnosis, correct?

4   A     Yes.

5   Q     Nothing further.

6              THE COURT:  Thank you very much, Counselor.

7              Mr. Ninosky, do you have any further questions of this

8   witness?

9                          RECROSS-EXAMINATION

10  BY MR. NINOSKY:

11  Q     Was the CT scan the first thing ordered at the hospital

12  from what you heard yesterday?

13  A     No.

14             MS. RAMEAU:  Objection.

15             THE COURT:  Basis?

16             MS. RAMEAU:  It's withdrawn, Your Honor.

17             THE COURT:  Very well.  Counsel, you may proceed.

18  BY MR. NINOSKY:

19  Q     You heard that it wasn't a CT scan, was it?

20  A     No.

21  Q     It was an x-ray.

22  A     Correct.

23  Q     And it was to rule out a small bowel obstruction, correct?

24  A     Correct.

25  Q     And you heard that a small bowel obstruction was a
```

1    reasonable thing to consider, huh?

2    A    Yes.

3    Q    Those are all I have.  Thank you.

4            THE COURT:  Thank you, Counselor.

5            Anything further of this witness?

6                    FURTHER REDIRECT EXAMINATION

7    BY MS. RAMEAU:

8    Q    Now, Mr. Ninosky asked you about a CT scan or an x-ray

9    being ordered first at the hospital.  Do you remember that?

10   A    Yes.

11   Q    And you have x-ray machines, portable x-ray machines

12   available to you at the facility, right?

13   A    Correct.

14   Q    And you never ordered that he be x-rayed, correct?

15   A    The patient had bowel sounds.

16   Q    You never ordered that he be -- the question was --

17   A    His vital signs were stable.  There was no report to me

18   through the weekend of nausea or vomiting.

19   Q    Your Honor.  Ms. McGowan, my question was you didn't order

20   an x-ray for Mr. Rodriguez, did you?

21   A    No.

22   Q    Nothing further.

23           THE COURT:  Thank you, Counselor.

24           Mr. Ninosky.

25           MR. NINOSKY:  Nothing further, Your Honor.  Thank you.

1          (Witness excused.)

2          (End of witness testimony 12:24 p.m.)

3                         *  *  *  *  *

# C E R T I F I C A T I O N

I, Crystal Thomas, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

*Crystal Thomas*

_____

Crystal Thomas, CET-654

Date:  June 9, 2017